UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| SAN LUIS & DELTA-MENDOTA WATER AUTHORITY, *et al.*, <br>     Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, <br>     Defendants. | CASE NO. 1:11-cv-00952-OWW-GSA <br><br> FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (DOCS. 8 & 9) |

## I. INTRODUCTION

This case concerns the operation of the Central Valley Project ("CVP"). Plaintiffs San Luis & Delta-Mendota Water Authority ("Delta-Mendota") and Westlands Water District ("Westlands") (collectively "Plaintiffs") seek a temporary restraining order ("TRO") and a preliminary injunction to compel Defendants U.S. Department of the Interior ("Interior"), U.S. Fish & Wildlife Service ("FWS" or the "Service"), and U.S. Bureau of Reclamation ("Reclamation") (collectively "Federal Defendants") to increase pumping at the C.W. "Bill" Jones Pumping Plant pursuant to section 3411(b) of the Central Valley Project Improvement Act ("CVPIA"), Pub. L. No. 102-575, § 3411(b), 106 Stat. 4600, 4731 (1992). *See* Compl. ¶ 42 (Doc. 1). Representatives from Environmental Defense Fund ("EDF") and the Save San Francisco Bay Association ("Save the Bay") (collectively "Environmental Defendants") participated telephonically in the hearing on the Plaintiffs' motions held on June 15, 2011.

After consideration of the written briefs of the parties, supporting declarations and exhibits, oral arguments, materials contained in the entire record, the Federal Defendants' proposed findings of fact and conclusions of law, and the Plaintiffs' and Environmental Defendants' responses thereto, the following findings of fact and conclusions of law concerning the preliminary injunction motion are entered. To the extent any finding of fact may be interpreted as a conclusion of law or any conclusion of law interpreted as a finding of fact, it is so

intended.

## II.  BACKGROUND

The CVP, which is operated by Reclamation, is the largest water storage and delivery system in California, servicing twenty-nine of the state's fifty-eight counties. Compl. ¶ 21. The CVP consists of twenty reservoirs with a combined storage capacity of over eleven million acre-feet ("af") of water; eleven power plants; and five hundred miles of major canals, aqueducts, and tunnels. *Id.* ¶ 21. CVP water irrigates approximately 3.25 million acres of farmland and supplies water to millions of people, including many in the Central Valley. *Id.* ¶ 24. According to the allegations in the Plaintiffs' Complaint, ninety percent of CVP water is used for agricultural purposes. *Id.* ¶ 24. For years, Reclamation has coordinated its operation of the CVP with the California Department of Water Resources' ("DWR") operation of the California State Water Project ("SWP"). *Id.* ¶ 22. The SWP is the largest state-operated water supply network in the United States, consisting of thirty-two storage facilities, reservoirs, and lakes, seventeen pumping plants, three pumping-generating plants, five hydroelectric power plants, and about 660 miles of pipelines and open canals throughout the state. *Id.*

Together, the CVP and SWP store and move water within the State of California, including from Northern California to water users in Central and Southern California. *Id.* ¶ 23. Much of this water is moved south of the San Francisco Bay Delta, near where the Sacramento and San Joaquin Rivers meet, by two pumping stations located near Tracy, California; one, the Banks Pumping Facility, is a SWP facility, while the other, the Jones Pumping Plant, is a CVP facility. *Id.* ¶¶ 21-23.

Plaintiff Delta-Mendota consists of thirty-two entities that have executed contracts with Reclamation for the delivery of water supply from the CVP. *Id.* ¶ 10. Water delivered to Delta-Mendota's members by the CVP is used in all or part of San Joaquin, Stanislaus, Merced, Fresno, Kings, San Benito, and Santa Clara Counties. *Id.* Pursuant to a March 1998 agreement between Delta-Mendota and the United States, Delta-Mendota operates the Jones Pumping Plant and other related facilities of the CVP. *Id.* Plaintiff Westlands is a California water district and member of Delta-Mendota which has executed with Reclamation a water service contract for the

delivery of project water from the CVP. Westlands is supplied primarily via CVP pumps and facilities in the Delta and, to a lesser extent, via SWP pumps and facilities in the Delta.

