1

2

3

4

5

6                          **UNITED STATES DISTRICT COURT**

7                     **FOR THE EASTERN DISTRICT OF CALIFORNIA**

8

9    **SAN LUIS & DELTA-MENDOTA WATER**          **1:11-cv-00952 LJO GSA**
     **AUTHORITY,** *et al.,*

10                                              **ORDER RE DEFENDANTS' MOTION**
               **Plaintiffs,**                  **TO DISMISS (DOC. 56)**

11

12        **v.**

13   **UNITED STATES DEPARTMENT OF THE**
     **INTERIOR,** *et al.,*

14
               **Defendants.**

15

16                                  **I. INTRODUCTION**

17        This case presents a conflict between two provisions of the 1992 Central Valley Improvement

18   Act ("CVPIA"), Pub. L. No. 102-575, 106 Stat. 4700 (1992).  CVPIA § 3406(b)(2) requires the

19   Secretary of the Interior to dedicate 800,000 acre feet ("AF") of water to serve certain fish and wildlife

20   restoration purposes.  CVPIA § 3411(b) requires the Secretary to comply with a 1985 Agreement

21   Between the United States of America and the Department of Water Resources of the State of California

22   for Coordinated Operation of the Central Valley Project and the State Water Project (otherwise

23   referenced as "Coordinated Operations Agreement" or "COA")[1], which in turn requires the Bureau of

24

25

26   _____

27   [1] A copy of the COA is attached to the First Declaration of James Snow, Doc. 14, as Exhibit 1.  This document may be
     considered at this stage of the litigation, as it is relied upon extensively in the complaint and its authenticity is not questioned.
     *Parino v. FHP, Inc.*, 146 F.3d 699, 705-706 (9th Cir. 1998), superseded by statute on other grounds as stated in *Abrego*

28   *Abrego v. The Dow Chem. Co*., 443 F.3d 676, 681 (9th Cir. 2006).

                                              1

Reclamation ("Bureau") to export as much water as possible when the Delta is in "excess water"[2] conditions.

Plaintiffs, San Luis & Delta-Mendota Water Authority ("Authority") and one of the Authority's Member Districts, Westlands Water District ("Westlands"), filed this lawsuit on June 6, 2011, during a period when the Delta was in "excess water conditions," complaining that, contrary to the mandate in CVPIA § 3411(b) to export as much water as possible, Defendants ordered reduced export pumping for a two-week period starting on June 8, 2011, pursuant to the Secretary's authority under § 3406(b)(2). Plaintiffs' motion for preliminary injunctive relief was denied, *see* Doc. 38 & 49, and the pumping reduction expired of its own accord.

Defendants now move to dismiss this case as moot. Doc. 56. Plaintiffs oppose the motion and attach the supporting declaration of James Snow. Docs. 57 & 57-1. Defendants replied. Doc. 58. The motion was originally set for hearing on February 24, 2012, but the hearing was vacated and the matter submitted for decision on the papers. On March 5, 2012, supplemental declarations were requested to address the narrow issue of whether Federal Defendants have ever before, apart from the June 2011 instance that is the subject of the Complaint, ordered reduced pumping during excess conditions based purely on the Secretary's authority under CVPIA § 3406(b)(2). Doc. 61. In accordance with the deadlines set forth in the March 5, 2012 Order, Plaintiffs filed the Supplemental Declaration of James Snow on March 30, 2012. Doc. 64. Federal Defendants filed the Supplemental Declaration of Paul Fujitani on April 9, 2012. The matter is now ripe for decision.

## II. BACKGROUND

CVPIA § 3406 (b)(2) has been extensively litigated in this Court and the Ninth Circuit. A brief primer on that provision and related litigation provides context for this case.

---

[2] "Excess water conditions," are defined in the COA as "periods when it is agreed that releases from upstream reservoirs plus unregulated flow exceed Sacramento Valley inbasin uses plus exports." COA ¶ 3(c), Doc. 14-1 at p. 7 of 46.

**A.     Statutory Text.**

CVPIA section 3406(b)(2) provides:

> (b) FISH AND WILDLIFE RESTORATION ACTIVITIES.--The Secretary [of the Interior], immediately upon the enactment of this title, shall operate the Central Valley Project to meet all obligations under state and Federal law, including but not limited to the Federal Endangered Species Act, 16 U.S.C. 1531, *et seq*., and all decisions of the California State Water Resources Control Board establishing conditions on applicable licenses and permits for the project.  The Secretary, in consultation with other State and Federal agencies, Indian tribes, and affected interest, is further authorized and directed to:

> ***

> (2) upon enactment of this title dedicate and manage annually eight hundred thousand acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title; to assist the State of California in its efforts to protect the waters of the San Francisco Bay/Sacramento-San Joaquin Estuary; and to help meet such obligations as may be legally imposed upon the Central Valley Project under state or federal law following the date of enactment of this title, including but not limited to additional obligations under the federal Endangered Species Act....

Pub. L. No. 102-575, § 3406(b)(2), 106 Stat. 4700, 4714 (1992).

**B.     Prior District Court and Ninth Circuit Rulings.**

Decisions in consolidated cases concerning § 3506(b)(2) comprehensively recount this history of previous litigation:

> The CVPIA took effect October 31, 1992.  In 1998, Plaintiffs in [*San Luis & Delta-Mendota Water Authority, et al. v. United States Dept. of the Interior, et al.,* 1:97-cv-6140] challenged Federal Defendants' October 5, 1999 "Final Decision on Implementation of Section 3406(b)(2)...," contending that Federal Defendants were required to credit against the 800,000 AF allocation of CVP yield all water used to satisfy either the 1995 Water Quality Control Program for the San Francisco Bay/ Sacramento-San Joaquin Estuary ("1995 WQCP") or post-CVPIA Endangered Species Act ("ESA") requirements.  *See* Doc. 466 at 26.  The district court granted Plaintiffs' motion for summary judgment, concluding: "[A]s a matter of law, [the statutory] language is not ambiguous -- water used to meet WQCP or post-CVPIA ESA requirements is an additional (b)(2) purpose and <u>must</u> be charged against the 800 TAF [thousand acre-feet] (b)(2) mandate if so used." *Id*. at 33.  The district court further found that to "hold otherwise would render the 800 TAF figure superfluous." *Id*. at 35.  On March 20, 2002, partial final judgment was entered in favor of Plaintiffs on that claim, and the issue was certified for interlocutory appeal to the Ninth Circuit.  Doc. 491 at 4.

> On appeal, Environmental Plaintiffs [in a consolidated action] argued that the district court "improperly elevated the subordinate purpose of the (b)(2) dedication over the primary purpose."  Envt'l Appellants' Opening Brief, 2002 WL 32123196 *36 (9th Cir. Dec. 23, 2002).  In response, Plaintiffs argued that "the plain words of the statute dictate and Congress intended that all water used to assist the State in protection of the

3

Bay/Delta, or to meet obligations (including ESA obligations) legally imposed upon the CVP under State or Federal law following the date of enactment of CVPIA, would be counted toward the 800,000 acre-feet limit." Appellants' Brief in Answer to Envt'l Appellants' Opening Brief, 2003 WL 21471613 *27, (9th Cir. Jan. 30, 2003). In reply, Environmental Plaintiffs emphasized that "the CVPIA cannot defeat the statute's specific and non-discretionary directions to Interior to use the 800,000 AF for the 'primary purpose' of implementing the CVPIA's new restoration measures, and to achieve the CVPIA's salmon doubling mandate." Envt'l Appellants' Reply Brief, 2003 WL 21471615 *13 (9th Cir. Feb. 18, 2003).

The Ninth Circuit, in a ruling initially issued June 3, 2003 and amended January 23, 2004, affirmed the district court's partial final judgment on four of five issues, but reversed regarding (b)(2) accounting discretion:

> The district court erred in concluding that Interior lacks discretion to refrain from crediting the amount of Project yield actually used for any (b)(2) purpose against the designated 800,000 acre feet of Project yield. To hold otherwise would defeat the primary purpose for which the 800,000 acre feet were designated–fish, wildlife, and habitat restoration. Section 3406(b)(2) provides that the "primary purpose" to which the 800,000 acre feet should be dedicated is the implementation of "fish, wildlife, and habitat restoration purposes authorized by this title..." Section 3406(b)(2) also provides that the 800,000 acre feet may be used to "help" meet obligations under the Endangered Species Act and to "assist" in meeting water quality standards. If Interior were required to deduct some or all the water it uses for water quality and Endangered Species Act purposes from the (b)(2) dedication, the water needed for implementation of the [] Act's restoration mandate could be relegated to a secondary role, or perhaps no role at all. Such a scenario would directly conflict with the Interior's mandate to give effect to the hierarchy of purposes established in Section 3406(b)(2).

*Bay Institute of San Francisco v. United States*, 87 Fed. Appx. 637 at 639-40 (9th Cir. 2004)[].

