1

2

3

4

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

5

6

7

8

9

10

11

| | |
|---|---|
| **SAN LUIS & DELTA-MENDOTA WATER AUTHORITY,** *et al.,* | **1:11-cv-00952 LJO GSA** |
| **Plaintiffs,** | **ORDER RE DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING AND FOR FAILURE TO CHALLENGE A FINAL AGENCY ACTION (DOC. 69)** |
| **v.** | |
| **UNITED STATES DEPARTMENT OF THE INTERIOR,** *et al.,* | |
| **Defendants.** | |

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I. INTRODUCTION

This case presents a conflict between two provisions of the 1992 Central Valley Improvement Act ("CVPIA"), Pub. L. No. 102-575, 106 Stat. 4700 (1992). CVPIA § 3406(b)(2) requires the Secretary of the Interior (the "Secretary") to dedicate 800,000 acre feet ("AF") of water to serve certain fish and wildlife restoration purposes. CVPIA § 3411(b) requires the Secretary to comply with a 1985 Agreement Between the United States of America and the Department of Water Resources of the State of California for Coordinated Operation of the Central Valley Project and the State Water Project (otherwise referenced as "Coordinated Operations Agreement" or "COA"), which in turn requires the Bureau of Reclamation ("Reclamation") to export as much water as possible when the Delta is in "excess water"[1] conditions.

Plaintiffs, San Luis & Delta-Mendota Water Authority ("Authority") and one of the Authority's Member Districts, Westlands Water District ("Westlands"), filed this lawsuit on June 9, 2011, during a period when the Delta was in "excess water conditions," complaining that, contrary to the mandate in

[1] "Excess water conditions," are defined in the COA as "periods when it is agreed that releases from upstream reservoirs plus unregulated flow exceed Sacramento Valley inbasin uses plus exports." COA ¶ 3(c), Doc. 14-1 at p. 7 of 46.

1

CVPIA § 3411(b) to export as much water as possible, Defendants ordered reduced export pumping for a two-week period starting on June 8, 2011, pursuant to the Secretary's authority under § 3406(b)(2). Plaintiffs' motion for preliminary injunctive relief was denied, *see* Doc. 38 & 49, and the pumping reduction expired of its own accord.

Defendants move to dismiss this case pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, arguing: (a) that Plaintiffs lack Article III standing; and (b) have failed to challenge a final agency action. Doc. 60. Plaintiffs opposed the motion and attached the supporting declarations of Russell Freeman, Daniel G. Nelson, and James Snow. Docs. 70 - 70-5. Defendants replied and attached the Third Declaration of Paul Fujitani . Doc. 71 - 71-2. The motion was originally set for hearing on February October 1, 2012, but the hearing was vacated and the matter submitted for decision on the papers. Doc. 72.

## II. BACKGROUND

**A.     CVPIA § 3406(b)(2).**

CVPIA § 3406 (b)(2), which has been extensively litigated in this Court and the Ninth Circuit, provides:

> (b) FISH AND WILDLIFE RESTORATION ACTIVITIES.--The Secretary, immediately upon the enactment of this title, shall operate the Central Valley Project to meet all obligations under state and Federal law, including but not limited to the Federal Endangered Species Act, 16 U.S.C. 1531, *et seq*., and all decisions of the California State Water Resources Control Board establishing conditions on applicable licenses and permits for the project. The Secretary, in consultation with other State and Federal agencies, Indian tribes, and affected interest, is further authorized and directed to:
>
> ***
>
> (2) upon enactment of this title dedicate and manage annually eight hundred thousand acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title; to assist the State of California in its efforts to protect the waters of the San Francisco Bay/Sacramento-San Joaquin Estuary; and to help meet such obligations as may be legally imposed upon the Central Valley Project under state or federal law following the date of enactment of this title, including but not limited to additional obligations under the federal Endangered Species Act....

2

Pub. L. No. 102-575, § 3406(b)(2), 106 Stat. 4700, 4714 (1992).

Previous decisions in this case and in consolidated cases concerning § 3506(b)(2) comprehensively recount more than ten years of litigation on this subject, which need not be repeated herein. *See* Doc. 66; *San Luis & Delta-Mendota Water Authority, et al. v. United States Dept. of the Interior, et al.,* 1:97-cv-6140, Doc. 711, at 1-5 ("(b)(2) Case"). It is against this backdrop that Plaintiffs now complain for the first time that Federal Defendants acted unlawfully by allocating water pursuant to (b)(2) during periods when the Delta is in "excess water conditions."

