1

2

3

4

5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

6

7

**SAN LUIS & DELTA MENDOTA**
**WATER AUTHORITY, et al.,**

8                                                    **Case No. 1:11-cv-00952 LJO GSA**

**Plaintiffs,**

9          **v.**

**ORDER DENYING PLAINTIFFS'**
**MOTION FOR LIMITED DISCOVERY**
**WITHOUT PREJUDICE**

10    **UNITED STATES DEPARTMENT OF**
**THE INTERIOR, et al.,**

11

**Defendants.**

12

**I.    INTRODUCTION**

13

Plaintiffs San Luis & Delta-Mendota Water Authority and one of the Authority's member

14   districts, Westlands Water District (collectively, "Plaintiffs") filed this action for declaratory and

15   injunctive relief in June 2011, against the U.S. Department of the Interior, the U.S. Bureau of

16   Reclamation, the U.S. Fish & Wildlife Service and a number of federal officials (collectively,

"Federal Defendants").[1]  Plaintiffs sought to prevent the U.S. Bureau of Reclamation

17   ("Reclamation") from temporarily reducing the volume of water pumped and exported from the

18   Sacramento-San Joaquin River Delta and San Francisco Bay (referred to as the Bay-Delta) to the

19   _____

[1] The Defendants in this action include the U.S. Department of Interior, the Secretary of the U.S. Department of
20   Interior, the U.S. Fish and Wildlife Service, the U.S. Bureau of Reclamation, as well as officials of the latter two
agencies.

-1-

21

Delta-Mendota-Canal, at the C.W. "Bill" Jones Pumping Plant ("Jones Pumping Plant") near Tracy, California. The Jones Pumping Plant is part of the operations of the Central Valley Project, a major federal water project in California.[2] The export pumping reduction was recommended by the U.S. Fish and Wildlife Service ("FWS") and other fish agencies. Reclamation directed the pumping reduction through a change order dated June 6, 2011 issued to the San Luis & Delta-Mendota Water Authority, the entity responsible for operating the Jones Pumping Plant. Reclamation ordered the export pumping reduction "for the stated purpose of improving conditions for out-migrating fall run Chinook salmon and Steelhead," a number of which were being lost or salvaged at the Delta pumps. Doc. 80, Joint Status Report, at 6. The export pumping reduction ordered by Reclamation remained in effect for fourteen days, from June 8 to June 23, 2011. *Id.* Since the inception of this action challenging the pumping reduction, the District Court has ruled on motions for a temporary restraining order and preliminary injunction filed by Plaintiffs, as well as two motions to dismiss filed by Federal Defendants—all of which were denied. Pending before the Court is Plaintiffs' Motion for Limited Discovery. Doc. 83. The matter has been fully briefed and argued by the parties, and is ripe for decision.

---

[2] The Central Valley Project or CVP (along with California's State Water Project—see below) uses the Bay-Delta to convey water from the wetter northern regions of California to farms, cities and industries in the drier central and southern regions of the state. Doc. 1, Cmplt., ¶23. The CVP is operated by Reclamation and is the largest water storage and delivery system in California, covering 29 of the state's 58 counties. The CVP consists of 20 reservoirs capable of storing 9 million acre-feet of water, 11 power plants, 500 miles of major canals, aqueducts and tunnels. In order to facilitate CVP operations, Reclamation holds title to water export facilities located in the Delta, including the Jones Pumping Plant, which is operated by the San Luis & Delta-Mendota Water Authority. The Jones Pumping Plant pumps water from the Sacramento-San Joaquin Delta, for delivery to areas of California south and west of the Delta. *Id.* at ¶21.

The Jones Pumping Plant lifts water nearly 200 feet from the southern end of the Sacramento-San Joaquin Delta into the Delta-Mendota Canal through 15-foot diameter pipes with six 22,500-horsepower motors capable of pumping a total of 8,500 acre-feet per day. The Delta-Mendota Canal extends nearly 120 miles to the south, ending at Mendota, Calif. The Delta-Mendota Canal delivers water to CVP water service contractors, exchange contractors, and wildlife refuges. The CVP water is also conveyed with pumping units to the San Luis Reservoir for deliveries to CVP contractors through the San Luis Canal. *See* United States Bureau of Reclamation website, www.usbr.gov/mp/PA/docs/fact_sheets/Jones_Pumping_Plant.pdf (last visited November 20, 2013).

## II.   APPLICABLE LEGAL FRAMEWORK

This case presents a conflict between two provisions of the 1992 Central Valley Project Improvement Act ("CVPIA"), Pub. L. No. 102-575, 106 Stat. 4700 (1992).  The two provisions at issue are CVPIA (Pub. L. No. 102-575) §§ 3406(b)(2) and 3411(b).  One of these provisions, CVPIA § 3406(b)(2), requires the Secretary of the Interior ("Secretary"), through the Bureau of Reclamation, to dedicate 800,000 acre-feet of water to serve certain fish, wildlife, and habitat restoration purposes.  The other provision, CVPIA § 3411(b), requires the Secretary to comply with a 1985 agreement between the federal government and California to coordinate the operations of their respective water projects in the state, namely the Central Valley Project and the State Water Project.[3]  This agreement, the "Agreement Between the United States of America and the Department of Water Resources of the State of California for Coordinated Operation of the Central Valley Project and the State Water Project," is commonly known as the "Coordinated Operations Agreement" or "COA."  Article 6(g) of the COA requires both parties to the agreement to "export and store as much water as possible" during "excess water conditions."