At issue in this action is a temporary fourteen-day pumping reduction at the Jones Pumping Plant, recommended by the FWS and other fish-protection agencies, specifically the National Marine Fisheries Service ("NMFS") and the California Department of Fish and Game ("CDFG") (collectively "fish agencies"), and directed by Reclamation through a change order to Delta-Mendota dated June 6, 2011. The change order instructed Delta-Mendota to reduce pumping at the Jones Pumping Plant from five units to three units for two weeks starting on June 8, 2011, resulting in a decrease in flow from 4200 cubic feet per second ("cfs") to 3000 cfs. Declaration of Paul Fujitani ("Fujitani Decl.") (Doc. 36) ¶ 5.

FWS made its recommendation to provide additional protection to out-migrating juvenile salmon and steelhead being lost or salvaged at the Jones Pumping Plant due to this year's abnormally wet hydrology and cooler water temperatures. Declaration of Roger Guinee ("Guinee Decl.") (Doc. 37) ¶ 4. FWS and the other fish agencies recommended the change in CVP operations, and Reclamation directed the change pursuant to the Secretary of the Interior's ("Secretary") authority under section 3406(b)(2) of the CVPIA, which requires the Federal Defendants to dedicate and manage 800,000 af of CVP yield annually for the primary purpose of implementing the CVPIA's fish, wildlife, and habitat restoration mandate. CVPIA § 3406(b)(2); *Bay Institute of San Francisco v. United States*, 87 Fed. Appx. 637, 640 (9th Cir. 2004); *see also* Fujitani Decl. ¶¶ 7, 10; Guinee Decl ¶¶ 6, 8.

On June 9, 2011, Plaintiffs filed suit in this Court, seeking both a TRO and a preliminary injunction to enjoin the pumping reduction at the Jones Pumping Plant and affirmative relief directing Reclamation to restore the flow at that plant to 4,200 cfs, its effective capacity. *See* Compl. ¶ 42. In making their claim, Plaintiffs rely on CVPIA section 3411(b), which they maintain acts as a limit on Interior's discretion under section 3406(b)(2) to decide how to dedicate and manage the 800,000 af of CVP yield for fish, wildlife, and habitat restoration. CVPIA §§ 3406(b)(2), 3411(b).

For the reasons that follow, Plaintiffs' motion for a preliminary injunction is DENIED.

3

Because the Court's Order resolves the preliminary injunction motion, there is no need for the Court to address separately the application for a TRO, which involves similar standards and is subsumed within the preliminary injunction.

### III.     LEGAL STANDARDS

#### A.     Jurisdiction

Jurisdiction over the subject matter of the claims against FWS and Reclamation exists under 28 U.S.C. § 1331, as this case arises under the CVPIA, Pub. L. No. 102-575, 106 Stat. 4600 (Oct. 30, 1992), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 *et seq*.

#### B.     Standards for Injunctive Relief

Injunctive relief is an "extraordinary remedy, never awarded as of right." *Winter v. Natural Res. Def. Council*, 129 S. Ct. 365, 376 (2008). To obtain a preliminary injunction, the moving party must establish four factors by a preponderance of the evidence: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm absent injunctive relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Id*. at 374; *Am. Trucking Ass'n v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). In general, "the test for determining if equitable relief is appropriate is whether an injunction is necessary to effectuate the congressional purpose behind the statute." *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 (9th Cir. 2002).

#### C.     The Applicable Standard of Review

In assessing the likelihood of success on the merits, Plaintiffs' claims are reviewed under the APA's highly deferential arbitrary and capricious standard of review. *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917 (9th Cir. 2008). Under the APA, reviewing courts may reverse agency action only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Courts should defer to the agency on matters within the agency's expertise unless the agency completely failed to address a factor that was essential to making an informed decision. *Nat'l Wildlife Fed'n v. NMFS*, 422 F.3d 782, 798 (9th Cir. 2005). A court "may not substitute its judgment for that of the agency concerning the wisdom or prudence of [the agency's] action." *River Runners for Wilderness v. Martin*, 593 F.3d

4

1064, 1070 (9th Cir. 2010), *citing Or. Envtl. Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987). As the Ninth Circuit continued in *River Runners for Wilderness v. Martin*:

> In conducting an APA review, the court must determine whether the agency's decision is "founded on a rational connection between the facts found and the choices made . . . and whether [the agency] has committed a clear error of judgment." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1243 (9th Cir. 2001). "The [agency's] action . . . need only be a reasonable, not the best or most reasonable, decision." *Nat'l Wildlife Fed'n v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989).