*San Luis & Delta-Mendota Water Authority, et al. v. United States Dept. of the Interior, et al.,* 1:97-cv-6140, Doc. 711, at 1-5 ("(b)(2) Case").

After remand, a September 19, 2008 ruling in the (b)(2) Case addressed cross-motions for summary judgment in light of the Ninth Circuit's ruling:

> Plaintiffs [in *San Luis & Delta-Mendota Water Authority,* 1:97-cv-6140] assert that "primary purpose" should be interpreted broadly, to include the 159,200 AF designated as "Non-B2 Fishery Actions" in late June and August/September 2004, because those actions benefitted fish. (Doc. 681 at 9.) They suggest that any water used to meet WQCP and/or ESA purposes must be counted unless doing so would not serve any fish, wildlife, and habitat restoration purposes, or if counting the water toward the 800,000 AF limit would "significantly impair" the primary restoration purposes. (*Id.*) However, when "water is used pursuant to the mandates of the [WQCP] or the ESA to further fish and wildlife restoration," Plaintiffs maintain that such use "serves the primary purpose and effectuates the hierarchy of purposes set in section 3406(b)(2)." (*Id.* at 7.) Plaintiffs maintain that the Ninth Circuit could not have intended to emasculate the 800,000 AF limit by granting Interior "unfettered discretion to exclude from its accounting of (b)(2)

4

water any water dedicated to fulfill environmental obligations emanating from other statutes." (*Id.* at 8.) This, they argue, would run afoul of the cannon of statutory construction that requires effect be given to every provision in a statute.

Federal Defendants rejoin that Interior properly exercised its discretion to designate the 159,200 AF as "Non-B2 Fishery Actions" in late June and August/September 2004, because that water did not serve the "primary purpose" of the CVPIA. (*See* Doc. 658-3 at 24.) Federal Defendants argue that the Ninth Circuit's decision construed (b)(2) broadly to uphold the agency's ability to carry out the CVPIA's "restoration mandate," holding that if "Interior were required to deduct some or all of the water it uses for water quality and Endangered Species Act purposes from the (b)(2) dedication," then the water needed to implement the restoration mandate could be relegated to a secondary role, or perhaps no role at all." 87 Fed. Appx. at 640. That result, "would directly conflict with Interior's mandate to give effect to the hierarchy of purposes established in Section 3406(b)(2)." *Id.* Federal defendants insist that the Court of Appeals' decision must be read as a command to Interior to ensure that it exercises its discretion in a manner that will not frustrate the primary purpose of fish, wildlife and habitat restoration. This is a partial truth, as the 800,000 AF cap on CVP yield that must be annually dedicated to (b)(2) purposes is not discretionary and can only be reduced in times of water shortage.

Environmental Plaintiffs add that the primary purpose of the CVPIA is anadromous fish doubling and that Interior retains the discretion to refrain from counting actions that use CVP yield for other purposes if doing so would give effect to the hierarchy of purposes. (Doc. 686 at 9.) Environmental Plaintiffs [in the consolidated action] emphasize that "since the Ninth Circuit has expressly held that Interior may -- indeed must -- prioritize (b)(2) water for the CVPIA's restoration mandate beyond mere compliance with the CVP's water quality obligations, there will be years in which the sum of the actions taken under Section 3406(b)(2), the WQCP, and the ESA will exceed 800,000 AF." (*Id.* at 6.) Environmental Plaintiffs maintain that "[t]here is nothing illegal or inappropriate about this. Interior is required to provide water for fishery purposes under several statutes. As the appellate court decided, Section 3406(b)(2) did not simply subsume the CVP's water quality obligations. Contrary to the position of [the Authority], the 800,000 AF dedication is not a cap on the CVP's environmental water obligations." (*Id.*)

The parties all agree that under the Ninth Circuit's decision, Interior retains some degree of discretion to refrain from deducting water from the (b)(2) account if doing so will give effect to the hierarchy of purposes in the CVPIA. The dispute in this case arises over the nature and extent of that discretion. The fundamental disagreement is, essentially, over the scope and meaning of the phrase "primary purpose," as that term is used in the Ninth Circuit's decision.

1:97-cv-06140, Doc. 711 at 33-36 (footnotes omitted).

The September 19 Decision in the (b)(2) Case defined the scope and meaning of the phrase

"primary purpose":

The Ninth Circuit explained in general that the "primary purpose to which the 800,000 acre feet should be dedicated is the implementation of 'fish, wildlife, and habitat restoration purposes authorized by this title....'" *Bay Institute*, 87 Fed. Appx. 639-40 (quoting CVPIA 3406(b)(2)). Plaintiffs suggest that the "primary purpose" includes any action designed to help fish, while Environmental Plaintiffs and Federal Defendants suggest that the "primary purpose" is the anadromous fish doubling program set forth in

5

section 3406(b)(1).  (Doc. 686 at 9; Doc. 696 at 19 n.3 (Federal Defendants "generally agree" with Environmental Plaintiffs' position on this issue).)

\*\*\*

The "primary purpose" includes all those fish and wildlife restoration activities specifically described in section 3406(b).  This includes water dedicated to accomplish the anadromous fish doubling goal set forth in section 3406(b)(1), but also includes water needed to accomplish any of the other specifically enumerated programs listed in section 3406(b) (e.g., 3406(b)(4), (5), (8), (9), (12), (18) & (19)).

\*\*\*

Under the Ninth Circuit Decision, Interior has discretion not to count water used for any of the (b)(2) "secondary" purposes, so long as that water is "needed" to effectuate the "primary" restoration programs specifically enumerated in section 3406(b), including the fish doubling program contained within 3406(b)(1).  <u>The primary purpose language does not globally encompass every action that benefits fish.  Rather, it applies only to those actions that support the specifically enumerated fish and wildlife restoration programs contained within 3406(b).</u>

*Id*. at 36, 43, 45 (emphasis added).

The Decision also recognized that there is "potential for overlap between the 'primary' purpose and actions taken pursuant to the fisheries purposes of the WQCP and ESA."

For example, 3406(b)(1)(c) provides:

> The Secretary shall cooperate with the State of California to ensure that, <u>to the greatest degree practicable</u>, the specific quantities of yield dedicated to and managed for fish and wildlife purposes under this title are credited against any additional obligations of the Central Valley Project which may be imposed by the State of California following enactment of this title, including but not limited to increased flow and reduced export obligations which may be imposed by the California State Water Resources Control Board in implementing San Francisco Bay/Sacramento-San Joaquin Delta Estuary standards pursuant to the review ordered by the California Court of Appeals in United States v. State Water Resources Control Board, 182 Cal. App. 3d 82 (1986), and that, to the greatest degree practicable, the programs and plans required by this title are developed and implemented in a way that avoids inconsistent or duplicative obligations from being imposed upon Central Valley Project water and power contractors.

(Emphasis added.)

Interior recognized the potential for this overlap in its December 2003 Guidance, which provides:

> [A]ctions taken pursuant to the 1995 Water Quality Control Plan and State Water Resources Control Board Decision D-1641 ("the 1995 WQCP") involve the dedication and management of Central Valley Project yield for long-term fishery beneficial use and protection.  Such actions are not taken to help meet agricultural or municipal and industrial water quality standards that are set forth in the 1995

6

WQCP. Most of the fishery beneficial uses and objectives under the 1995 WQCP and in Reclamation's water rights permits help fulfill the fish, wildlife, and habitat restoration purposes and measures authorized by Section 3406(b). Consistent with the June 3, 2003 Ninth Circuit decision, much of the (b)(2) water that is dedicated and managed annually to help meet fishery beneficial use and protection objectives of the 1995 WQCP serves Section 3406(b)(2)'s "primary purpose" of fish, wildlife, and habitat restoration. Therefore the implementation of Section 3406(b)(2) in accordance with the May 9, 2003 Decision and with this supplemental guidance effectuates the "hierarchy of purposes" in Section 3406(b)(2).

(AR 2156-57 [].)

In practice, many actions taken to fulfill the fishery beneficial uses and objectives of the WQCP and/or actions taken to comply with the ESA may serve the primary purpose of the CVPIA. In keeping with the general structure of the CVPIA's language, if the "primary" purpose of any action taken under the WQCP and/or the ESA is to support or effectuate a "primary purpose" program, such action must be counted toward the (b)(2) account. Environmental Plaintiffs advance a helpful definition of the term "primary," the ordinary meaning of which is "predominant," of "first importance," or "principal." See Malat v. Riddell, 383 U.S. 569, 572 (1966). Applying this definition, if an action taken under the WQCP and/or the ESA predominantly contributes to one of the primary purpose programs (e.g., fish doubling), it must be counted toward the 800,000 AF limit. Interior retains the discretion not to count other secondary actions, so long as doing so is necessary to give effect to the hierarchy of purposes.

*Id.* at 46-48 (footnotes omitted).