**B.     The Coordinated Operations Agreement.**

The COA, adopted by both the federal government and the State of California, was enacted as federal law in 1986 as Pub. L. No. 99-546, § 103, which amended § 2 of the Act of August 26, 1937, 50 Stat. 850, by inserting the following new subsection: "(d) The Secretary is authorized and directed to execute and implement the 'Agreement Between the United States of America and the Department of Water Resources of the State of California for Coordinated Operation of the Central Valley Project and the State Water Project' dated May 20, 1985." The United States and the State of California signed the COA, effective on November 24, 1986. COA, § 1.

This statutory directive for the Secretary to comply with the COA was enacted as part of the 1992 CVPIA. Section 3411(b) of the CVPIA states:

> SEC. 3411 - COMPLIANCE WITH STATE WATER LAW AND COORDINATED OPERATIONS AGREEMENT.
>
> (b) The Secretary, in the implementation of the provisions of this title, shall fully comply with the United States' obligations as set forth in the "Agreement Between the United States of America and the Department of Water Resources of the State of California for Coordinated Operation of the Central Valley Project and the State Water Project" dated May 20, 1985, and the provisions of Public Law 99-546; and shall take no action which shifts an obligation that otherwise should be borne by the Central Valley Project to any other lawful water rights permittee or licensee.

Of particular importance to this case is Section 6(g) of the COA, which provides:

> (g) Responsibilities During Excess Water Conditions: During excess water conditions

3

each party has the responsibility to export and store as much water as possible within its physical and contractual limits.

The COA defines "excess water conditions" as "periods when it is agreed that releases from upstream reservoirs plus unregulated flow exceed Sacramento Valley inbasin uses, plus exports." COA, § 3(c).

**C.     The Complaint in this Case.**

Plaintiffs allege that, during "excess water conditions," the Department of the Interior ("Interior") is mandated by Section 6(g) of the COA to pump water to the maximum physical and contractual limits of the CVP. Doc. 1, Complaint, at ¶ 42. It is undisputed that excess water conditions existed in June 2011. *Id.* at ¶ 34. Those particular hydrological conditions led Reclamation, acting in response to a recommendation from the U.S. Fish and Wildlife Service ("FWS"), to issue a temporary change order, effective at 6:59 AM on June 8, 2011. *Id.* at ¶¶ 35-36. Reclamation directed the Authority, as the entity responsible for operating the Jones Pumping Plant, to reduce pumping from 4,200 cubic feet per second ("cfs") to 3,000 cfs for fourteen days in order to reduce the number of fish that would be "taken" (i.e., injured or killed) due to pumping operations at the higher flow levels. *Id.*

**D.     Preliminary Injunction Motion.**

On June 10, 2011, Plaintiffs filed an application for a temporary restraining order ("TRO") and a motion for preliminary injunction, seeking to halt the temporary pumping reduction. Docs. 8 & 9. Plaintiffs asserted that Federal Defendants lacked discretion to reduce pumping during excess water conditions and that its members would suffer immediate and irreparable injury as a result of Defendants' actions. A hearing was held on June 15, 2011, after which the Court denied the motion from the bench. Docs. 38 & 39. The Court found that Plaintiffs had not demonstrated likely success on the merits of their statutory claims and that Plaintiffs members were unlikely to experience irreparable injury absent immediate injunctive relief. Doc. 39, 6/15/12 Hng. Tr., at 106-08. Defendants were directed to prepare and submit proposed findings of fact and conclusions of law, which they did on July 25, 2011. Doc. 40.

After considering Plaintiffs' objections, Doc. 45, the Court issued its findings of fact and conclusions of law on September 6, 2011. Doc. 49.

**E.      Previous Motion to Dismiss.**

On January 27, 2012, in light of the fact that the temporary pumping restrictions expired of their own terms in June 2011, Federal Defendants moved to dismiss the case as moot. Doc. 56. This motion was denied on the ground that the case satisfied one of the exceptions to the mootness doctrine because Plaintiffs alleged wrongs capable of repetition yet evading review. Doc. 66. In reaching this conclusion, the Court found that, in addition to the June 2011 pumping reduction, Reclamation ordered a reduction based purely on its authority under CVPIA § 3406(b)(2) on one other occasion, in June 2006, citing *Greenpeace Action v. Franklin*, 14 F. 3d 1324, 1329-30 (9th Cir. 1992), for the proposition that a single, additional instance is sufficient to trigger the "capable of repetition yet evading review" exception. *See* Doc. 66 at 21-28.