In this case, Plaintiffs challenge, based on Article 6(g) of the COA, the lawfulness of Reclamation's two-week pumping reduction which the parties agree occurred during a period when the Sacramento-San Joaquin Delta was experiencing "excess water conditions." Federal Defendants assert, in response, that FWS and Reclamation acted pursuant to the statutory mandate in CVPIA § 3406(2) to implement certain fish, wildlife and habitat restoration measures.

---

[3] The State Water Project or SWP is the largest state-operated water supply project in the United States and includes 32 storage facilities, reservoirs, and lakes; 17 pumping plants; 3 pumping-generating plants; 5 hydroelectric power plants; and about 660 miles of pipelines and open canals that collectively stretch from Oroville Reservoir, located on the Feather River in the north, to Perris Reservoir, located in Riverside County in the south.  Through the SWP, water is pumped from the Delta at the Banks Pumping Facility, located near Tracy, California, for transmittal to end users located within several regions of California via the California Aqueduct.  The SWP supplies urban and agricultural water to about two-thirds of the residents of California (approximately 25 million Californians) and about 750,000 acres of the State's farmland located in the San Francisco Bay Area, the San Joaquin Valley, the Central Coast, and Southern California.  Doc. 1, Cmplt. ¶22.

**A.      The Relevant Provisions of the COA and the CVPIA**

Congress authorized and directed the Secretary of the Interior to execute and implement the COA in 1986 through Pub. L. No. 99-546, 100 Stat. 3050, § 103.[4]  Subsequently, in November 1986, the parties to the COA executed the agreement, which they had reached in May 1985. Article 6(g) of the COA defines the "Responsibilities During Excess Water Conditions" of the two parties to the COA, i.e., the Bureau of Reclamation and the State of California Department of Water Resources (DWR), and states: "During excess water conditions each party has the responsibility to export and store as much water as possible within its physical and contractual limits."  COA, Art. 6(g).  The COA defines "excess water conditions" as "periods when it is agreed that releases from upstream reservoirs plus unregulated flow exceed Sacramento Valley inbasin uses, plus exports."  COA, Art. 3(c).

In 1992, Congress enacted the CVPIA, Pub. L. No. 102-575, 106 Stat. 4700 (1992).  In § 3411 of the CVPIA, Congress directed the Secretary of the Interior, acting through the Bureau of Reclamation, to comply with the COA.  CVPIA § 3411(b) states:

> SEC. 3411—COMPLIANCE WITH STATE WATER LAW AND
> COORDINATED OPERATIONS AGREEMENT.
>
> (b) The Secretary [of the interior], in the implementation of the provisions of this title, shall fully comply with the United States' obligations as set forth in the "Agreement Between the United States of America and the Department of Water Resources of the State of California for Coordinated Operation of the Central Valley Project and the State Water Project" dated May 20, 1985, and the provisions of Public Law 99-546; and shall take no action which shifts an obligation that otherwise should be borne by the Central Valley Project to any other lawful water rights permittee or licensee.

At the same time, Congress directed the Secretary of the Interior, in § 3406(b)(2) of the CVPIA, to dedicate and manage 800,000 acre-feet of Central Valley Project yield annually for

the primary purpose of implementing the CVPIA's fish, wildlife, and habitat restoration

mandate.  CVPIA § 3406(b)(2) states:

> (b) FISH AND WILDLIFE RESTORATION ACTIVITIES.
> The Secretary, immediately upon the enactment of this title, shall
> operate the Central Valley Project to meet all obligations under
> state and Federal law, including but not limited to the Federal
> Endangered Species Act, 16 U.S.C. 1531, et seq., and all decisions
> of the California State Water Resources Control Board establishing
> conditions on applicable licenses and permits for the project. The
> Secretary, in consultation with other State and Federal agencies,
> Indian tribes, and affected interest, is further authorized and
> directed to:
>
> ***
>
> (2) upon enactment of this title dedicate and manage annually eight
> hundred thousand acre-feet of Central Valley Project yield for the
> primary purpose of implementing the fish, wildlife, and habitat
> restoration purposes and measures authorized by this title; to assist
> the State of California in its efforts to protect the waters of the San
> Francisco Bay/Sacramento-San Joaquin Estuary; and to help meet
> such obligations as may be legally imposed upon the Central
> Valley Project under state or federal law following the date of
> enactment of this title, including but not limited to additional
> obligations under the federal Endangered Species Act....

Pub. L. No. 102-575, § 3406(b)(2), 106 Stat. 4700, 4714 (1992).