*Id.* at 1070.

Reviewing courts must be at their "most deferential" when an agency makes predictions, within its area of special expertise," at the frontiers of science." *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983); *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (*en banc*). As the Ninth Circuit held in *Lands Council v. McNair*, courts may not "'impose on the agency [their] own notion of which procedures are 'best' or most likely to further some vague, undefined public good.'" 537 F.3d at 993 (quoting *Churchill County v. Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001) (alteration in original) (quoting *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 549 (1978)). In particular, an agency's "scientific methodology is owed substantial deference." *See Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1066 (9th Cir. 2004). The deferential nature of a Court's inquiry is not altered at the preliminary injunction stage. *Lands Council v. McNair*, 537 F.3d at 987; *Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1093 (9th Cir. 2005) (finding that, in granting a preliminary injunction, "the district court committed legal error by failing to respect the agency's judgment and expertise").

"The deference accorded an agency's scientific or technical expertise is not unlimited." *Brower v. Evans*, 257 F.3d 1058, 1067 (9th Cir. 2001). Deference is not owed if "the agency has completely failed to address some factor consideration of which was essential to making an informed decision" *id.*., and courts are not required to defer to an agency conclusion that runs counter to that of other agencies or other individuals with specialized expertise in a particular technical area, *see, e.g., Am. Tunaboat Ass'n v. Baldrige*, 738 F.2d 1013, 1016-17 (9th Cir. 1984) (agency decision under the Marine Mammal Protection Act was not supported by substantial

5

evidence because agency ignored data that was product of "many years' effort by trained research personnel").

Although a court's analysis of likelihood of success in the context of an injunctive relief request is governed by the deferential APA's arbitrary and capricious standard, *see Lands Council v. McNair,* 537 F.3d 981, 987 (9th Cir. 2008); *Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1093 (9th Cir. 2005)), courts do not owe deference to federal agencies' positions concerning irreparable harm, balance of hardships, or public interest. In *Sierra Forest Legacy v. Sherman,* --- F.3d ----, 2011 WL 2041149 at *18 (9th Cir. 2011), the Ninth Circuit held that a district court "abused its discretion by deferring to agency views concerning the equitable prerequisites of an injunction." The Ninth Circuit reasoned that "[e]cology is not a field within the unique expertise of the federal government," and remanded for analysis "without deference" to the agency's experts "simply because of their relationships with the agency." *Id*. If government experts "were always entitled to deference concerning the equities of an injunction, substantive relief against federal government policies would be nearly unattainable." *Id*.

**D.    Statutory Framework and Legal Authority**

1.    In CVPIA § 3406(b)(2), Congress directed that the Secretary of the Interior:

> upon enactment of this title dedicate and manage annually eight hundred thousand acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title; to assist the State of California in its efforts to protect the waters of the San Francisco Bay/Sacramento-San Joaquin Estuary . . . .

106 Stat. 4714. Reclamation and the FWS implement the Secretary's authority under CVPIA § 3406(b)(2). The CVPIA does not limit its fish protection and doubling purposes only to ESA-protected species. Rather, CVPIA extends those protections to species that are not protected under the ESA, including fall-run Chinook salmon. Central Valley steelhead and Spring Run Chinook salmon are both listed species under the ESA. Transcript of Hearing on Motion for Preliminary Injunction ("Tr.") at 101 (June 15, 2011).

2.    In Section 3411(b) of the CVPIA, Congress directed that the Secretary:

> fully comply with the United States' obligations as set forth in the "Agreement

6

Between the United States of America and the Department of Water Resources of the State of California for Coordinated Operation of the Central Valley Project and the State Water Project" dated May 20, 1985, and the provisions of Public Law 99-546; and shall take no action which shifts an obligation that otherwise should be borne by the Central Valley Project to any other lawful water rights permittee or licensee.