This "primary purpose" definition was applied, resulting in a finding that Interior did not abuse its discretion in connection with two sets of actions for which water was released but not charged against the annual (b)(2) "account" of 800,000 AF of water:

From June 17 through June 24, 2004 Interior allocated 9,100 AF to Non-B2 Fishery Actions. The daily accounting for June 17 through June 30, 2004 indicates that water costs were being incurred for changes in operations at Nimbus, Clear Creek, and New Melones. (First Fujitani Decl. at ¶17.) Only those costs incurred at Nimbus and New Melones were accounted for as Non-B2 Fishery Actions. (Id.) A draft document entitled "Summary of (b)(2) Fish Actions for Water Year 2004," dated December 1, 2004, specifies that releases from Nimbus during the "latter part" of June were "to meet Delta demands." (AR 1521.) Mr. Fujitani states that releases from Nimbus were required to meet the June Delta outflow standard. (First Fujitani Decl. at ¶17.) Releases from New Melones were needed to meet San Joaquin River flow requirements at Vernalis. (Id.) Interior did not count these releases as "(b)(2)" releases, but instead as "Non-B2 Fishery Actions." (Id.)

The question presented is: Did either of these actions predominantly contribute to one of the (b)(2) primary purpose programs (e.g., fish doubling)? The Delta outflow standard was promulgated as part of the 1995 WQCP (D-1641). The stated purpose of the outflow standard is to protect "estuarine habitat for anadromous fishes and other estuarine-dependent species." (1995 WQCP at 15.) The Vernalis flow requirement on the San Joaquin River, along with similar flow requirement on the Sacramento River, originate in

the WQCP.  The stated purpose of the Vernalis flow requirements are "to provide attraction and transport flows and suitable habitat for various life stages of aquatic organisms, including Delta smelt and chinook salmon." (Id. at 15.)

Although both of these standards are to benefit anadromous fish species, they do not specifically identify an intent to support the fish doubling goal (or any other specifically-enumerated 3406(b) program).  In fact, the WQCP contains a wholly separate "narrative objective" for salmon doubling, which provides: "Water quality conditions shall be maintained, together with [other] measures in the watershed, sufficient to achieve a doubling of natural production of chinook salmon from the average production of 1967-1991, consistent with the provisions of State and federal law." (Id. at 15 & 18.)  The existence of this separate provision, directed at anadromous fish doubling, suggests that neither the Delta outflow objective nor the Vernalis flow requirement [was] intended to achieve the CVPIA fish doubling purpose.  Actions taken to comply with the Delta outflow objective and/or the Vernalis flow requirement do not "predominantly" contribute to primary purpose programs.  Interior did not abuse its discretion in excluding these actions that consumed approximately 9,000 AF of CVP yield from (b)(2) accounting.

*Id*. at 48-49 (footnotes omitted).

The *San Luis* plaintiffs' narrow motion for reconsideration was granted on May 14, 2009, and the Court corrected an error in the September 19 Decision by finding that "the State Board intended for the numeric flow standards in the 1995 WQCP to contribute toward the narrative fish doubling goal in the WQCP." Doc. 738 at 33.   However, the Court refused to alter its ultimate conclusion, declining to find "water used for WQCP purposes also is predominantly used for primary CVPIA 3406(b)(2) purposes." *Id*.  Rather, the Court found the "disputed actions were within the Federal Defendants' discretion and expertise in managing the CVP and implementing the CVPIA. *Id*.  This discretion was not abused by not charging against the (b)(2) account, CVP water released in late June 2004 to comply with the 1995 WQCP's Delta outflow and Vernalis flow requirements under the unique conditions that then existed." *Id*.  On March 2, 2012, in a lengthy and detailed opinion, the Ninth Circuit affirmed, agreeing that the Bureau's accounting with respect to the June 2004 releases was lawful. *San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676 (9th Cir. 2012):

It is against the backdrop of this more than ten years of litigation history that Plaintiffs now complain Federal Defendants acted unlawfully by allocating water pursuant to (b)(2) during periods when the Delta is in "excess water conditions."

**C.     The Coordinated Operations Agreement.**

The COA, adopted by both the federal government and the State of California, was enacted as federal law in 1986 as Pub. L. No. 99-546, § 103, which amended § 2 of the Act of August 26, 1937, 50 Stat. 850, by inserting the following new subsection: "(d) The Secretary of the Interior is authorized and directed to execute and implement the 'Agreement Between the United States of America and the Department of Water Resources of the State of California for Coordinated Operation of the Central Valley Project and the State Water Project' dated May 20, 1985." The United States and the State of California signed the COA effective on November 24, 1986. COA, § 1.

This statutory directive for Interior to comply with the COA was enacted as part of the 1992 CVPIA. Section 3411(b) of the CVPIA states:

> SEC. 3411 - COMPLIANCE WITH STATE WATER LAW AND COORDINATED OPERATIONS AGREEMENT.
>
> (b) The Secretary [of the Interior], in the implementation of the provisions of this title, shall fully comply with the United States' obligations as set forth in the "Agreement Between the United States of America and the Department of Water Resources of the State of California for Coordinated Operation of the Central Valley Project and the State Water Project" dated May 20, 1985, and the provisions of Public Law 99-546; and shall take no action which shifts an obligation that otherwise should be borne by the Central Valley Project to any other lawful water rights permittee or licensee.

Of particular importance to this case is Section 6(g) of the COA, which provides:

> (g) Responsibilities During Excess Water Conditions: During excess water conditions each party has the responsibility to export and store as much water as possible within its physical and contractual limits.

The COA defines "excess water conditions" as "periods when it is agreed that releases from upstream reservoirs plus unregulated flow exceed Sacramento Valley inbasin uses, plus exports." COA, § 3(c).

**D.     The Complaint in this Case.**

Plaintiffs allege that, during "excess water conditions," Interior is mandated by Section 6(g) of the COA to pump water to the maximum physical and contractual limits of the CVP. Doc. 1, Complaint, at ¶ 42. It is undisputed that excess water conditions existed in June 2011. *Id*. at ¶ 34.

9

Those particular hydrological conditions led the Bureau, acting in response to a recommendation from the U.S. Fish and Wildlife Service ("FWS"), to issue a temporary change order, effective at 6:59 AM on June 8, 2011. *Id*. at ¶¶ 35-36.  The Bureau directed the Authority, as the entity responsible for operating the Jones Pumping Plant, to reduce pumping from 4,200 cubic feet per second ("cfs") to 3,000 cfs for up to fourteen days in order to reduce the number of fish that would be "taken" (i.e., injured or killed) due to pumping operations at the higher flow levels.  *Id*.

## E.  **Preliminary Injunction Motion.**

On June 10, 2011, Plaintiffs filed an application for a temporary restraining order ("TRO") and a motion for preliminary injunction, seeking to halt the temporary pumping reduction.  Docs. 8 & 9. Plaintiffs asserted that Interior lacked discretion to reduce pumping during excess water conditions and that its members would suffer immediate and irreparable injury as a result of Defendants' actions.  A hearing was held on June 15, 2011, after which the Court denied the motion from the bench.  Docs. 38 & 39.  The Court found that Plaintiffs had not demonstrated likely success on the merits of their statutory claims and that Plaintiffs members were unlikely to experience irreparable injury absent immediate injunctive relief.  Doc. 39, 6/15/12 Hng. Tr., at 106-08.  Defendants were directed to prepare and submit proposed findings of fact and conclusions of law, which they did on July 25, 2011.  Doc. 40.  After considering Plaintiffs' objections, Doc. 45, the Court issued its findings of fact and conclusions of law on September 6, 2011.  Doc. 49.

## III. STANDARD OF DECISION

### A.  **Motion to Dismiss Under Fed. R. Civ. P. 12(b)(1).**

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of an action for "lack of subject-matter jurisdiction."  Faced with a Rule 12(b)(1) motion, a plaintiff bears the burden of proving the existence of the court's subject matter jurisdiction.  *Thompson v. McCombe*, 99 F.3d 352, 353 (9th Cir.

1996).  A federal court is presumed to lack jurisdiction in a particular case unless the contrary

affirmatively appears.  *Gen. Atomic Co. v. United Nuclear Corp.*, 655 F.2d 968, 968–69 (9th Cir. 1981).

A challenge to subject matter jurisdiction may be facial or factual.  *White v. Lee*, 227 F.3d 1214,

1242 (9th Cir. 2000).  As explained in *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1038 (9th Cir.

2004):

> In a facial attack, the challenger asserts that the allegations contained in a complaint are
> insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack,
> the challenger disputes the truth of the allegations that, by themselves, would otherwise
> invoke federal jurisdiction.