In addition, the Court *sua sponte* raised the issue of standing, noting that despite the export reduction in 2011, Plaintiffs' water supply allocation remained at 80%. *Id*. at 28-29.

## III. STANDARD OF DECISION

**A.      Motion to Dismiss Under Fed. R. Civ. P. 12(b)(1).**

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of an action for "lack of subject-matter jurisdiction." Faced with a Rule 12(b)(1) motion, a plaintiff bears the burden of proving the existence of the court's subject matter jurisdiction. *Thompson v. McCombe*, 99 F.3d 352, 353 (9th Cir. 1996). A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears. *Gen. Atomic Co. v. United Nuclear Corp.*, 655 F.2d 968, 968–69 (9th Cir. 1981).

A challenge to subject matter jurisdiction may be facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). As explained in *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1038 (9th Cir.

2004):

> In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction.

In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment. *Savage v. Glendale Union High School*, 343 F.3d 1036, 1039 n. 2 (9th Cir. 2003); *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988). "If the challenge to jurisdiction is a facial attack, i.e., the defendant contends that the allegations of jurisdiction contained in the complaint are insufficient on their face to demonstrate the existence of jurisdiction, the plaintiff is entitled to safeguards similar to those applicable when a Rule 12(b)(6) motion is made." *Cervantez v. Sullivan*, 719 F. Supp. 899, 903 (E.D. Cal. 1989), rev'd on other grounds, 963 F.2d 229 (9th Cir. 1992). "The factual allegations of the complaint are presumed to be true, and the motion is granted only if the plaintiff fails to allege an element necessary for subject matter jurisdiction." *Id.*; *see also Cassirer v. Kingdom of Spain*, 580 F.3d 1048, 1052 n. 2 (9th Cir. 2009), *rev'd on other grounds en banc*, 616 F.3d 1019 (9th Cir. 2010) (applying *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009), to a facial motion to dismiss for lack of subject matter jurisdiction).

A Rule 12(b)(1) motion can be made as a speaking motion -- or factual attack -- when the defendant submits evidence challenging the jurisdiction along with its motion to dismiss. *Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.,* 594 F.2d 730, 733 (9th Cir. 1979); *see Savage v. Glendale Union High Sch.,* 343 F.3d 1036, 1039-40 & n. 2 (9th Cir. 2003). A proper speaking motion allows the court to consider evidence outside the complaint without converting the motion into a summary judgment motion. *See Safe Air for Everyone,* 373 F.3d at 1039. "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Savage,* 343 F.3d at 1039-40, n. 2. In a

speaking motion, "[t]he court need not presume the truthfulness of the plaintiff's allegations." *Safe Air*, 373 F.3d at 1039. Few procedural limitations exist in a factual challenge to a complaint's jurisdictional allegations. *St. Clair v. City of Chico*, 880 F.2d 199, 200-202 (9th Cir. 1989). The court may permit discovery before allowing the plaintiff to demonstrate the requisite jurisdictional facts. *Id*. A court may hear evidence and make findings of fact necessary to rule on the subject matter jurisdiction question prior to trial, if the jurisdictional facts are separable from the merits. *Rosales v. United States*, 824 F.2d 799, 802-803 (9th Cir. 1987). However, if the jurisdictional issue and substantive claims are so intertwined that resolution of the jurisdictional question is dependent on factual issues going to the merits, the court should dismiss for lack of jurisdiction only if the material facts are not in dispute and the moving party is entitled to prevail as a matter of law. Otherwise, the intertwined facts must be resolved by the trier of fact. *Id*.

Here, both sides have presented declarations containing facts relevant to the jurisdictional questions. As the material facts themselves are undisputed, there is no need for an evidentiary hearing.

## IV. DISCUSSION

**A.  Standing.**

    **1.  General Legal Standard Re: Standing.**

Standing is a judicially created doctrine that is an essential part of the case-or-controversy requirement of Article III. *Pritikin v. Dept. of Energy*, 254 F.3d 791, 796 (9th Cir. 2001). "To satisfy the Article III case or controversy requirement, a litigant must have suffered some actual injury that can be redressed by a favorable judicial decision." *Iron Arrow Honor Soc. v. Heckler*, 464 U.S. 67, 70 (1984). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). To have standing, a plaintiff must show three elements.