### III.   History of this Case

Plaintiffs' complaint alleges two alternative claims for relief that arise under the

Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA").  First the complaint alleges that

the "Defendants' decision to reduce pumping for export and storage from the Jones Pumping

Plant in favor of the [CVPIA § 3406](b)(2) account during a period of excess water conditions in

the Delta violates the mandatory, nondiscretionary duty set forth in § 3411(b) of the CVPIA to

maximize pumping during such periods as required under Section 6(g) of the COA."  Doc. 1, ¶

46.  Plaintiffs allege that this decision constituted "agency action unlawfully withheld," within

the meaning of 5 U.S.C. § 706(1).  Doc. 1, ¶ 47.  Second, Plaintiffs allege that the "Defendants'

---

[4] Pub. Law No. 99-546 was entitled, "An Act to implement the Coordinated Operations Agreement, the Suisun
Marsh Preservation Agreement, and to amend the Small Reclamation Projects Act of 1956, as amended, and for

decision to impose pumping restrictions on the CVP for the benefit of the fall-run Chinook salmon is a final agency action within the meaning of Section 706(2) of the APA."  Doc. 1, ¶ 51. Plaintiffs' claim that "imposing pumping reductions not otherwise required" constituted agency action contrary to CVPIA § 3411(b) and, therefore, was "arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A) and "in excess of statutory jurisdiction" under 5 U.S.C. § 706(2)(C).  Doc. 1, ¶¶ 52-53.

Since the filing of Plaintiffs' complaint, the Court has denied the Plaintiffs' motions for a temporary restraining order ("TRO") and a preliminary injunction, which asked the Court, respectively, to halt the temporary export pumping reduction at the Jones Pumping Plant and to compel the Bureau to increase pumping to prior levels.  Docs. 38, 39 and 49.  Ruling from the bench, the Court found that the Plaintiffs had not demonstrated likely success on the merits of their statutory claims and would not experience irreparable injury absent immediate injunctive relief.  Doc. 39, Transcript of Hrg. on Mtns. for TRO and Prelim. Injunction, at 106. Subsequently, the Court also denied Federal Defendants' motion to dismiss the complaint as moot.  Doc. 66.  The Court found that although the Plaintiffs' challenge to the June 2011 pumping reduction action technically was moot (in light of the fact that the temporary pumping restrictions expired of their own terms in June 2011), the case should not be dismissed because the Plaintiffs had demonstrated that an exception to the mootness doctrine, "capable of repetition, yet evading review," applied in this case.[5]  *Id*.  Finally, the Court denied Federal Defendants' motion to dismiss for lack of standing and for failure to challenge a final agency action.  Doc. 73.  The Court found that the Plaintiffs had demonstrated injury-in-fact causation

---

other purposes."

[5] The Court further ruled that Plaintiffs could not bring a generic challenge to the Secretary's claimed authority to exercise discretion under the CVPIA to order pumping reductions during periods of excess water conditions.  Doc. 66 at 13.  Therefore, Plaintiffs' challenge is limited to contesting the validity of the June 2011 temporary pumping reduction.

and redressability sufficient to prove standing, and also that the June 6, 2011 change order

constituted final agency action suitable for review under the APA, 5 U.S.C. § 701 et seq.  *Id.*

Accordingly, on February 8, 2013, Federal Defendants lodged and certified two

administrative records in this case—one administrative record from Reclamation and another

from FWS.  *See* Doc. 77.  Federal Defendants maintain that each record contains all the materials

relied on by each agency in deciding to implement the June 2011 pumping reduction at issue in

this case, and have certified that the documents they have lodged represent the complete

administrative records for this case for Reclamation and FWS, respectively.  *See* Doc. 77-1 ¶4;

Doc. 77-3 ¶4; Doc. 80, Joint Status Report, at 7.  Plaintiffs have stated that they "are not aware of

information that would contradict Defendants' representations that the two records include all

documents and information the Defendants considered and relied upon when they made the June

2011export pumping reduction" and "do not intend to seek to augment these records."  Doc. 80,

Joint Status Report, at 7.

## IV.   OVERVIEW OF THE PARTIES' PLEADINGS AND POSITIONS

### A.   Plaintiffs' Motion for Limited Discovery

Plaintiffs' instant motion for limited discovery seeks "discovery of matters relevant to the

interpretation of the COA," specifically Article 6(g) of the COA, for the stated purpose of

assisting the Court in determining whether the June 2011 pumping reduction was "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law," under the APA, 5

U.S.C. § 706(2)(A).  Doc. 83-1, Pltffs. Mtn. for Discovery, at 1, 3.  Plaintiffs argue, citing a joint

status report filed by the parties, that "[a]ll parties agree that the key issue in this case is whether

P.L. 99-546 and CVPIA section 3411(b), through Article 6(g) of the COA, require Reclamation

to export and store as much water as possible within physical and contractual limits during

excess water conditions."  *Id.* at 3.  Plaintiffs contend "Article 6(g) unambiguously requires

Reclamation" to maximize water exports and storage during periods of "excess water

conditions," subject to the stated constraints.  *Id.*  Federal Defendants acknowledge the statutory

directive to comply with the COA, but also claim the discretion to manage overall CVP

operations.  *Id.*

Plaintiffs contend that the parties' dispute regarding the interpretation of Article 6(g) is

"fundamentally an issue of contract interpretation."  *Id.*  Plaintiffs argue that "[e]xtrinsic

evidence may be necessary to resolve [the parties'] competing interpretations of the COA, and

[that] discovery is appropriate and necessary to obtain such evidence."  *Id.*  Specifically,

Plaintiffs seek "to conduct limited discovery focusing on the negotiation and interpretation of the

COA and the parties' performance thereunder—to secure the evidence necessary for the Court to

adequately perform the contractual interpretation needed to determine Defendants' statutory

obligations and resolve this case."  *Id.* at 4-5.  Plaintiffs argue that "[i]n the unique context of this

case," relevant, extrinsic facts regarding the negotiation of, and performance under, the COA,

"are all in the nature of legislative facts because they will help the Court understand what the

COA requires of Defendants, and hence what P.L. 99-546 and CVPIA section 3411(b) require."