3. The Agreement Between the United States of America and the Department of Water Resources of the State of California for Coordinated Operation of the Central Valley Project and the State Water Project ("Coordinated Operations Agreement" or "COA") provides, in Article 6(g), that "[d]uring excess water conditions each party has the responsibility to export and store as much water as possible within its physical and contractual limits." The COA defines "excess water conditions" as "periods when it is agreed that releases from upstream reservoirs plus unregulated flow exceed Sacramento Valley inbasin uses, plus exports." COA § 3(c). Federal Defendants agree, and the Court finds, that excess water conditions existed in the Delta during the fourteen-day period starting June 8, 2011 through June 22, 2011.

## IV. FINDINGS OF FACT

1. FWS, in cooperation with Reclamation, prepared a "fact sheet" explaining the biological rationale and other justifications for curtailing exports at the Jones Pumping Plant. Tr. at 102. The fall-run Chinook salmon, one of the fish species at issue, while not listed under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, is nevertheless declining in abundance. Tr. at 101:11-13; *see* Guinee Decl. Ex. 2 (Doc. 37-2). In 2000, nearly 40,000 fall-run Chinook salmon returned to the San Joaquin River and its tributaries to spawn; in 2010, that number had fallen to under 2,300 adult fish. *See id.* Compounding this significant decline, the 2011 water year has been abnormally wet. Compl. ¶ 2. Large numbers of fall-run Chinook salmon continued to migrate out of the San Joaquin River and its tributaries and into the Delta later into the year than usual; in fact, FWS biologists predicted that high spring runoff and cooler water temperatures associated with a wet year would mean that large numbers of fish migrating through the Delta would continue into June. Guinee Decl. Ex. 1, at 1 (Doc. 37-1).

2. Every year, a certain number of out-migrating juvenile fish are lost at the CVP and SWP pumps, which alter Delta channel flow patterns and draw fish into the facilities. *See* Guinee Decl. ¶¶ 4-5, 7. This year, however, out-migrating fish were being lost later in the

season than usual; based on FWS projections, nearly 3,700 wild, juvenile Chinook salmon were lost at the Jones Pumping Plant between mid-May and June 8, 2011.  Guinee Decl. Ex. 1, at 1 (Doc. 37-1).  In addition, smaller quantities of juvenile wild steelhead, an ESA-listed species, also were being salvaged at the CVP facility in late May and early June.  Guinee Decl. Ex. 1, at 1 (Doc. 37-1).

3. On June 2, 2011, pursuant to the process established by Interior for implementing Section 3406(b)(2), FWS scientists made a request that Reclamation adjust operations at the Jones Pumping Plant to protect fish migrating through the Delta.  *See* Guinee Decl. ¶ 3 (Doc. 37). Specifically, FWS recommended that Reclamation reduce pumping at the Jones Pumping Plant from 4,200 cfs to 1,000 cfs for two weeks.  Guinee Decl. ¶ 6.  FWS, along with the fish agencies, made this recommendation "to provide additional protections for juvenile Chinook salmon and steelhead that continue to emigrate from the San Joaquin and Sacramento [R]ivers due to this year's wet hydrology and cooler water temperatures."  Guinee Decl. ¶ 4.  The fish agencies made their recommendation due to concern over the status of San Joaquin fall-run Chinook salmon which, while not a listed species under the ESA, is a population nonetheless at "historic lows." Guinee Decl. ¶ 4; *see also id.* Ex. 2 (Doc. 37-2).  The CVPIA establishes a requirement that Interior double the natural populations of Central Valley anadromous fish species, including Fall Run Chinook. CVPIA Sec. 3406(b)(1)

4. The fish agencies made their recommendation pursuant to CVPIA section 3406(b)(2), which directs the Secretary of the Interior to "dedicate and manage annually eight hundred thousand acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration measures authorized by [the CVPIA]." CVPIA § 3406(b)(2).  The protections afforded to fish under section 3406(b) are not limited to ESA-listed species; rather, statutory protections extend to other species of anadromous fish, including the San Joaquin fall-run Chinook salmon, in light of the CVPIA's goal of doubling the natural populations of Central Valley anadromous fish species.  *See* CVPIA § 3406(b)(1).