In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint

without converting the motion to dismiss into a motion for summary judgment.  *Savage v. Glendale*

*Union High School*, 343 F.3d 1036, 1039 n. 2 (9th Cir. 2003); *McCarthy v. United States*, 850 F.2d 558,

560 (9th Cir. 1988).  "If the challenge to jurisdiction is a facial attack, i.e., the defendant contends that

the allegations of jurisdiction contained in the complaint are insufficient on their face to demonstrate the

existence of jurisdiction, the plaintiff is entitled to safeguards similar to those applicable when a Rule

12(b)(6) motion is made."  *Cervantez v. Sullivan*, 719 F. Supp. 899, 903 (E.D. Cal. 1989), rev'd on other

grounds, 963 F.2d 229 (9th Cir. 1992).  "The factual allegations of the complaint are presumed to be

true, and the motion is granted only if the plaintiff fails to allege an element necessary for subject matter

jurisdiction."  *Id.*; *see also Cassirer v. Kingdom of Spain,* 580 F.3d 1048, 1052 n. 2 (9th Cir. 2009),

*rev'd on other grounds en banc*, 616 F.3d 1019 (9th Cir. 2010) (applying *Ashcroft v. Iqbal*, 556 U.S.

662, 129 S. Ct. 1937 (2009), to a facial motion to dismiss for lack of subject matter jurisdiction).

# IV. DISCUSSION

A.    **The Mootness Doctrine.**

Here, Defendants argue that the Court lacks subject matter jurisdiction over the case because

Plaintiffs' claims are moot.  An issue is moot "when the issues presented are no longer 'live' or the

parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287

11

(2000).  "The underlying concern is that, when the challenged conduct ceases such that there is no reasonable expectation that the wrong will be repeated, then it becomes impossible for the court to grant any effectual relief whatever to the prevailing party." *Id*. (internal citations and quotations omitted).  If the parties cannot obtain any effective relief, any opinion about the legality of a challenged action is advisory. *Id*.  "Mootness has been described as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n. 22 (1997) (internal citation and quotation omitted).  "[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Id*. at 67.

Even if a case is technically moot, a case may nevertheless be judiciable if one of three exceptions to the mootness doctrine applies:  (1) where a plaintiff "would suffer collateral legal consequences if the actions being appealed were allowed to stand"; (2) where defendant voluntarily ceased the challenged practice; and (3) for "wrongs capable of repetition yet evading review." *Ctr. for Biological Diversity v. Lohn*, 511 F.3d 960, 964-66 (9th Cir. 2007).  "The party asserting mootness has a heavy burden to establish that there is no effective relief remaining for a court to provide." *In re Palmdale Hills Property, LLC*, 654 F.3d 868, 874 (9th Cir. 2011).

**B.    Are Plaintiffs' Claims Moot?**

Federal Defendants maintain that this case is moot because the challenged government action expired by its own terms in June 2011.  Doc. 56-1 at 4.  Federal Defendants argue that "there is no basis for meaningful relief" because the action ended more than a year ago. *Id*. at 5.

Plaintiffs contend that Federal Defendants are mischaracterizing their claim as challenging only Reclamation's temporary pumping restriction in June 2011.  Rather, Plaintiffs maintain that their claim "includes a challenge to Reclamation's claimed discretion to order pumping reductions during any period of excess water conditions," citing paragraphs 1 and 55 of the Complaint.  Doc. 57 at 4.  The

cited paragraphs allege:

> 1. This Complaint challenges the federal government's failure to comply with the mandatory, nondiscretionary duty set forth under Section 6(g) of the Coordinated Operating Agreement ("COA") between the United States and the State of California "to export and store as much water as possible" during periods of excess water conditions in the Sacramento-San Joaquin Delta ("Delta"). This duty is incorporated into section 3411(b) of the Central Valley Project Improvement Act ("CVPIA"), which requires that the Secretary of the Interior "shall fully comply with the United States' obligations" under the COA in implementing the CVPIA.

> \*\*\*

> 55. An actual controversy has arisen between Plaintiffs and Defendants regarding Defendant's failure to administer and operate the CVP in accordance with federal law. A judicial declaration is necessary and appropriate at this time under these circumstances in order that Plaintiffs may ascertain its rights and Defendants' obligations pursuant to federal law, as alleged above. Unless such a declaration is issued, Plaintiffs will suffer a loss and/or impairment of their interests, mission, rights and property in violation of law.

The extent to which these generic paragraphs even state a general "challenge to Reclamation's claimed discretion to order pumping reductions during any period of excess water conditions" is debatable, particularly in light of the fact that the remainder of the Complaint focuses on the specific example of the June 2011 pumping reduction. Even if, *arguendo*, the Complaint did include the generic challenge Plaintiffs now advance, this Court could not adjudicate such a claim, as it fails to satisfy the jurisdictional pre-requisites of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, which Plaintiffs admit is the only waiver of sovereign immunity applicable in this case. *See* Compl. at ¶ 8 ("The United States has waived its sovereign immunity, and that of the federal agencies and employees, pursuant to 5 U.S.C. §§ 701 *et seq.* including sections 702 and 704). The APA permits a federal court to "compel agency action unlawfully withheld or unreasonably delayed," or "hold unlawful and set aside" agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706, but that power is limited to "[a]gency action made reviewable by statute," 5 U.S.C. § 704, which is not the case here, or "<u>final agency action</u> for which there is no other adequate remedy in a court," *id* (emphasis added). Lack of APA finality precludes judicial review.

*Ukiah Valley Medical Center v. F.T.C.*, 911 F.2d 261, 263-64 (9th Cir. 1990).  The only "final agency action" to which Plaintiffs point is the June 2011 export pumping decision.  A generic challenge to the Bureau's non-specific "exercise of discretion" is not cognizable under the APA.

Plaintiffs' contention that the case is not moot because the court can grant declaratory relief is equally misplaced.  Plaintiffs cite *Forest Guardians v. Johanns*, 450 F.3d 455, 462 (9th Cir. 2006).  There, the Ninth Circuit considered a claim that that the U.S. Forest Service violated the ESA when it failed to re-initiate consultation on the environmental impact of cattle grazing on a particular plot of national forest land in Arizona.  *Id*. at 456-57.  The Forest Service authorizes livestock use of national forest land through the issuance of grazing permits, which are typically granted for ten-year terms.  *Id*. at 458.  The particular permit at issue in *Forest Guardians* was for a ten-year term, but a related agreement between the Forest Service and FWS required that the Forest Service annually confirm compliance with certain "guidance criteria" designed to ensure that grazing was "not likely to adversely affect" the ESA-listed Mexican spotted owl.  *Id*. at 459.  "In other words, the Forest Service was allowed to presume annual concurrence by FWS in the 'not likely to adversely affect' finding only if it confirmed each year that the guidance criteria were being satisfied."  *Id*.  Grazing under this permitting scheme commenced in 1999.  *Id*.

In 2001, Forest Guardians sued, alleging that the Forest Service violated the ESA by not re-initiating ESA consultation after "the agency failed over several years to meet the guidance criteria...."  *Id*.  Specifically, Forest Guardians alleged that the Forest Service had failed to conduct adequate annual monitoring of utilization levels on [the] grazed allotments [] and that, as a result, the continuing 'not likely to adversely affect' findings for those allotments were invalid."  *Id*. at 459-60.  The district court ruled in favor of the Forest Service on the merits of the ESA claim.  *Id*. at 460.  Forest Guardians appealed.  *Id*. at 461.  While the appeal was being briefed, however, the Forest Service re-initiated consultation and FWS subsequently concurred in writing that the grazing activity was "not likely to

1  adversely affect" the Mexican spotted owl.  *Id.*  Before tackling the merits of the appeal, the Ninth

2  Circuit addressed the issue of mootness:

> The Forest Service argues that, as a result of this recent re-consultation, there is no
> effective relief that the district court can grant.

***

> The only court of appeals case cited by the Forest Service in its effort to meet its burden
> is *Southern Utah Wilderness Alliance v. Smith*, 110 F.3d 724 (10th Cir. 1997). In *SUWA*,
> the plaintiff alleged that the Bureau of Land Management (BLM) violated § 7 of the ESA
> by failing to consult with FWS on a management plan for BLM land that was home to a
> listed species of plant life. 110 F.3d at 725. The management plan required BLM to close
> certain access routes used by off-road vehicles but to leave open several others. *Id.* at
> 726. The plaintiff sought declaratory and injunctive relief-principally, it requested a stay
> of the management plan pending consultation regarding the impact on the listed plant life
> of off-road vehicle use on the still-open access routes. *Id.* While the matter was pending
> in the district court, BLM initiated and completed consultation with FWS on the
> challenged plan. The district court subsequently ruled against the plaintiff on the merits
> and also found that the action was moot as a result of the inter-agency consultation. *Id.* at
> 727. The Tenth Circuit affirmed, ruling that "[t]here is no point in ordering an action that
> has already taken place." *Id.* at 728. However, the court expressly narrowed its holding:

> > This is not to say that a violation of section 7(a)(2) could always be cured by
> > subsequent consultation, nor is this general approval for consultation after the
> > fact. Instead, this merely recognizes that the changed circumstances of this
> > particular case no longer present an opportunity for meaningful relief.... A
> > declaratory judgment would serve no purpose in this case. This case does not
> > involve a continuing violation or practice, and SUWA has not shown that the
> > defendants are likely to violate section 7(a)(2) in the near future. A declaratory
> > judgment would not affect the matter, and would be in the nature of an advisory
> > opinion.