First, the plaintiff must have suffered an "injury in fact" -- an invasion of a legally

> protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and quotations omitted).

The Supreme Court has described a plaintiff's burden of proving standing at various stages of a case as follows:

> Since [the standing elements] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

*Id*. at 561.

In addition, where an organization or association is bringing suit on behalf of its members, that organization or association must demonstrate that: (1) its members would otherwise have standing to sue in their own right; (ii) the interests it seeks to protect are germane to the organization's purpose; and (iii) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

Standing is evaluated on a claim-by-claim basis. "A plaintiff must demonstrate standing 'for each claim he seeks to press' and for 'each form of relief sought.'" *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 969 (9th Cir. 2009) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). "[S]tanding is not dispensed in gross...." *Lewis v. Casey*, 518 U.S. 343, 358, n.6 (1996).

> The actual-injury requirement would hardly serve the purpose ... of preventing courts from undertaking tasks assigned to the political branches[,] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy all inadequacies in that administration.

*Id*. at 357.

### 2. __Standing Measured at Time Complaint Filed.__

When evaluating whether the elements of standing are present, this Court must look at the facts "as they exist at the time the complaint was filed." *Lujan,* 504 U.S. at 569 n. 4 (emphasis in original)(internal quotation marks omitted); *Clark v. City of Lakewood*, 259 F.3d 996, 1006 (9th Cir. 2001) ("Standing is determined by the facts that exist at the time the complaint is filed.").

Federal Defendants give lip service to this rule, but emphasize the related rule that "a plaintiff must prove all elements of Article III jurisdiction at every stage of the litigation." Doc. 71. It is well established that because standing is an "indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. However, that a plaintiff must prove standing to the same degree as any other element of a claim at successive stages of a case does nothing to alter the fact that the elements of standing are measured as of the date the complaint was filed. Post-filing events are not relevant to the standing inquiry. It is the mootness inquiry that requires a court to look to "changing circumstances that arise after the complaint is filed." *Clark,* 259 F.3d at 1006. Federal Defendants' mootness challenge was rejected and has not been renewed.

### 3. __Injury-in-Fact.__

*Lujan* defines "injury-in-fact" as "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not 'conjectural or hypothetical.' " 504 U.S. at 560 (internal citations omitted). Here, evidence presented by Plaintiffs establishes that on June 6, 2011, Reclamation issued a change order instructing the Authority to reduce pumping at the Jones Pumping Plant from five units to two units for a period of fourteen days starting on June 8, 2011. *See* Doc. 13 and

13-1. It is undisputed that as of June 9, 2011, the date on which the Complaint was filed, Plaintiffs'

allocation from the CVP for 2011 was 80%. Third Decl. of James Snow, Doc. 70-4, at ¶ 14. No party

asserts that the 2011 allocation was likely to change as a result of the change order. However, it is

equally undisputed that as of June 9, 2011, the pumping reductions demanded by the change order were

anticipated to result in an approximately 30,000–35,000 AF "hole" in water storage at San Luis

Reservoir. *See* First Decl. of James Snow, Doc. 14 at ¶5; Third Decl. of James Snow, Doc. 70-4 at ¶ 15.

This is not an insignificant volume of water, being enough to irrigate more than 13,000 acres of

farmland for an entire season or to supply the City of Tracy with water for almost two years. Third Decl.

of James Snow, Doc. 70-4, at ¶ 16.

That this volume of water was not going into storage in June 2011 is undisputed.[2] What is

disputed is whether or not it was "likely" that this "hole" would result in reduced allocations in 2012. In

reality, it did not, as the deficit was refilled in December of 2011.[3] However, according to James Snow,

the filling of the Reservoir at this time of year was "quite unusual and was due to the unusually long

period of time excess conditions continued…, the relatively high carryover storage of the Reservoir as of

the low point in August 2011 [after the Complaint was filed], and the lack of any significant operating

restrictions [imposed in connection with other legal requirements.]" *Id*. at ¶ 21. This assertion has not

been disputed or otherwise called into question by any evidence submitted by Federal Defendants.[4]