*Id.* at 7.

At the hearing held by the Court on Plaintiffs' instant discovery motion, Plaintiffs' counsel,

Eileen Diepenbrock, stated that the Plaintiffs envisioned potentially utilizing the full range of

discovery tools available in civil cases, including contention interrogatories, requests for

production of documents, requests for admissions, and depositions of agency officials.

**B.   Federal Defendants' Opposition to Plaintiffs' Motion**

In their response to Plaintiffs' motion, Federal Defendants point out that Plaintiffs requests

for discovery go beyond the administrative records lodged with the Court, in that Plaintiffs seek

(1) to obtain and introduce extrinsic evidence regarding contract negotiations concerning the

COA; and (2) discovery  regarding the "parties' performance" under Article 6(g) of the COA

during the 25 years between when the COA was executed in November 1986 and the filing of Plaintiff's complaint.  Doc. 84, Def. Opp., at 6-7.

With regard to Plaintiffs' request for discovery related to contract negotiations concerning the COA, Federal Defendants argue that while Plaintiffs contend that this discovery is needed to "inform the meaning of the law," determining "the meaning of the law" is the "quintessential judicial function of the court which unquestionably is more-than-capable of reviewing the statutory provisions and construing and applying the COA by reference to customary judicial tools of construction," without recourse to extra-record discovery conducted by Plaintiffs.  *Id.* at 1-2.

Next, with regard to discovery regarding the parties' performance under Article 6(g) of the COA over the past 25 years, Federal Defendants argue that while Plaintiffs assert that this discovery is necessary to enable the Court to construe and apply the provisions of the 1992 CVPIA, including § 3411(b) of that Act, such discovery is unwarranted because Plaintiffs are restricted to contesting the validity of the June 2011 fourteen-day pumping reduction and, under established principles governing APA review, judicial review of that June 2011 action is based on the closed universe of the administrative records lodged with the Court.  *Id.* at 5.

Finally, Federal Defendants contend that interpretation of the COA's Article 6(g) is not the sole focus of this case.  Rather, what matters is what Congress intended when it incorporated the COA into federal law, including into the CVPIA, which also incorporates other, potentially conflicting Congressional priorities and mandates.  Argument by Fed. Defts. counsel, Charles Shockey, at the hearing on Pltffs. Mtn. for Discovery.

///

///

///

///

## IV.   DISCUSSION

### A.   Applicable Legal Standards

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  In reviewing agency decisions under the APA, courts apply the appropriate APA standard of review, based on the administrative record that the agency compiles and submits to the court.  5 U.S.C. § 706; s*ee also Friends of the Earth v. Hintz*, 800 F.2d 822, 829 (9th Cir. 1986); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971).  When a court reviews an agency determination, "there are no disputed facts that the district court must resolve."  *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985).  "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Id*.  The Supreme Court and the Ninth Circuit have emphasized that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the court."); *Lands Council v. Powell*, 395 F.3d 1019, 1029 (9th Cir. 2004).

Although "[g]enerally, judicial review of an agency decision is limited to the administrative record on which the agency based the challenged decision," a court may consider allowing supplementation of the administrative record in four limited circumstances:

> (1) supplementation is necessary to determine if the agency has considered all factors and explained its decision; (2) the agency relied on documents not in the record; (3) supplementation is needed to explain technical terms or complex subjects; or (4) plaintiffs have shown bad faith on the part of the agency.

1   *Fence Creek Cattle Co. v. U.S. Forest Serv*., 602 F.3d 1125, 1131 (9th Cir. 2010).  The Ninth

2   Circuit has clearly explained that these exceptions to record review are "narrowly construed and

3   applied:"

> The scope of these exceptions permitted by our precedent is
> constrained, so that the exception does not undermine the general
> rule. Were the federal courts routinely or liberally to admit new
> evidence when reviewing agency decisions, it would be obvious
> that federal courts would be proceeding, in effect, de novo rather
> than with the proper deference to agency process, expertise, and
> decision-making.

6   *Lands Council*, 395 F.3d at 1030.

7        "The broadest exception to the general rule that review is to be restricted to the record

8   certified by the agency is [the] one which permits expansion of the record when necessary to

9   explain agency action."  *Pub. Power Council v. Johnson*, 674 F.2d 791, 793 (9th Cir. 1982).

10  While courts rarely invoke this exception, there are instances in which courts "provide limited

    discovery when serious gaps would frustrate challenges to the agency's action."  *Id.*

11  Nonetheless, "[w]hen there is a need to supplement the record to explain agency action, the

12  preferred procedure is to remand to the agency for its amplification."  *Id.* at 794.  Indeed,

13  "remand to the agency may satisfy the request for expanding the record in most cases."  *Id.* at

    795; *see also Proietti v. Levi,* 530 F.2d 836 (9th Cir. 1976) (holding that if the district court

14  found, upon reviewing a decision of the Attorney General, that the administrative record did not

15  sustain the action, the remedy was not to take additional evidence, but instead to remand the

16  matter for reconsideration by the agency).