5. As of the end of May 2011, Reclamation estimated that it had used no more than approximately 164,000 af of the 800,000 af of CVP yield allotted to it for fishery actions under

section 3406(b)(2) for the current water year, which concludes at the end of September 2011. Tr. at 100; Fujitani Decl. ¶ 7. The fish agencies' proposed reduction was scheduled to last for fourteen days, subject to a decrease in the temperature of the San Joaquin River at Mossdale, where it is measured, or a decline in the number of fish lost at the pumps. Guinee Decl. ¶ 7. A fourteen-day reduction in exports from five units (about 4200 cfs) to one unit (about 1000 cfs) at the Jones Pumping Plant could have resulted in a loss of storage of about 90,000 af, or about fourteen percent of the approximately 636,000 af remaining under Interior's section 3406(b)(2) allotment. Tr. at 100-01. A two-unit reduction in pumping from five units to three units (about 3000 cfs), over the course of the proposed two-week period, would result in a loss of storage of about 35,000 af, or about five percent of the approximately 636,000 af remaining under Interior's section 3406(b)(2) allotment. Tr. at 100-01.

  6. The 2011 water supply allocation for the south-of-Delta agricultural water service contractors, including Plaintiffs, is eighty percent of their contract amounts. The fourteen-day export pumping reduction would not result (nor is there evidence that it has resulted) in a reduction of the Plaintiffs' 2011 CVP water supply allocation. Tr. at 101.

  7. On June 9, 2011, Plaintiffs filed suit in this Court, seeking a TRO and a preliminary injunction to compel Federal Defendants to end the pumping reduction at the Jones Pumping Plant and to restore the pumping at that plant to 4200 cfs, its full capacity. *See* Compl. ¶ 42. Plaintiffs rely on CVPIA section 3411(b), which they maintain acts as a statutory limitation on Interior's discretion under section 3406(b)(2) to decide how to use the 800,000 af for fish and wildlife restoration. Plaintiffs contend that, in ordering a reduction in pumping, Federal Defendants failed to comply with COA's "mandatory, nondiscretionary duty" to pump and store as much water as possible during such conditions. *Id*. ¶ 1. Plaintiffs requested a Court order to compel the Federal Defendants to increase pumping at the Jones Pumping Plant to 4200 cfs. *Id*. ¶ 42.

**V. CONCLUSIONS OF LAW**

  **A. Plaintiffs Have Failed to Establish a Likelihood of Success on the Merits**

1.    To obtain the "extraordinary remedy" of injunctive relief, Plaintiffs first must show that they are likely to succeed on the merits of the case. *Winter*, 129 S. Ct. at 374, 376.

2.    In implementing the Secretary's authority under CVPIA § 3406(b)(2), FWS and Reclamation have the legal duty to dedicate and manage 800,000 af of CVP yield annually for the primary purposes listed in CVPIA § 3406(b)(2). *See Cent. Delta Water Agency v. Bureau of Reclamation*, 452 F.3d 1021, 1026 (9th Cir. 2006) ("The clear language of § 3406(b)(2) first *requires* [Interior] to dedicate and manage 800,000 acre-feet of Central Valley Project yield." (emphasis added) (quotation omitted)); *San Luis & Delta-Mendota Water Auth. v. U.S. Dep't of Interior*, 236 F.R.D. 491, 494 (E.D. Cal. 2006) ("Congress *mandates* that exactly 800,000 af of CVP yield be dedicated for (b)(2) purposes, whether primary or secondary. . . . The 800,000 af is intended by Congress as an immutable floor and ceiling on annual reallocation of water from CVP yield for (b)(2) purposes." (emphasis added) (quotation omitted)).