> *Id.* at 729-20.

> *SUWA* is distinguishable in two critical ways from the case before us. First, our case does
> involve a continuing practice. The grazing permit [in question] has a ten-year term and
> requires that the Forest Service obtain from FWS annual concurrence that the guidance
> criteria governing the "not likely to adversely affect" finding have been met. Second, the
> Forest Service's practice of not complying with the monitoring requirements is likely to
> persist despite the recent re-consultation. Notably, the Forest Service has argued
> throughout this litigation that it is not required to meet the monitoring requirements
> incorporated in the guidance criteria. The Forest Service asserts that those requirements
> are "unreasonable." Declaratory judgment in favor of Forest Guardians would thus ensure
> that the Forest Service does not continue to fail to meet its monitoring responsibilities in
> the future and that it fulfills its duty under the ESA to consult with FWS when necessary.

15

We have repeatedly held that where, like here, both injunctive and declaratory relief are sought but the request for an injunction is rendered moot during litigation, if a declaratory judgment would nevertheless provide effective relief the action is not moot. *See, e.g., Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1174-75 (9th Cir. 2002); *Northwest Envtl. Defense Ctr. [v. Gordon]*, 849 F.2d [1241,] 1245 [(9th Cir. 1988)]. In *Northwest Environmental Defense Center*, for instance, a federal agency charged with ensuring the viability of salmon fisheries in the Pacific Northwest set a 1986 salmon escapement goal that did not meet the requirements of its own fishery management plan. 849 F.2d at 1243. The plaintiff filed a lawsuit requesting an injunction requiring the agency to meet the management plan's escapement goal and a declaratory judgment that the agency violated various environmental laws. *Id*. at 1244. After the 1986 salmon season ended, the district court dismissed the action as moot. We reversed, ruling that, although the request for an injunction was rendered moot, a declaratory judgment could help to remedy the effects of the agency's statutory violations and to ensure that similar violations would not occur in the future: "In deciding such a case the court is not merely propounding on hypothetical questions of law, but is resolving a dispute which has present and future consequences." *Id*. at 1245.

Here, although it is true that the only agency action sought by Forest Guardians in this appeal-re-initiation of informal consultation on [the permit]-has already occurred, that is not the only form of effective relief that Forest Guardians seeks or that the district court may grant. As discussed above, a declaratory judgment that the Forest Service's actions relating to [the permit] violated the ESA would provide effective relief by governing the Forest Service's actions for the remainder of the allotment's permit term and by prohibiting it from continuing to violate the law. It would, accordingly, "resolve a dispute with present and future consequences." *Id*. Because such relief remains available to Forest Guardians notwithstanding the Forest Service's re-initiation of consultation on Water Canyon, the agency has failed to carry its burden to establish mootness. *See id*. at 1244.

450 F.3d at 461-63.

Key to the Ninth Circuit's ruling in *Forest Guardians* was the notion of a "continuing practice." In *Forest Guardians*, the Forest Service was required to make annual findings about the guidance criteria and obtain from FWS annual concurrences that the guidance criteria have been satisfied. In addition, the *Forest Service* argued throughout the litigation that it was not required to meet the monitoring requirements incorporated into the guidance criteria. This all-but ensured that the Forest Service would repeat the alleged violation every year for the remainder of the permit term. Unlike the almost guaranteed annual violations that could be expected in *Forest Guardians*, Plaintiffs point to no

such likelihood of repetitive violations in this case.  Plaintiffs suggest that excess water conditions occur in every year, but provide no evidence of an annual, repetitive or otherwise "continuing" practice[3] by the Bureau of ordering pumping reductions during periods of excess water conditions.[4]

In *Northwest Environmental Defense Center*, the Ninth Circuit emphasized the "continuing effects" of the 1986 fishery management measures for the Oregon coho salmon, which permitted the harvest of certain numbers of coho during the 1986 fishing season.  849 F.2d at 1245.  The Ninth Circuit found that the 1986 management measures would continue to have an effect on species because it would impact the number of coho that would return to Oregon to spawn three years later, in 1989.  *Id*.  If the 1986 measures were unlawful and caused harm to the coho, the Ninth Circuit reasoned that "the damage can still be repaired or mitigated – obviously not by restoring the fish harvested in 1986, but by allowing more fish to spawn in 1989."  *Id*.  "In a case such as this, where the violation complained of may have caused continuing harm and where the court can still act to remedy such harm by limiting its future adverse effects, the parties clearly retain a legally cognizable interest in the outcome."  *Id*.

In support of their argument that there is a continuing harm that could be remedied by the Court here, Plaintiffs cite *Pyramid Lake Paiute Tribe v. Hodel*, 882 F.2d 364 (9th Cir. 1989).  That case, which has a complex history that must be explained in order to evaluate its discussion of mootness, concerned the waters of the Truckee River, which if not diverted, flow into Pyramid Lake.  *Id*. at 365-66.  Some of the Truckee's water can be stored in upstream reservoirs, including the Stampede Reservoir.  *Id*.  Water can then be released throughout the irrigation season for diversion by agricultural water rights holders.  *See id*. at 366.  By the late 1960s, diversions of water from the Truckee had depleted Pyramid Lake to

---

[3] The concept of a "continuing practice," the presence of which precludes a threshold finding of mootness, is distinct from the concept of a wrong that is "capable of repetition but evading review," which is an exception to mootness that permits adjudication of otherwise moot cases.  *See Ctr. for Biol. Diversity v. Salazar*, 2010 WL 4055568, *9 (N.D. Cal. Oct. 15, 2010) (separately addressing both concepts).  The latter is discussed below.

[4] Plaintiffs do contend that "excess water conditions" occur frequently and that periods of excess water conditions occur every year.  Second Snow Decl., Doc. 57-1, ¶¶ 7-8.  However, the existence of excess water conditions is only a precondition to the type of violation alleged here.  The conduct complained of occurs only when excess water conditions coincide with pumping reductions taken <u>only</u> pursuant to the Bureau's authority under CVPIA § 3406(b)(2).

such an extent that some of the Lake's native fish received protected status. *Id*. The Bureau as operator of the dams on the Truckee began to manage the dams under operating criteria designed both make deliveries under existing water rights decrees and minimize diversions from the Truckee to make as much water as possible available for Pyramid Lake. *Id.* In 1970 the Pyramid Lake Indian Tribe challenged the operating criteria the Bureau was using to manage the Truckee system. *Id*. The district court held that the Secretary of the Interior, who oversees the Bureau, was obligated by trust responsibilities to the Tribe to ensure that the Lake received "the maximum benefit from the upper Truckee flow ... which may be available under [] reasonable and proper interpretation of the decrees." *Id*.

A related dispute arose in the late 1980s, when the Bureau sought approval of proposed operating criteria to govern diversions from the Truckee in 1987. *Id*. at 367. The agricultural water rights holders objected to the operating criteria. Among other things, the agricultural users argued they should be permitted to "carry over" to 1988 any water stored in upstream reservoirs for their use in 1987, but not used in 1987. *Id*. In the spring of 1988, as the litigation progressed, the Bureau refused to release any "carry over" water (also referred to as "credit water"). *Id*. However, in June 1988, the district court ordered the Bureau to release the water. *Id*. The releases began in August 1988. *Id.* The next day, the Tribe filed an emergency motion for a stay pending appeal. *Id*. at 367-68. The emergency stay request was denied, but the Ninth Circuit established an expedited briefing schedule. *Id*. at 368. Nevertheless, the credit water releases were completed by the time the appeal was ripe for decision. *Id*. The Ninth Circuit then addressed whether the appeal had been rendered moot "by execution of the order to be reviewed." *Id*. Following *Northwest Environmental Defense Center*, the Ninth Circuit concluded:

> The survival of the cui-ui and the Lahontan cutthroat trout is directly related to the amount of water allowed to reach Pyramid Lake from the Stampede Reservoir during the spawning season. [Citation]. If the Pyramid Lake fishery was or may be impaired by the diversion of the Stampede Reservoir "credit water" to the Lahontan Reservoir in 1988 pursuant to the district court's order, thus reducing the amount of water that might be

available to flow to Pyramid Lake in the future, that harm can be remedied by storing in Stampede Reservoir an equivalent amount of water from the District's future allotment to be available for possible use during future spawning seasons—just as the District said it could in its opposition to the Secretary's motion to stay the district court's order. [¶] Since effective relief may still be available if we conclude the district court's order was issued in error, the appeal from the order is not moot.

*Id.* at 368-69.