---

[2] Plaintiffs expend a great deal of energy hypothesizing all could have occurred if the pumping reduction had been more severe or lasted longer than originally anticipated. This is irrelevant to the standing inquiry, as there is no evidence that a more severe or lengthy reduction was likely. Equally irrelevant is proof (or absence of proof) of injury stemming from the 2006 pumping reduction cited by Plaintiffs in response to and relied upon by the Court in rejecting Federal Defendants' previous motion to dismiss this case as moot. *See* 69-1 at 9 (Federal Defendants' discussing the 2006 pumping reduction). The relevant harm for standing purposes is that which was apparent or anticipated as of June 9, 2011 as a result of the June 6, 2011 change order.
[3] Federal Defendants place great emphasis on the fact that the "hole" was actually filled due to conditions that arose in the late summer and fall of 2011. Doc. 71 at 6. This is entirely irrelevant to the standing inquiry. What is relevant is whether, based upon conditions and anticipated pumping reductions as of June 9, 2011, Plaintiffs were likely to suffer future injury (e.g., in the form of an allocation reduction in 2012).
[4] Federal Defendants suggest that the pumping reduction ordered in June 2011 could not possibly have harmed Plaintiffs because it was accounted for as part of the 800,000 AF of water allocated to fisheries and wildlife restoration purposes under the CVPIA. In particular, Federal Defendants assert that "all fish actions" in 2011 were charged to the (b)(2) account. But,

The Ninth Circuit recognizes that "the loss of affordable irrigation water for ... agricultural lands" is an injury-in-fact, *San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676, 701 (9th Cir. 2012) ("*San Luis II*") (quoting *Laub v. U.S. Dep't of Interior,* 342 F.3d 1080, 1086 (9th Cir. 2003)), and that the adverse consequences flowing from a reduction in water delivery are "concrete and particularized" and "actual or imminent." *Id.* (quoting *San Luis & Delta-Mendota Water Auth. v. Salazar,* 638 F.3d 1163, 1169–70 (9th Cir. 2011)("*San Luis I*")). The water loss need not be enormous to qualify. *San Luis II*, 672 F.3d at 701 (finding standing when Reclamation withheld 9,000 AF of water pursuant to its authority under CVPIA § 3406(b)(2)).

The Ninth Circuit has also recognized that an increased risk of future harm may constitute injury-in-fact for purposes of standing. This is so both for threatened environmental injuries, *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151-52 (9th Cir. 2000); *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947-48 (9th Cir. 2002), and other types of injuries, *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1142 (9th Cir. 2010) (addressing future risk of identity theft). In *San Luis II*, for example, the Ninth Circuit found water agency plaintiffs had standing based in part on a showing that they faced a "significant risk" that water allocations would be reduced in the future as a result of government water accounting decisions. *San Luis II*, 672 F.3d 676. Yet, there is no requirement that the risk of future injury satisfy any particular threshold of significance. Cases have variously looked for "credible threats" of future harm, *Cent. Delta Water Agency*, 306 F.3d at 948–50, and "increased risk" of future harm, *Krottner*, 628 F.3d at 1142-43 (reviewing caselaw), with the Ninth Circuit recently appearing to have settled on the following test:

---

Plaintiffs claim in this case that it was unlawful for the Secretary to exercise his discretion under the CVPIA to order this particular reduction because it took place during a period of excess conditions. It is impossible to determine whether, absent this particular change order, the Secretary would have ordered some other reduction that would have had an equivalent impact on Plaintiffs. In a system as complex as the coordinated operations of the CVP and/or SWP it would be pure speculation to assume as much.

> If a plaintiff faces a credible threat of harm, and that harm is both real and immediate, not conjectural or hypothetical, the plaintiff has met the injury-in-fact requirement for standing under Article III.

*Id.* at 1143.

Here, the evidence presented establishes that as of June 9, 2011, the June 6, 2011 change order threatened to cause future harm to Plaintiffs in the form of an increased risk that the 2012 water allocation would be reduced. Although it was not guaranteed that reduced allocations would come to pass, the threat of harm was certainly real, not conjectural or hypothetical. The "immediacy" requirement is also satisfied here in light of the facts that: (1) the risk of future harm was being caused by events concurrent to the filing of the lawsuit (i.e. the reduced pumping in early June 2011); and (2) hydrologic conditions likely to alleviate any such harm were in fact both unpredictable and "quite unusual." Third Decl. of James Snow, Doc. 70-4, at ¶ 21. The injury-in-fact requirement is satisfied here.