17       The record review limitations of the APA apply to claims challenging agency inaction as

    well as to claims challenging agency action.  *See City of Santa Clarita v. U.S. Dep't of the*

18  *Interior*, No. CV02-0697, 2005 WL 2972987, at *2 (C.D. Cal. Oct. 31, 2005).  "Section 706 of

19  the APA makes clear that the scope of review of both claims under Section 706(1), challenges to

20  agency inaction, and section 706(2), challenges to agency action, is to be based 'on the whole

21

record,' 5 U.S.C. § 706, although in the case of challenges to agency inaction, there may be "no final agency action to demarcate the limits of the record."[6]  *San Francisco BayKeeper v. Whitman*, 297 F.3d 877, 886 (9th Cir. 2002), *quoting Friends of Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000); *also see City of Santa Clarita*, 2005 WL 2972987 at *2.

Finally, "once an agency has taken final agency action under the APA, a reviewing court analyzes that decision under the 'arbitrary and capricious' standard of review."[7]  *Mt. St. Helens Mining & Recovery Ltd. P'ship v. United States*, 384 F.3d 721, 727 (9th Cir. 2004).  The court "must determine whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made."  *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. USDA*, 499 F.3d 1108, 1115 (9th Cir. 2007).  "This standard of review is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision."  *Id*.

**B.   Plaintiffs' are not entitled to Extra-Record Discovery at this Juncture**

**(1)   The Jurisdictional Posture and Legal Framework of the Case Preclude Discovery at this Stage of the Proceedings**

Plaintiffs' assert that the discovery they seek is warranted because the fact that the parties' dispute what the law requires in this case, in particular what Article 6(g) of the COA means, makes Article 6(g) and the COA potentially ambiguous for purposes of this case.  Plaintiffs argue that in light of this potential ambiguity, the Court requires extrinsic evidence in order to

---

[6] Where a court considers a claim that an agency has failed to act in violation of its obligations, review may not be limited to record documents if "there is no final agency action to demarcate the limits of the record."  *San Francisco BayKeeper v. Whitman*, 297 F.3d 877, 886 (9th Cir. 2002). The reason for this exception is that "when a court is asked to review agency inaction before the agency has made a final decision, there is often no official statement of the agency's justification for its actions or inactions."  *Id*.  Here, the Court has previously found that "[t]he June 6, 2011 change order constituted a final agency action suitable for review under the APA."  Doc. 73 at 16.  Therefore, Plaintiffs' alternative claims of agency action and inaction may both be reviewed using the existing administrative records lodged with the Court.

[7] This standard is applicable to the instant case because "Plaintiffs contend that the June 2011 export cuts were 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' and should be held unlawful under the judicial review provisions of the APA, 5 U.S.C. § 706(2)(A)."  Doc. 80, Parties' Joint Status Report, at 8.

properly interpret the meaning of the law applicable to this case.[8]  Plaintiffs contend that the relevant extrinsic evidence that the Court must have in order to interpret the contractual provision at issue in this case is (1) extrinsic evidence regarding the intent of the parties to the COA in negotiating and signing that agreement; and (2) extrinsic evidence regarding the course of dealing between the California DWR and Reclamation in implementing the COA since its adoption.  Plaintiffs' argue that they should be permitted to utilize standard discovery tools to obtain this extrinsic evidence because such evidence is necessary to clarify the meaning of Article 6(g), and determining  what Article 6(g) requires is a necessary predicate to application of the applicable APA standard to the June 2011 pumping reduction.

Federal Defendants respond that the fact that the parties dispute the meaning of a contractual provision relevant to this case, i.e., Article 6(g) of the COA, by itself does not render that provision or the COA ambiguous.  Federal Defendants point out that the COA was negotiated between the California DWR and Reclamation in 1985; subsequently Congress authorized its execution and implementation; and, ultimately, it was incorporated into the 1992 CVPIA, in § 3411, by means of a statutory directive to the Secretary of the Interior to comply with the COA.  Federal Defendants contend that, therefore, what matters in resolving this case is determining (1) what Congress intended when it authorized the execution and implementation of the COA and when it incorporated the COA into the CVPIA; and (2) what the plain language of Article 6(g), interpreted with reference to the whole agreement, means.

Federal Defendants argue that extrinsic evidence regarding the negotiating of the COA between the California DWR and Reclamation is not relevant to the issues before the Court because the specific terms agreed upon by the parties are included in the COA and Congress adopted the COA as it was signed and agreed upon by the parties.  In other words, the COA is a

---

[8] Plaintiffs also argue that the Court may consider extrinsic evidence to determine whether Article 6(g) is ambiguous in the first place.  Doc. 83-1, Pltffs. Mtn. for Discovery, at 6.

contract and must be construed according to its terms and conditions as executed, not with reference to parol evidence of extrinsic documents or events.  Federal Defendants further contend that Plaintiffs' request for discovery of extrinsic evidence regarding the course of dealing under the COA also is not relevant to the contested issue of statutory construction.  Federal Defendants assert that prior to the instant complaint, no party, including the Plaintiffs, had ever challenged on the basis of COA Article 6(g), Reclamation's discretion to order pumping reductions under the CVPIA during excess water conditions.  Therefore, Federal Defendants argue that discovery regarding the course of dealing between California DWR and Reclamation pursuant to Article 6(g) of the COA is unlikely to be fruitful or helpful to the Court.  Rather, Federal Defendants suggest that this course of dealing is sufficiently reflected in the administrative record before the Court, and is an area that may properly be probed based on the administrative record.  Finally Federal Defendants point out, and Plaintiffs concede, that Plaintiffs are not parties to the COA or third party beneficiaries, and are not suing for breach of contract or alleging bad faith or irregularities in how the contract was negotiated.  Rather, Plaintiffs are limited to challenging Reclamation's June 6, 2011 pumping reduction under the APA, and, therefore, the principles that govern APA review are controlling here.