3.    Absent certain statutorily defined circumstances, Federal Defendants have "no discretion whether to annually provide more or less than 800,000 af of CVP yield . . . for (b)(2) purposes." *San Luis & Delta-Mendota*, 236 F.R.D. at 494. Interior has the discretion to determine annually how much of that 800,000 af of CVP yield to devote to the various purposes listed under section 3406(b)(2). *Id.*; *see also Cent. Delta Water Agency*, 452 F.3d at 1027 ("Congress granted [Interior] considerable discretion in determining how to meet those obligations."). The "primary purpose" of the 800,000 af of annual CVP yield set aside under section 3406(b)(2) is "implementing the fish, wildlife, and habitat restoration purposes and measures authorized by [the CVPIA]." Federal Defendants have discretion to determine how best to implement the Secretary's authority to determine what fish actions meet the primary purpose of CVPIA § 3406(b)(2), subject to the requirement that their implementation is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

4.    The FWS and other fish agencies recommended, and Reclamation ordered, the pumping reduction at the Jones Pumping Plant pursuant to the Secretary's authority under CVPIA § 3406(b)(2). Pursuant to that provision, Reclamation and the fish agencies participated

in the decision-making process and collectively concluded that a pumping reduction would benefit the fish. *See* Guinee Decl. Ex 1, at 1. DWR did not oppose the reduced pumping of CVP water at the Jones Pumping Plant. The FWS, in cooperation with Reclamation, prepared a "fact sheet" that provided the biological rationale and other lawsuit justifications for the export reduction. Tr. at 102:9. Based on the fact sheet and the entire record, the Court cannot conclude that FWS's recommendation and Interior's direction to reduce pumping was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

5. Plaintiffs argue that the COA, which Congress directed the Secretary to implement in CVPIA § 3411(b), acts to limit the Secretary's discretion to dedicate and manage the 800,000 af of annual CVP yield for section 3406(b)(2) purposes in times of excess water conditions. *See* Compl. ¶ 42. Under CVPIA § 3406, there is a mandatory duty for the Secretary to dedicate and manage 800,000 af of CVP yield annually for section 3406(b)(2) purposes. Indeed, "[t]o hold otherwise would defeat the primary purpose for which the 800,000 af were designated." *San Luis & Delta-Mendota Water Auth. v. U.S. Dep't of Interior*, 637 F. Supp. 2d 777, 781 (E.D. Cal. 2008), *appeal docketed*, No. 09-17594 (9th Cir. Nov. 18, 2009) (argued Mar. 15, 2011) (quotation omitted) (citing *Bay Inst. of San Francisco v. United States*, 87 Fed. Appx. 637 (9th Cir. 2004). The interplay of the CVPIA and COA is a highly disputed question of law.

6. The COA's statutory duty "to export and store as much water as possible" during excess water conditions is not temporally limited, as the current 2011 water year does not end until September 30, 2011. There also is no mandate in the CVPIA or COA as to which reservoir Reclamation is required to select, north of the Delta versus south of the Delta, to store any such water during the pendency of the excess water conditions. Tr. at 100:19-22. Plaintiffs do not have an absolute right to fill San Luis Reservoir, and there has been no showing by Plaintiffs that Interior will fail to exercise its discretion in an appropriate manner or that the agency lacks the capacity to do so. There is no evidence that the Federal Defendants will fail to comply with the CVPIA and the COA. There also is no showing by Plaintiffs that any "other lawful water rights permittee or licensee" will be burdened by the reduced pumping. CVPIA § 3411(b). Nor is there any showing by Plaintiffs that their 2011 allocation of CVP water for agricultural purposes,

which currently stands at eighty percent of their contract amount, will be affected by the pumping reduction.

7. While Federal Defendants must fully comply with the provisions of CVPIA section 3411(b) of the COA, including the mandate in Article 6(g) to export and store as much water as possible during excess water conditions, Federal Defendants also have a separate, mandatory obligation under section 3406(b)(2) to dedicate and manage 800,000 af of CVP yield annually for the primary fish, wildlife, and habitat restoration purposes authorized by the CVPIA. At the time of the hearing, Federal Defendants had more than 600,000 af of CVP yield remaining for section 3406(b)(2) purposes in the 2011 water year. Based on all of these considerations, the Court concludes that the Plaintiffs have failed to demonstrate that they are likely to succeed on the merits of this case.