Here, Plaintiffs maintain that "[i]f the Court concludes that the June 2011 pumping reduction was unlawful ... [it may] require[] Reclamation to make available to Plaintiffs or send to storage an amount of water equivalent to the water lost through implementation of the June pumping reduction." Doc. 57 at 7.  Federal Defendants are correct that this proposed relief is very different than the type of relief contemplated in *Pyramid Lake*.  Critically, in *Pyramid Lake*, the agricultural users underlined admitted any harm to the Lake and its fishery could be remedied by holding back a portion of the users' own water allotment in a future year.  Here, the Federal Defendants make no such admission.  For one thing, compelling the Bureau by way of an affirmative injunction to deliver water to Plaintiffs regardless of whether that water is needed for other purposes (e.g., to protect ESA-listed fish) is totally unprecedented.  *Pyramid Lake* presented a unique example of a continuing harm that, despite the fact that the specific dispute was rendered moot, could nevertheless be remedied by a court.  The present facts are simply not analogous.

With this in mind, given that the June 2011 action is now complete, Plaintiffs' claims are technically moot.  However, adjudication may still be proper if one of the exceptions to the mootness doctrine applies.

**C.    Exceptions to Mootness.**

Even if a case is technically moot, it may nevertheless be judiciable if one of three exceptions to the mootness doctrine applies:  (1) where a plaintiff "would suffer collateral legal consequences if the actions being appealed were allowed to stand"; (2) where defendant voluntarily ceased the challenged

practice; and (3) for "wrongs capable of repetition yet evading review." *Ctr. for Biological Diversity v. Lohn*, 511 F.3d at 964-66.

### 1.    **Collateral Legal Consequences.**

This exception applies "to situations where a [plaintiff] would suffer collateral legal consequences if the actions being challenged were allowed to stand. *Pub. Util. Comm'n of State of Cal. v. F.E.R.C.*, 100 F.3d 1451, 1460 (1996). It is commonly applied in habeas corpus proceedings where mootness would generally bar relief if the petitioner completes his sentence before the court has addressed the merits of his petition, but not if the plaintiff demonstrates he will suffer collateral legal consequences if the challenged conviction is allowed to stand. *See Zal v. Steppe*, 968 F.2d 924, 926 (9th Cir. 1992) (petitioner risked discipline by the California State bar if conviction was permitted to stand). Plaintiffs point to no such collateral consequences here.

### 2.    **Voluntary Cessation.**

"It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). "[T]he standard ... is whether the defendant is free to return to its illegal action at any time.... [I]n order for this exception to apply, the defendant's voluntary cessation must have arisen <u>because of</u> the litigation." *Pub. Util. Comm'n*, 100 F.3d at 1460 (emphasis in original). Here, there is no suggestion that Federal Defendants voluntarily ceased the challenged practice because of this litigation. Rather, the challenged action expired of its own accord.

### 3.    **Capable of Repetition Yet Evading Review.**

Plaintiffs do invoke the final exception, which "permit[s] suits for prospective relief to go forward despite abatement of the underlying injury [in] exceptional[5] situations where the following two

---

[5] In line with the Supreme Court's explanation that this exception only applies in exceptional cases when the two stated

circumstances [are] simultaneously present: (1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." *Fed. Elec. Com'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 462 (2007) (internal citations and quotations omitted); *San Luis*, 672 F.3d at 703.

### a.   Duration of Challenged Action.

There can be little dispute that the challenged action, a temporary pumping reduction, was too short in duration to be fully litigated prior to its expiration. Federal Defendants admit as much. *See* Doc. 58 at 8.[6]

### b.   Reasonable Expectation of Repeat Conduct.

The crux of this motion is whether there is a reasonable expectation that the same complaining party would be subjected to the same action again. As discussed above, Plaintiffs have failed to demonstrate that there is a "continuing practice" here, but the "capable of repetition yet evading review" exception is not so narrowly circumscribed.

Whether similar events occurred in the past is potentially dispositive of the application of the "capable of repetition but evading review" exception. *Demery v. Arpaio*, 378 F.3d 1020, 1027 (9th Cir. 2004) (repeated past conduct on multiple occasions taken as evidence of likely repetition); *Natural Resources Defense Council, Inc. v. Evans*, 316 F.3d 904, 910 (9th Cir. 2003) (same, noting that agency repeatedly applied the same, challenged rationale, "year after year"); *Greenpeace Action v. Franklin*, 14

---

conditions are met, the Ninth Circuit only applies the exception in "extraordinary cases." *West Coast Seafood Processors Ass'n v. Natural Res.s Def. Council*, 643 F.3d 701, 704 (9th Cir. 2011).

[6] Federal Defendants did initially suggest that the duration of the Bureau's action in this case was sufficient to permit judicial review, pointing to *Headwaters, Inc. v. BLM*, 893 F.2d 1012, 1016 (9th Cir. 1989), which held that the "evasion" prong of the capable of repetition yet evading review exception was not satisfied "[w]here prompt application for a stay pending appeal can preserve an issue for appeal...." Yet, *Headwaters* and the small number of other cases that have applied this test ignore the weight of the authority that suggests the critical inquiry is whether a plaintiff can obtain "complete judicial review" before the case is rendered moot. *See Wisconsin Right to Life*, 551 U.S. at 462. In Reply, Federal Defendants "acknowledge[] that [Plaintiffs] can satisfy the first prong of the exception." Doc. 58 at 8.

F.3d 1324, 1329 -1330 (9th Cir. 1992) (one subsequent instance of agency relying on allegedly

insufficient biological opinion sufficient to find reasonable expectation of recurrence).

   Here, supplemental Declarations were submitted on the narrow issue of whether Federal

Defendants have ever before, apart from the June 2011 instance that is the subject of the Complaint,

ordered reduced pumping during excess conditions based purely on the Secretary's authority under

CVPIA § 3406(b)(2).  Critically, Plaintiffs do not challenge the Secretary's authority to implement

reductions during excess conditions if those reductions are mandated by some other (i.e., non-CVPIA)

source of law or were imposed as part of the voluntary VAMP experiment.[7]  Plaintiffs only dispute that

the Secretary has the discretion to order such reductions when other laws are not controlling.

   Plaintiffs submitted the Supplemental Declaration of James Snow,[8] which indicates that Federal

Defendants have ordered reduced pumping based solely on the Secretary's (b)(2) authority on three

separate occasions prior to 2011, from May 16-May 31, 2000, from February 7-February 22, 2004, and

from June 7 – June 21-2006.  Doc. 64.

### (1)   May 16 to May 31, 2000.

   Interior's (b)(2) accounting documents indicate:  "CVP and SWP exports were reduced to a

combined 2250 cfs for 31 days from April 15 – May 15, 2000.  From May 16 -31, CVP and SWP

exports were maintained at reduced levels."  Suppl. Snow Decl., Ex. 1, Doc. 64-1, at p 4 of 5.  The April

15 to May 15, 2000 period coincided with the VAMP experiment, so reductions ordered during that

period cannot be attributed to the Bureau's exercise of discretion under (b)(2).  The latter period, from

---

[7] "As part of the flow objectives in the 1995 Bay–Delta Plan, [California's State Water Resources Control Board] set minimum monthly average flow rates on the San Joaquin River at Vernalis .... Currently, the Vernalis Adaptive Management Plan ("VAMP"), a voluntary arrangement, allocate[es] responsibility for meeting some but not all of the Vernalis flow objectives for a twelve year period to members of the [San Joaquin River Group Authority], who in exchange would receive $3 million per year from Reclamation and $1 million per year from the California Department of Water Resources ("DWR"). *San Joaquin River Group Authority v. Nat'l Marine Fisheries Serv.*, 819 F. Supp. 2d 1077, 1093 (E.D. Cal. 2011) (internal citations and quotations omitted).

[8] Mr. Snow, an engineer formerly employed by California's Department of Water Resources and currently an employee of Westlands, has previously been accepted as an expert in related cases.

May 16-31, however, fell outside the VAMP experimental period.

Mr. Snow endeavored to determine whether the May 16-31 reduction was mandated by some source of law other than CVPIA § 3406(b)(2). Doc. 64 at ¶ 6. To determine whether this reduction was required by the ESA, Mr. Snow consulted with Sheila Greene, a fish biologist with Westlands. *Id.* Ms. Greene and Mr. Snow reviewed the then-applicable incidental take limits for the relevant ESA-listed salmonids.[9] *Id.* In light of the take limits, Mr. Snow and Ms. Greene determined the actual level of take of salmonids at the CVP and SWP pumps in May 2000 would not have warranted a pumping reduction. *Id.* Mr. Snow further opines that the May 16-31 pumping was not mandated by State Water Resources Control Board Decision 1641 ("D-1641")[10] either, because D-1641 does not include any outflow or salinity standards that require reductions in export pumping during excess water conditions.