### 4.    **Causation.**

The causation element requires that the injury be "fairly traceable to the challenged action of the defendant" and not "the result of the independent action of some third party not before the court." *Tyler v. Cuomo,* 236 F.3d 1124, 1132 (9th Cir. 2000). Facially, the alleged injury, namely increased risk of reduced allocations in 2012, is fairly traceable to the challenged action: reduced pumping for 14 days in June 2011. Plaintiffs have demonstrated how the pumping reduction produced a "hole" in storage in San Luis Reservoir that produced a credible threat of future injury.

To support the argument that causation is lacking here, Federal Defendants cite *San Joaquin River Group Auth. v. Nat'l Marine Fisheries Serv.*, 819 F. Supp. 2d 1077 (E.D. Cal. 2011) ( *"SJRGA"*), which concerned the adoption and approval of commercial and recreational ocean fishing management measures that permitted certain numbers of fall-run Chinook salmon ("fall-run") to be harvested in 2011. Plaintiffs, a coalition of California water users, argued that the management measures could result

12

in lower numbers of fall-run returning from the ocean to spawn in freshwater, and, therefore, among other things, that water users could be subject to future remedial action by the California State Water Resources Control Board ("SWRCB") to protect salmon in the freshwater environment. *Id*. at 1082. As to this theory, the district court found that plaintiffs failed to demonstrate the plausibility of two links in the causal chain: (1) that the 2011 management measures would decrease salmon abundance; and (2) that "any such decrease [would] result in harm in the form of additional burdens upon" plaintiffs. *Id*. at 1093-94.

Federal Defendants suggest that Plaintiffs have likewise failed to establish a link between the June 6, 2011 change order and any injury, asserting that Plaintiffs must "show an actual connection between the pumping reduction and actual harm to its members." Doc. 69-1. This is an inaccurate description of Plaintiffs' burden. As the district court described in SJRGA:

> A "chain of causation [may have] more than one link, but [may not be] hypothetical or tenuous...." *Nat'l Audubon Soc'y v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002). It is Plaintiff's burden to establish by a preponderance of the evidence that its theory of causation is at least "plausib[le]." *Id*.; *see also Envtl. Def. Ctr. v. EPA*, 344 F.3d 832, 867 (9th Cir. 2003) ("A plaintiff who shows that a causal relation is 'probable' has standing, even if the chain cannot be definitively established.").

*SJRGA*, 819 F. Supp. 2d at 1093. In *SJRGA*, which was decided on summary judgment, there was a complete lack of evidence of any causal connection between the management measures and flow restrictions that might be imposed upon plaintiffs by a third party agency.

Here, in contrast, the causal link certainly qualifies as plausible. As discussed, the June 6, 2011 change order indisputably caused a "hole" in storage in San Luis Reservoir that otherwise would not have been there. The evidence suggests that as of June 9, 2011, when the Complaint was filed, it was more likely than not that the "hole" would not fill. Third Decl. of James Snow, Doc. 70-4, at ¶ 21 (filling of Reservoir in December was "quite unusual"). Federal Defendants have produced no evidence to the

contrary.[5] Plaintiffs have satisfied the causation requirement.

### 5. Redressability.

To satisfy the final requirement of Article III standing, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61; *Friends of the Earth*, 528 U.S. at 181. When this case was filed on June 9, 2011, it was likely that a favorable decision by this Court would redress the threatened injuries described above. Plaintiffs requested "temporary, preliminary and permanent injunctive relief ... prohibiting Defendants from continuing to violate CVPIA section 3411(b)" as well as a declaratory judgment that Defendants must operate the CVP in accordance with the CVPIA and COA. Compl., Prayer at ¶¶ 1-2. Even though Plaintiffs no longer seek (as they cannot) injunctive relief that would correct the June 2011 pumping reduction, where an action is "capable of repetition yet evading review," relief that would prevent repeat injury is sufficient to satisfy the redressability requirement. *See San Luis II*, 672 F.3d at 703-04. Declaratory relief prohibiting future instances of the challenge conduct would redress the possibility of future injury in this case. The redressability requirement is satisfied.[6]

### B. Final Agency Action.

Federal Defendants also argue that the temporary pumping reductions challenged in this case are