The Court finds Plaintiffs' argument for extra-record discovery unpersuasive at this juncture.  On the one hand, Plaintiffs take the position that COA "Article 6(g) unambiguously precludes Reclamation from making discretionary cuts in export pumping during times of excess water conditions."  Doc. 74, Joint Status Report, at 6; Doc. 80, Joint Status Report, at 8; Doc. 83-1, Pltffs. Mtn. for Discovery, at 1.  On the other hand, Plaintiffs argue that "the Court may consider extrinsic evidence to determine the meaning of Article 6(g), including whether it is ambiguous," in light of the fact that Federal Defendants' have challenged Plaintiffs' interpretation of this provision.  Doc.83-1, Pltffs. Mtn. for Discovery, at 1.  While Federal Defendants dispute Plaintiffs' interpretation of Article 6(g), they do not take the position that

Article 6(g) is ambiguous.  Rather, they urge the Court to interpret Article 6(g) with reference to the COA as a whole, and also with reference to the larger statutory scheme of the CVPIA, which incorporates the COA.  *See* Doc. 84, Def. Opp., at 17 ("The 1986 COA represents a comprehensive 30-page agreement carefully negotiated and executed between the State of California and the United States.  The terms of that Agreement must be construed by reference to the four corners of the COA and the later congressional enactments that incorporated the COA as a whole—not simply the language of Article 6(g)—in CVPIA § 3411(b).").

The Ninth Circuit has noted that the "fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous."  *Kennewick Irr. Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1980) (internal quotation marks and citation omitted).  Here Plaintiffs, who claim that Article 6(g) is unambiguous, ironically are inviting the Court to inject ambiguity into Article 6(g) by implicating parole evidence before the Court has even had an opportunity to attempt to interpret that provision on the basis of its plain meaning, in relation to the COA as a whole, or with reference to the larger statutory scheme of the CVPIA.

The *Kennewick* decision sets forth general principles applicable to federal contracts.  In *Kennewick*, the court examined and interpreted the contractual terms at issue based on the language of the agreement itself, not with reference to extrinsic materials or discovery.  The court noted that "[a] written contract must be read as a whole and every part interpreted with reference to the whole," with preference given to reasonable interpretations over unreasonable ones.  *Id.*  Again, in *Klamath Water Users Prot. Ass'n v. Patterson*, a contract dispute case, the Ninth Circuit applied the general principles of contract interpretation, turning first to the "plain language of the Contract" to resolve the dispute at issue in that case.  204 F.3d 1206, 1210 (9th Cir. 1999) ("Whenever possible, the plain language of the contract should be considered first."); *also see United States v. Johnson*, 43 F.3d 1308, 1310-11 (9th Cir. 1995) (absent an

1  irreconcilable ambiguity in a contract, there is no basis for a court to consider parol evidence to

2  clarify the contract terms).

    The Court finds that it would be premature to allow discovery now, with a view to

3  obtaining relevant, extrinsic evidence, before the Court has even had a chance to consider the

4  questions of law at issue in this matter.  The Court will consider those questions, specifically

5  construction and application of the CVPIA and COA to the facts of this case, upon the filing of

    the parties' cross-motions for summary judgment.  The Court finds persuasive the Federal

6  Defendants' argument that before resorting to discovery in this case, the Court must first have

7  the opportunity to interpret the complex statutory framework applicable to this case—which

8  includes the COA as a whole by incorporation—on its own terms.

9      Various courts have undertaken interpretation and reconciliation of provisions of the

    CVPIA in prior cases.  Indeed, Judge Oliver Wanger, a former district judge of this Court, noted

10  at the hearing on Plaintiffs' motions for temporary restraining order and preliminary injunction

11  in this case: "we have already recognized in many prior decisions [that the CVPIA] is a very

12  difficultly drafted statutory enactment which has required extended, hundreds and hundreds and

13  hundreds [sic] of pages of legal decision to attempt to parse and understand its terms and

    conditions and provisions."  Doc. 39 at 108.  As in those previous cases, the Court in this case

14  must also address complex statutory interpretation issues implicated by the CVPIA.  Specifically,

15  the Court must determine what Congress intended by directing the Secretary of the Interior to

16  implement and comply with the COA in light of the requirements of the concurrent statutory

    mandate regarding fish, wildlife, and habitat protection of Section 3406(b) of the CVPIA.