8. The Court's conclusions regarding likelihood of success on the merits, made in the context of expedited and limited briefing and on a limited record, are without prejudice to further argument of the same issues later in this proceeding.

**B.    Plaintiffs Have Not Shown Irreparable Harm Absent Injunctive Relief**

9. Plaintiffs seeking injunctive relief also must establish that they are likely to suffer irreparable harm absent injunctive relief. *Winter*, 129 S. Ct. at 374. Such harm must be "actual or imminent, not conjectural or hypothetical." *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 (9th Cir. 2011) (quoting *Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1149 (2009)). Indeed, "[s]peculative injury cannot be the basis for a finding of irreparable harm." *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007).

10. Here, Plaintiffs argue that the water not pumped during the fourteen-day reduced pumping period will be "irrevocably and irretrievably lost and unavailable to Plaintiffs for allocation in the 2011-2012 water year and water years thereafter." Compl. ¶ 42. There is no evidence that Plaintiffs' 2011 CVP water allocation, which is currently eighty percent of their contract entitlement, will be affected by the reduced pumping.

11. Plaintiffs expressly argue that the estimated 35,000 af of water lost due to foregone pumping during the fourteen-day pumping during reduction will "increase the risk and

potential of *future* shortages." Pls.' Memo at 6 (emphasis added). Plaintiffs concede that the "full, additional impacts of this loss of water . . . will depend upon ongoing operations and hydrology." *Id*. The Court concludes that this is exactly the sort of "conjectural or hypothetical" harm that the Ninth Circuit found could not constitute irreparable harm in *Center for Food Safety v. Vilsack*. Plaintiffs cannot prove that even this future risk of potential harm is certain, much less likely, to occur. Based on these considerations, the Court cannot conclude that Plaintiffs are likely to suffer irreparable injury absent injunctive relief.

### C. The Balance of Hardships Does Not Tip in Plaintiffs' Favor

12.  To obtain injunctive relief, Plaintiffs must further show that the balance of equities tips in their favor. *Winter*, 129 S. Ct. at 374. Here, the Court concludes that Plaintiffs' injury, to the extent that it exists, is inchoate and will not occur, if at all, for months.

13.  From mid-May to June 8, 2011, nearly 3,700 wild, juvenile fall-run Chinook salmon were lost at the Jones Pumping Plant. Guinee Decl. Ex. 1, at 1. Since the pumping reduction took effect on June 8, 2011, a steady decline occurred in the number of juvenile fall-run Chinook salmon lost at the plant. *See* Guinee Decl. Ex. 3 (Doc. 37-3). The balance of equities does not tip in Plaintiffs' favor.

### D. The Public Interest Does Not Favor Injunctive Relief.

14.  Finally, Plaintiffs must show that an injunction is in the public interest if they are to obtain injunctive relief. *Winter*, 129 S. Ct. at 374. In this case, though, the competing public interest considerations appear to be balanced on both sides of the equation. As Plaintiffs urge, there is a public interest in ensuring that Federal Defendants comply with the law. *See Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010) ("The public interest is served by ensuring that governmental bodies comply with the law."). The public certainly has an interest in seeing that the CVPIA and the COA are implemented and that Plaintiffs' interests, under their water service contracts, are protected. But the public – including the people of California – has an important interest in keeping water in storage, subject to the other statutory requirements that affect Interior's management of the CVPIA. The public also has an important interest in ensuring that Federal Defendants comply with all statutory objectives of the CVPIA,

including the requirement to double Central Valley anadromous fish populations.  Balancing these competing considerations, the Court finds that the overall public interest is best served by denying Plaintiffs' request for immediate injunctive relief at this time.

## VI.   CONCLUSION

For the foregoing reasons, Plaintiffs' motion for preliminary injunction is DENIED.

IT IS SO ORDERED.

Dated:   September 6, 2011                             /s/ Oliver W. Wanger
                                                                        UNITED STATES DISTRICT JUDGE