However, Mr. Snow and Ms. Green appear to have overlooked an important legal obligation. In response to Mr. Snow's declaration, Federal Defendants submitted the Supplemental Declaration of Paul Fujitani, the Deputy Operations Manager of the Bureau's Central Valley Operations Office.[11] Mr. Fujitani points out that in May 2000, the Bureau was operating the CVP in accordance with, among other legal requirements, a 1995 biological opinion for the protection of delta smelt, issued by FWS pursuant to ESA § 7 ("1995 smelt BiOp"). A May 25 letter from the Bureau to FWS explained that although the CVP and SWP had been operating under voluntary export reductions (i.e. VAMP) from April 15, through May 15, as of May 20, the California Department of Water Resources ("DWR"), which manages the SWP, began a "gradual ramp up of exports" and had planned to be operating at a

---

[9] The winter-run and spring-run Chinook salmon and Central Valley steelhead.

[10] In 1995, the SWRCB promulgated flow-dependent water quality objectives for the San Francisco Bay/Sacramento-San Joaquin Delta ("Bay-Delta") in the Water Quality Control Plan for the Bay-Delta (the "1995 Bay Delta Plan"). *See SWRCB Cases*, 136 Cal. App. 4th 647, 687 (2006). In 2000, with the issuance of Revised Water Right Decision 1641, the SWRCB attempted to allocate responsibility among various water rights holders for meeting the water quality objectives set forth in the 1995 Bay Delta Plan. *Id.* Much of that responsibility was allocated to the CVP and SWP in the form of directives to ensure maintenance of salinity and outflow objectives. *Id.* at 710-712. Federal Defendants are obligated to comply with these and other state law mandates, so long as they do not conflict with federal law, by virtue of section 8 of the Reclamation Act of 1902. Pub. L. No. 57–161, 32 Stat. 288, at § 8 (June 17, 1902); *California v. United States*, 438 U.S. 645, 675 (1978).

[11] Mr. Fujitani has also been accepted as an expert in related cases on numerous occasions.

relatively high pumping level (5000 cfs) by the end of May.  Suppl. Fujitani Decl., Ex. 1, Doc. 65-1 at p. 2 of 34.  *Id*.  However, on May 23, DWR met with representatives from FWS, the Bureau and California's Department of Fish and Game to modify the "ramping schedule" to "minimize the likelihood that Delta smelt .... will be drawn into the SWP export facility." *Id*. at p. 2-3 of 34. Therefore, just a few days into the May 16-31 period, pumping appears to have once again been curtailed for ESA purposes.  This period is not a good example of the Bureau exercising "pure" (b)(2) discretion.

### (2)   February 7 to February 22, 2004

Interior's annual (b)(2) accounting document indicates that from February 7 through February 22, 2004, exports were reduced to provide "a functional equivalent in the delta for the Vernalis flow objective of 2280 cfs."  Suppl. Snow Decl., Ex. 2, Doc. 64-2.  Mr. Snow concluded, and Federal Defendants do not dispute, that this export reduction was not taken to comply with the ESA or the 35 % Export/Inflow ratio imposed by D-1641[12], nor was it undertaken as part of the Environmental Water Account ("EWA")[13].  *Id*. at ¶ 7.   Mr. Snow also concluded that the export reduction was not mandated by D-1641's additional requirement that flow in the San Joaquin River at Vernalis remain at or above 2280 cfs.  *Id*.  Mr. Snow based this conclusion on the fact that reducing export pumping cannot physically alter the flow of the San Joaquin at Vernalis, which is well upstream (and uphill) from the export pumps.  *Id*.  Instead, Vernalis flow is a function of runoff conditions upstream of Vernalis and releases from New Melones Reservoir, which is also located upstream of Vernalis.

---

[12] As part of D-1641, the SWRCB requires the CVP and SWP to limit project pumping (i.e. exports) to a certain percentage of total outflow from the Delta.  *See Natural Res. Def. Council v. Kempthorne*, 506 F. Supp. 3d 322, 331 (E.D. Cal. 2007).

[13] It is not clear why any pumping reduction would ever be required to "comply" with the EWA.  The EWA was a program used to allow curtailment of project export pumping during critical time periods for fish.  *Natural Resources Defense Council v. Kempthorne*, 506 F. Supp. 2d 322, 340 (E.D. Cal. 2007).  The EWA was originally designed to compensate CVP and SWP contractors for water losses caused when pumping or diversions from the Delta were reduced to protect fish.  Typically, the EWA would replace water loss due to curtailment of pumping by purchasing surface or groundwater supplies from willing sellers.  *San Luis & Delta-Mendota Water Authority v. Salazar*, 760 F. Supp. 2d 855, 897 n. 23 (E.D. Cal. 2010) (internal quotations and citations omitted).

Once again, Mr. Snow appears to not have had the benefit of complete information.  Mr. Fujitani explains in his declaration that in January and February 2004, because of low reservoir storage conditions in New Melones, the Bureau did not believe it was prudent to release water from new Melones to meet D-1641's flow objectives.  Instead, on January 30, 2004, the Bureau petitioned the SWRCB for a Temporary Urgency Change in Permit Conditions, requesting that the SWRCB change the flow requirement to a lower objective.  *See* Suppl. Fujitani Decl., Ex. 2, Doc. 65-1 at p. 7 of 34 (referencing Jan. 30, 2004 letter).  The SWRCB asked Reclamation to provide a proposed alternative flow objective and the basis for that objective.  *See id*. at p. 8 of 34 (referencing request from SWRCB).  On February 9, 2004, the Bureau indicated that it would work with the relevant agencies to "develop alternative actions to provide protection for fish and wildlife in the southern Delta" and that those actions " may not necessarily target a specific Vernalis flow objective, but may be composed of a combination of actions both as instream flow and in the Delta to provide that protection."  *Id*.  Among other things, in the February 9, 2004 letter, the Bureau indicated that it would "reduce pumping at [the CVP's] Tracy pumping plant y approximately 500 cfs ... to improve delta smelt spawning habitat in the southern Delta and improve survival of adult smelt."  *Id*.  On February 25, 2004, the SWRCB approved the Bureau's petition through the issuance of Water Rights Order 2004-2005-DWR, which clearly indicates that the measures proposed by the Bureau were required under D-1641 in lieu of the otherwise applicable flow requirements at Vernalis.  Suppl. Fujitani Decl., Ex. 3, Doc. 65-1 at p. 11 of 34.  The reductions in February 2004 were mandated under D-1641.

### (3)   June 7 to June 21, 2006.

Finally, according to Interior's annual (b)(2) accounting document, from June 7 to June 21, 2006, exports were reduced to "6000 cfs (combined) ... to help protect emigrating juvenile San Joaquin basin salmon."  Suppl. Snow Decl., Ex. 3, Doc. 64-3.  Federal Defendants concede that this period of reduced exports was not mandated by either D-1641 or the ESA, impliedly conceding that this was a "pure"

1   exercise of the Bureau's discretion under CVPIA 3406(b)(2).  *See* Supp. Fujitani Decl., Doc. 65 at 4.

2          The June 7 through June 21, 2006 pumping reduction stands as the only clear example of Federal

3   Defendants engaging in conduct similar to that complained of in this case.  *Greenpeace* suggests that

4   this single, additional instance is sufficient to trigger the "capable of repetition yet evading review"

5   exception.  *Greenpeace* concerned the impact of pollock fishing in the Gulf of Alaska on the ESA-listed

6   Stellar sea lion. 14 F.3d 1324.  For the 1991 fishing season, defendant, the National Marine Fisheries

7   Service ("NMFS"), based the "total allowable catch" ("TAC") for the pollock fishery on a series of

8   biological opinions issued pursuant to section 7 of the ESA.  *Id*. at 1327-28.  Greenpeace sued, seeking

9   injunctive and declaratory relief to protect the Stellar sea lion, which relies on pollock as a major food

10  source, alleging that NMFS's management of the 1991 fishery violated the ESA and NEPA.  *Id*. at 1328-

11  29.  Among other things, Greenpeace argued the biological opinions on which NMFS based the 1991

12  TAC were unlawful.  *Id*. at 1329.  By the time the case made it to the Ninth Circuit, the 1991 fishing

13  season had ended.  NMFS argued the appeal was moot, pointing out that it had already amended the

14  fishery management plan for 1992 based on an entirely new administrative record.  *Id*.  The Ninth

15  Circuit disagreed, applying the capable of repetition but evading review exception:

16          The regulation challenged was in effect for less than one year, making it difficult to
            obtain effective judicial review. [Citation.] The major issue -- whether the Secretary has
17          adequately examined the effects of pollock fishing on the Steller sea lions -- is likely to
            recur in future years.  In fact, the [NMFS] has relied on the same biological opinion in
18          support of the 1992 TAC, and has declined to prepare an [environmental impact
            statement under NEPA]. [Citation.]