---

[5] In Reply, Federal Defendants also cite the Ninth Circuit's recent decision in *Natural Resources Defense Council v. Salazar*, 686 F.3d 1092 (9th Cir. 2012), which concerned a challenge by a coalition of environmental groups to Reclamation's renewal of certain CVP water service contracts. There, plaintiffs alleged renewal of the contracts adversely affected the ESA-threatened Delta smelt. *Id*. at 1095. The Ninth Circuit agreed with the district court that plaintiffs could not establish a causal connection between the threatened injury and Reclamation's renewal of the contracts because the contracts in question contained shortage provisions expressly allowing Reclamation to withhold water deliveries if doing so was required to comply with the ESA. *Id*. at 1098. The Ninth Circuit held that the threatened injury "would not be traceable to the contract renewals because such contracts expressly allow for [ESA] compliance." *Id*. The shortage provision in the contracts effectively broke the causal chain. There is simply no parallel between *NRDC v. Salazar* and this case.

[6] It is undisputed that the requirements of organizational standing are met by the organizational Plaintiffs in this case, where their members would otherwise have standing to sue in their own right; the interests they seeks to protect are germane to the organizations' purposes; and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Friends of the Earth*, 528 U.S. at 181.

not a type of agency action suitable for judicial review under the APA.[7] The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Where no other statute provides a right of action, the "agency action" at issue must also be "final agency action." § 704. "A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." *Id*. "Agency action" is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." § 551(13).

To be considered "final," the agency action (1) should "mark the consummation of the agency's decision-making process," and (2) "be one by which rights or obligations have been determined or from which legal consequences flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotations omitted). Both conditions must be satisfied for agency action to be final. *See id*. at 178. The Supreme Court has "interpreted the 'finality' element in a pragmatic way." *FTC v. Standard Oil of Cal*., 449 U.S. 232, 239 (1980); *Oregon v. Ashcroft*, 368 F.3d 1118, 1147 (9th Cir. 2004). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). Certain factors provide indicia of finality, such as whether "the action amounts to a definitive statement of the agency's position," whether the action "has a direct and immediate effect on the day-to-day operations" of the party seeking review, and whether "immediate compliance with the terms is expected." *Oregon Natural Desert Association v. U.S. Forest Service*, 465 F.3d 977, 982 (9th Cir. 2006) (internal citations and quotations omitted). Finality is a jurisdictional requirement. *Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261, 264 n. 1 (9th Cir. 1990).

---

[7] It has already been settled in this case that Plaintiffs cannot bring a generic challenge to the Secretary's claimed authority to exercise discretion under the CVPIA to order pumping reductions during periods of excess conditions. Doc. 66 at 13. What is at issue here is the remaining challenge to the June 6, 2011 change order.

To constitute the consummation of an agency's decision-making process, the challenged act "must not be of a merely tentative or interlocutory nature." *Bennett*, 520 U.S. at 178. An action marks the consummation of an agency's decision-making process if it constitutes the agency's "last word on the matter." *Oregon Natural Desert Ass'n*, 465 F.3d at 984. The June 6, 2011 change order was an instruction to the Authority to modify pumping operations for fourteen days. This is neither tentative nor interlocutory.[8]

The next question under *Bennett* is whether legal consequences flow from the agency action. 520 U.S. at 178. Relevant factors include whether the agency action has a "direct and immediate effect" on the complaining parties and requires their "immediate compliance." *Ass'n of Am. Medical Colleges v. United States*, 217 F.3d 770, 780 (9th Cir. 2000). The June 6, 2011 change order required pumping reductions to begin two days later. This had the direct and immediate effect of creating the storage hole in San Luis Reservoir discussed above.

The June 6, 2011 change order constituted final agency action suitable for review under the APA.

## V. CONCLUSION AND ORDER

For the reasons set forth above, Federal Defendants' motion to dismiss is DENIED.

IT IS SO ORDERED.

Dated:   **October 17, 2012**                    **/s/ Lawrence J. O'Neill**
                                         UNITED STATES DISTRICT JUDGE

---

[8] Federal Defendants' reliance on *Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232 (9th Cir 1990), to suggest otherwise is totally unpersuasive. That case did not even concern the "final agency action requirement." Instead, it addressed whether an operational decision to temporarily reduce the flow of water from a dam constituted a "major Federal action" necessitating the preparation of an Environmental Impact Statement ("EIS") under the National Environmental Policy Act. *Id.* at 234-35. The Ninth Circuit held that no EIS was required because the temporary reduction did not represent a departure from the status quo. *Id.* at 235. This analysis is wholly irrelevant to the present question: whether the June 6, 2011 change order constitutes a final agency action for purposes of the APA.