17      It is thus possible, that at the summary judgment stage, the Court will be able to resolve the

18  disputed issues of statutory construction and contract interpretation simply on the basis of the

19  plain language of the statutory and contractual provisions at issue, with reference to the larger

20  statutory scheme as well as the COA as whole.  The Court notes that the COA itself is a wide-

21                                         -16-

ranging agreement that goes far beyond the specific mandate in Article 6(g) regarding

management of water in excess water conditions.  Rather, the COA is an agreement between

Reclamation, as the entity responsible for the federal CVP, and the California DWR, as the entity

responsible for California's SWP, to manage the extensive operations of these two water projects

in an integrated manner.  The Court would also have traditional interpretive tools at its disposal

if it found the statutory scheme, the COA, or any of the relevant statutory or contractual

provisions to be ambiguous.  For example, the Court could consider legislative history regarding

the COA, particularly legislative history relating to the COA's incorporation into the 1986

legislation, Pub. L. No. 99-546, § 103, as well as to the COA's subsequent incorporation into §

3411(b) of the 1992 CVPIA.  In addition, the Court would have before it Reclamation's

interpretation of the applicable statutory mandate, which is "entitled to respect" under *Skidmore

v. Swift & Co.*, 323 U.S. 134, 140 (1044), to the extent that it is persuasive.  *See Chevron, U.S.A.,

Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-843 (1984) (to the extent that the court

finds the relevant statutory provisions to be silent or ambiguous with respect to the issue before

the court, the court's task is not to impose its own construction, but instead to ask whether the

agency's answer is based on a permissible construction of the statute).  By relying on traditional

tools of statutory and contract interpretation, as well as the principles of deference to the

agency's interpretation that apply in APA-review cases, the Court could avoid resorting to extra-

record evidence given that consideration of such evidence is the exception and not the norm in

APA cases.

At the summary judgment stage the Court would have the benefit of the parties' parsing of

the administrative record, the agency's interpretation of the relevant statutory mandates, as well

as briefing regarding the legislative history surrounding the COA and the CVPIA.  Upon review

of the statutory scheme, the COA, and the administrative record; application of the traditional

tools of statutory construction and contract interpretation; and consideration of Reclamation's

interpretation of the applicable statutory mandate as reflected in the record, the Court can decide for itself if it requires additional information to interpret the statutory conflict at issue in this case.  The administrative record before the Court contains the COA as well as documents relating to the facts and circumstances surrounding the June 2011 temporary pumping reduction from both the FWS as well as Reclamation.  In assessing the reasonableness of the decision to reduce pumping at the summary judgment stage, the Court would be well situated to pinpoint any additional materials needed as well as the most effective way to obtain them.

Traditionally, when the record is found to be insufficient to conduct adequate judicial review, courts have asked the relevant agency to supplement the record by providing "an additional explanation of the reasons for the agency decision" either through affidavits or testimony.  *Camp v. Pitts*, 411 U.S. 138, 143; *also see Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (remanding to the District Court for plenary review "based on the full administrative record," but noting that "since the bare record may not disclose the factors that were considered or the [Secretary of Transportation's] construction of the evidence it may be necessary for the District Court to require some explanation in order to determine if the Secretary acted within the scope of his authority and if the Secretary's action was justifiable under the applicable standard").  If, at the summary judgment stage, the Court identifies an insufficiency in the record or other obstacle to adequate judicial review, it can identify the appropriate remedy at that time, which is usually to obtain an additional explanation from the agency in question rather than allowing discovery.

In sum, the Court can identify no reason, at this point in the proceedings, to diverge from the traditional principle of record-based review that applies to APA cases, and Plaintiffs have cited no applicable authority to persuade the Court to do so.

///

///

**(2)  Plaintiffs have not Identified an Appropriate Exception to the Principle of Record-Based Review that Applies in APA-Review Cases**

In their motion for discovery, Plaintiffs do not address the applicability of any of the specific, narrow exceptions to the general rule of record-based review that pertains to APA cases. *See, e.g., Lands Council v. Powell*, 395 F.3d 1019, 1029-1030 (9th Cir. 2005), citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 ("The task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court.") (internal citation omitted).  In APA review cases, "[i]n limited circumstances, district courts are permitted to admit extra-record evidence: (1) if admission is necessary to determine "whether the agency has considered all relevant factors and has explained its decision," (2) if "the agency has relied on documents not in the record," (3) "when supplementing the record is necessary to explain technical terms or complex subject matter," or (4) "when plaintiffs make a showing of agency bad faith."  *Id.*, *quoting Southwest Ctr. for Biological Diversity v. U.S. Forest Serv.,* 100 F.3d 1443, 1450 (9th Cir. 1996) (internal citation and quotation marks omitted).

Rather than addressing these narrow exceptions, Plaintiffs instead argue that extra-record evidence and discovery is necessary here for effective judicial review.  The four cases on which they rely, however, do not support an exception in this case.  Three of the cases cited concern challenges to regulatory actions of the Environmental Protection Agency (EPA) involving scientific and technical determinations, for which the courts found the record insufficient for judicial review.  *See Bunker Hill Co. v. EPA*, 572 F.2d 1286 (9th Cir. 1977); *Asarco, Inc. v. US EPA*, 616 F.2d 1153 (9th Cir. 1980); *Assoc. of Pacific Fisheries v. EPA*, 615 F.2d 794 (9th Cir. 1980).  As Federal Defendants' point out, "[n]othing approaching that type of scientific complexity exists in the present case."  Doc. 84, Def. Opp., at 23.

In *Bunker Hill Co. v. EPA*, the court reviewed the EPA's decision to reject portions of a state implementation plan under the Clean Air Act and substitute its own.  Given the highly

-19-

technical nature of the subject matter the court decided it was not "straightjacketed" to the original record, and itself requested the parties to provide explanatory materials to assist the court in understanding the technical and scientific issues under review. *Bunker Hill*, 572 F.2d at 1299-1301 (requesting the parties to augment the record with materials that were "merely explanatory of the original record" because of the difficult task of "trying to make sense of complex technical testimony, which is often presented in administrative proceedings without ultimate review by nonexpert judges in mind").