19  *Id*. at 1329-30.[14]  The Ninth Circuit was content to apply the exception where there was a single,

20  subsequent example of NMFS relying on the allegedly unlawful biological opinion.  Although

---

[14] In *Greenpeace*, in support of its finding that the "capable of repetition yet evading review" exception applied, the Ninth Circuit also emphasized "there is a continuing public interest in determining the standards governing [NMFS's] decision to authorize a certain level of pollock fishing in the Gulf of Alaska.  *See Joint Bd. of Control v. United States*, 832 F.2d 1127, 1130 (9th Cir. 1987)[ ]; *Alaska Fish & Wildlife Fed'n v. Dunkle*, 829 F.2d [933,] 939 [(9th Cir. 1987)]."  *Id*. at 1329-30. Although the two cited cases also apply a "public interest" component to the "capable of repetition yet evading review" exception, more recent Ninth Circuit and Supreme Court cases do not.  *See Wisconsin Right to Life*, 551 U.S. at 462; *San Luis*, 672 F.3d at 703.

*Greenpeace* did concern a regulatory regime that demanded annual fishery decisions affecting the Steller sea lion, the only evidence that the complained of conduct would repeat itself was a single instance of NMFS actually relying on the allegedly unlawful biological opinion.  This suggests that for purposes of the capable of repetition yet evading review exception, a single additional instance does a pattern make.

Here, Plaintiffs have pointed to at least one previous example of the Bureau exercising its discretion under CVPIA § 3406(b)(2) to reduce pumping during "excess water conditions" where no other legal obligation mandated the pumping reduction.  Although it is impossible to precisely predict when excess water conditions will next coincide with hydrologic and/or biological conditions warranting a pumping reduction to serve a (b)(2) purpose where that reduction would not be mandated by another source of law, Federal Defendants do not disclaim they possess the discretion to order such a reduction.[15]  That the conduct occurred on another occasion five years prior to the action challenged in this case suggests there is a reasonable expectation Plaintiffs could be subject to the same conduct again.

This case is unlike *Feldman v. Bomar*, 518 F.3d 637, 640 (9th Cir. 2008), where Plaintiffs challenged whether the National Park Service followed proper procedures when developing a feral pig eradication program on Santa Cruz Island, part of Channel Islands National Park.  By the time the case reached the appellate court, the pigs had already been eradicated.  *See id*. at 642.  Under the circumstances, there was no reasonable expectation that plaintiffs would be subjected to the same alleged procedural violation in the future.  *Id*. at 644.  There was no live controversy there because subjects of that case were, quite literally, dead.[16]

---

[15] There is at least some Ninth Circuit authority that suggests Defendants bear the burden of demonstrating there is no reasonable expectation Plaintiffs will not again be subjected to the allegedly wrongful conduct.  *See Johnson v. Rancho Santiago Community College Dist.*, 623 F.3d 1011, 1020 (9th Cir. 2010) (non-union craftsmen could challenge public entity's decision to enter into an union labor contract that excluded non-members despite the fact that the contract had expired because defendant failed to demonstrate there was "no reasonable expectation" that non-union plaintiffs would be subject to the same type of contract again).

[16] As additional support for their mootness argument, Federal Defendants cite *In Defense of Animals v. U.S. Dep't of the*

The present case is distinguishable.  Although no party can predict exactly when Federal Defendants might again have the opportunity and motivation to exercise the discretion challenged in this case, the possibility remains, and past conduct indicates a reasonable expectation that the conduct may be repeated.  The capable of repetition yet evading review exception applies here, permitting adjudication of this case despite the fact that the underlying dispute over the 2011 pumping reduction is now moot.

### 4.    __Standing.__

Although Mr. Fujitani concedes that the June 2006 pumping reduction was a "pure" exercise of the Bureau's discretion under CVPIA § 3406(b)(2), his Supplemental declaration does raise an issue not addressed by any of the parties' briefs.  Mr. Fujitani points out that the water year encompassing June 2006 was considered a "wet" hydrologic year.  *Id*. at ¶ 9.  In that water year, despite the export reduction that took place from June 7 to June 21, Plaintiffs received 100% of the water allocated to them in their CVP water supply contracts.  *Id*.  Likewise, Mr. Fujitani points out that the June 2011 export reduction at issue in this case did not impact Plaintiff's water supply allocation in 2011.  *Id*.  Before June 2011, the Bureau's set Plaintiffs' water supply allocation at 80%.  *Id*.  Although allocations can change throughout the year, in 2011 Plaintiffs' allocation remained at 80%.  *Id*.[17]  Therefore, according to Mr. Fujitani,

*Interior*, 648 F.3d 1012, 1013 (9th Cir. 2011, which held that an interlocutory appeal from the denial of request for a preliminary injunction against the roundup of wild horses was moot because the roundup had already been completed. However, the Ninth Circuit specifically indicated that it was only the interlocutory appeal that was moot and "expressed no opinion as to whether the entire action is moot." *Id*.

[17] This fact was also noted in the September 6, 2011 Findings of Fact and Conclusions of Law Re: Plaintiffs' Motion for TRO and Preliminary Injunction.  Doc. 49, Finding of Fact # 6.  In reaching the conclusion that Plaintiffs' had not established they would suffer irreparable harm, the Court reasoned:

> Here, Plaintiffs argue that the water not pumped during the fourteen-day reduced pumping period will be "irrevocably and irretrievably lost and unavailable to Plaintiffs for allocation in the 2011-2012 water year and water years thereafter." Compl. ¶ 42.  There is no evidence that Plaintiffs' 2011 CVP water allocation, which is currently eighty percent of their contract entitlement, will be affected by the reduced pumping. [¶]Plaintiffs expressly argue that the estimated 35,000 af of water lost due to foregone pumping during the fourteen-day pumping during reduction will "increase the risk and potential of future shortages." Pls.' Memo at 6 (emphasis added).  Plaintiffs concede that the "full, additional impacts of this loss of water . . . will depend upon ongoing operations and hydrology." *Id*.  The Court concludes that this is exactly the sort of "conjectural or hypothetical" harm that the

28

1   "neither the June 2006 export reduction nor the June 2011 export reduction impacted the Plaintiffs'

2   allocation of CVP water in water year 2006 or 2011, respectively." *Id.*

3          Essentially, Mr. Fujitani questions whether Plaintiffs have been injured by the conduct

4   complained of in this case.  Injury-in-fact is a basic element of standing.  *Lujan v. Defenders of Wildlife*,

5   504 U.S. 555, 560 (1992).  Although Defendants have not (yet) challenged Plaintiffs' standing to sue,

6   the Court has a *sua sponte* obligation to evaluate standing at every stage of a case.  *Grupo Dataflux v.*

7   *Atlas Global Group*, 541 U.S. 567, 593 (2004) ("It is the obligation of both district court and counsel to

8   be alert to jurisdictional requirements.").  Mr. Fujitani's Supplemental Declaration suggests that

9   Plaintiffs may not have suffered any injury as a result of the 2011 water supply reduction.  However,

10  does the fact that the water supply allocation remained unchanged throughout 2006 and 2011 necessarily

11  preclude a finding that Plaintiffs were injured?

12

13         The Ninth Circuit recently confirmed in the (b)(2) case that Plaintiffs suffered an injury-in-fact in

14  2004 when interior failed to release 9,000 AF of water pursuant to the exercise of its discretion under

15  CVPIA 3406(b)(2).  *San Luis*, 672 F.3d at 701.  There, Plaintiffs claimed a beneficial interest in water

16  stored and delivered by the CVP.  *Id*.  The Ninth Circuit noted that "for most of the 2004 water year,

17  allocations of CVP yield to [Plaintiffs] were at 65% of contracted amounts" and that "in response to that

18  shortfall [Plaintiffs] had to purchase alternative supplies and [their] landowner customers had to pump

19

20  groundwater."  *Id*.  It is not clear why the facts of this case would demand a different result just because

21  the allocation in 2011 was 80%.[18]

22

23         The issue of standing or the specific issue of injury-in-fact has not been briefed by any party.

24  ───────────────────────────────────────────

        Ninth Circuit found could not constitute irreparable harm in Center for Food Safety v. Vilsack.  Plaintiffs cannot
25      prove that even this future risk of potential harm is certain, much less likely, to occur.  Based on these
        considerations, the Court cannot conclude that Plaintiffs are likely to suffer irreparable injury absent injunctive
26      relief.

    *Id.,* Conclusion of Law ## 10-11.
27  [18] Previously, in related cases, Plaintiffs have advanced the argument that because crop planning occurs early in the water
    year, water supply reductions (or even threats of water supply reductions) earlier in the year can cause injury throughout the
28  growing season, even if water losses are later "made up."

The present record does not presently permit a full inquiry into whether Plaintiffs suffered any injury as a result of the June 2006 or 2011 or export reduction.  Mr. Fujitani's declaration raises concerns about Plaintiffs' standing that must be resolved.  The parties are instructed to incorporate dispositive motions on the issue of standing into their scheduling for this case.

## V. <u>CONCLUSION AND ORDER</u>

For the reasons set forth above:

(1) Federal Defendants' motion to dismiss as moot is DENIED, and

(2) The parties are further ordered to incorporate dispositive motions on the issue of standing into their scheduling for this case.


**SO ORDERED**
**Dated:  April 25, 2012**

**/s/ Lawrence J. O'Neill**
**United States District Judge**