Similarly, in *Assoc. of Pacific Fisheries v. EPA*, where the court reviewed an industry challenge to the EPA's regulations establishing effluent guidelines for seafood processing plants, the court considered, in order to clarify the record, post-decision studies that concluded that various statistical and analytical errors by the EPA impugned the validity of the EPA's effluent guidelines. Once again, the subject matter before the court was highly technical and therefore required the "nonexpert" judges to obtain extra-record background information. *Assoc. of Pacific Fisheries*, 615 F.2d at 811-812.

In another case cited by Plaintiffs, *Asarco, Inc. v. U.S. EPA*, the EPA appealed the district court's ruling that the EPA's order, pursuant to the Clean Air Act, requiring Asarco, Inc., a copper producer, to install a sampling station in a 1,000-foot stack at a copper smelter was arbitrary and capricious. The Ninth Circuit reiterated that a reviewing court may properly go outside the administrative record to consider evidence relevant to the substantive merits of the agency action for background information. *Asarco, Inc.*, 616 F. 2d at 1160. However, the Ninth Circuit held that in *Asarco* the district court had "gone too far in its consideration of evidence outside the administrative record," by holding an extensive "trial," at which exhibits were introduced and witnesses testified about the scientific and technical issues involved. The court explained that:

> [a]lthough the testimony may have served some marginal purpose
> in allowing the district court to evaluate the EPA's court of

-20-

> inquiry, we can only conclude that the extent of scientific inquiry undertaken at trial necessarily led the district court to substitute its judgment for that of the agency.

*Id.* at 1161.  The court remanded the matter to the EPA to, upon reconsideration, "establish in the record the scientific and technical basis to support its conclusions that the existing sampling sites are inadequate and that particulates are formed in the stack."  Again, other than reiterating the general principle that under certain circumstances courts may order the agency to supplement the record, this case does little to advance Plaintiffs' argument for extra-record discovery.

Finally, Plaintiffs cite to *Public Power Council v. Johnson*, 674 F.2d 791 (9th Cir. 1982).  *Public Power* involved a unique and newly-enacted statute giving the Ninth Circuit original jurisdiction to review contracts negotiated under the statute, which the Ninth Circuit had little prior experience in applying.  While the court in *Public Power* permitted limited discovery, it did so because of unique statutory time constraints that made it impossible for the court to wait until the merits panel could ascertain whether augmentation of the record was required for adequate judicial review.  The court explicitly held that "[a]t this stage we do not decide whether the record ultimately may be expanded," leaving that issue for the merits panel to determine.  *Pub. Power Council*, 674 F.3d at 795.  The petitioners in *Public Power*, who were parties to a 20-year contract negotiated with a federal agency, contended (1) that statutorily required contract negotiations with the agency in question had been inadequate; (2) that the agency had relied on documents that were not part of the record; (3) that discovery was needed to elucidate allegedly vague and complex clauses of the contract, which had significant and long-term repercussions for the allocation of power from the extensive federal electric power system in the Pacific Northwest; and (4) that the agency had acted in bad faith.  *Id.* at 794-796.  The panoply of considerations at play in *Public Power*, such as allegations of bad faith on the part of the agency and suspect contract negotiations that were statutorily required, are not applicable to the instant case.  More importantly, the *Public Power* court did not hold that the record could in fact

legitimately be expanded on these bases.  Rather, it left that question to the discretion of the

merits panel but allowed discovery as a precautionary measure in light of unique statutory time

constraints that required expedited review.   Indeed, the court noted that "[o]rdinarily [the

petitioners' arguments] might not be sufficient to justify a discovery order."  *Id.* at 795.  Given

its unique facts, *Public Power* also does not support Plaintiffs' argument for discovery in this

case.

### (3)   The Doctrine of Legislative Facts is Inapplicable in this Case

Finally, Plaintiffs argue that discovery regarding the facts surrounding the negotiation and

performance of the COA is proper here because "[i]n the unique context of this case, these facts

are all in the nature of legislative facts," and, as such, constitute relevant, contextual information

that "will help the Court understand what the COA requires of Defendants, and hence what P.L.

99-546 and CVPIA section 3411(b) require."  Doc. 83-1, Plaintiffs' Mtn. for Discovery, at 12.

Plaintiffs' reliance on the doctrine of legislative facts to suggest that extra-record evidence and

discovery regarding the COA is required in this case is misplaced.  Legislative facts are useful in

certain instances when a court rules on the constitutionality of legislative action by providing the

necessary context to decipher congressional intent and the purpose of the statute in question.

However, legislative facts are not routinely used as a tool of statutory interpretation in instances,

such as here, where the Court must resolve a statutory conflict in order to determine the

reasonableness of a final agency action under the APA.  Plaintiff has cited only constitutional

cases, which are not analogous to the posture of the instant case.

### ORDER

For the foregoing reasons, Plaintiffs' motion for limited discovery is DENIED without

prejudice at this point in the proceedings.

1

2    IT IS SO ORDERED.

        Dated:   __**November 22, 2013**__          ___**/s/ Gary S. Austin**___
3                                                   UNITED STATES MAGISTRATE JUDGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20
                                         -23-
21