**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **SAN LUIS & DELTA-MENDOTA WATER AUTHORITY**, *et al.*,<br><br>                              **Plaintiffs**,<br><br>        **v.**<br><br>**UNITED STATES DEPARTMENT OF THE INTERIOR**, *et al.*,<br><br>                              **Defendants.** | **1:11-cv-00952 LJO GSA**<br><br>**ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 99, 100, 104)** |

## I. INTRODUCTION

This case presents a potential conflict between two provisions of the 1992 Central Valley Improvement Act ("CVPIA"), Pub. L. No. 102-575, 106 Stat. 4700 (1992). CVPIA § 3406(b)(2) requires the Secretary of the Interior (the "Secretary") to dedicate 800,000 acre-feet ("AF") of water to serve certain fish and wildlife restoration purposes. CVPIA § 3411(b) requires the Secretary to comply with a 1985 Agreement Between the United States of America and the Department of Water Resources of the State of California for Coordinated Operation of the Central Valley Project and the State Water Project (otherwise referenced as "Coordinated Operations Agreement" or "COA"), Article 6(g) of which in turn requires the U.S. Bureau of Reclamation ("Reclamation" or "the Bureau") to export and store as much water as possible within its physical and contractual limits" when the Sacramento-San Joaquin Delta ("Delta") is in "excess water conditions."[1]

Plaintiffs are San Luis & Delta-Mendota Water Authority ("Authority") and one of the

---

[1] "Excess water conditions," are defined in the COA as "periods when it is agreed that releases from upstream reservoirs plus unregulated flow exceed Sacramento Valley inbasin uses plus exports." COA ¶ 3(c) (USBR 00009).

1

1   Authority's Member Districts, Westlands Water District ("Westlands"). Defendants are the United

2   States Department of the Interior and its member agencies, Reclamation, and the United States Fish and

3   Wildlife Service ("FWS"), along with various officials of those agencies (collectively, "Federal

4   Defendants"). Plaintiffs filed this lawsuit on June 9, 2011, during a period when the Delta was in

5   "excess water conditions," complaining that, contrary to the mandate in CVPIA § 3411(b) to export as

6   much water as possible, Reclamation ordered reduced export pumping for a two-week period starting on

7   June 8, 2011, pursuant to the Secretary's authority under CVPIA § 3406(b)(2).

8        Before the Court for decision are cross motions for summary judgment. Plaintiffs request

9   summary judgment on their Second Claim for Relief, arising under the Administrative Procedure Act

10  ("APA"), 5 U.S.C. § 706(2), which alleges that, by imposing pumping restrictions during June 2011,

11  Federal Defendants undertook a final agency action not in accordance with law. *See* Doc. 99 (notice of

12  motion); Doc. 1 (Complaint) at ¶¶ 50-55. Alternatively, Plaintiffs move for summary judgment on their

13  First Claim for Relief, an APA claim arising under 5 U.S.C. § 706(1), which alleges Federal Defendants

14  unlawfully withheld agency action by not maximizing exports during the period of reduced pumping in

15  June 2011. *See* Doc. 99; Doc. 1 at ¶¶ 45-49. Federal Defendants filed a combined cross motion and

16  opposition. Docs. 104 & 105. Plaintiffs filed a combined opposition and reply, Doc. 107, to which

17  Federal Defendants replied, Doc. 109. The motions became ripe on June 24, 2014. Due to the

18  convergence of pending motions in numerous related cases, the Court inquired whether the legal issues

19  raised by these cases were likely to be of practical importance before the end of the 2014 water year.

20  Doc. 108. All parties agreed that the Court could defer ruling on these motions without likely practical

21  consequence in the interim. Doc. 110. In accordance with Local Rule 230(g), the Court decides the

22  pending motions on the papers, without oral argument.

23  **II. PROCEDURAL HISTORY**

24       When Plaintiffs initiated this lawsuit, they filed simultaneous motions for temporary and

25  permanent injunctive relief. Docs. 9 & 10. The previously assigned District Judge, Oliver W. Wanger,

1  denied the motions on the grounds that, among other things, Plaintiffs failed to establish likelihood of

2  success on the merits or that they would suffer irreparable harm in the absence of injunctive relief, in

3  part because it was unclear at the time whether the challenged action would result in any impact on

4  Plaintiffs' water supply. *See* Doc. 49 at 9-12.[2] The pumping reduction expired of its own accord.

5        Soon thereafter, this and other related cases were transferred to the undersigned upon Judge

6  Wanger's retirement. *See* Doc. 50. On January 27, 2014, Federal Defendants moved to dismiss

7  Plaintiffs' claims on mootness grounds. Doc. 56. In denying the motion, the Court concluded Plaintiffs'

8  claims were technically moot, but were nevertheless cognizable because there was a reasonable

9  expectation of repeat conduct in light of the fact that similar pumping reductions were ordered during

10  excess conditions on at least one prior occasion. Doc. 66 at 12-27.

11        On July 27, 2012, Federal Defendants moved to dismiss the case for lack of subject matter

12  jurisdiction, arguing that (a) Plaintiffs lacked Article III standing and (b) Plaintiffs failed to challenge a

13  final agency action. Doc. 69. The motion was denied. Doc. 73.

14        The administrative record was lodged on February 8, 2013. Doc. 77. On May 1, 2013, Plaintiffs

15  moved for discovery. Doc. 83. The magistrate judge denied that motion without prejudice on November

16  22, 2013. Doc. 94. These cross-motions followed.

17

18  [2] This Court is not bound by the injunctive relief rulings. In general, "decisions at the preliminary injunction phase do not
constitute the law of the case." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't. of Agric.,*
499 F.3d 1108, 1114 (9th Cir. 2007). A preliminary injunction decision is just that: preliminary. *Id.* "This rule acknowledges

19  that 'decisions on preliminary injunctions ... must often be made hastily and on less than a full record.'" *Id.* (quoting *S. Or.
Barter Fair v. Jackson Cnty.,* 372 F.3d 1128, 1136 (9th Cir. 2004)).

20      Federal Defendants argue that the district judge previously assigned to this matter cast doubt on Plaintiffs'
interpretation of the COA in another case. Specifically, Federal Defendants point to a 2010 decision in the *Consolidated
Salmonid Cases,* 713 F. Supp. 2d 1116, 1162-63 (E.D. Cal. 2010), supplemented (June 1, 2010), in which Plaintiffs argued

21  that Federal Defendants acted unlawfully in the context of evaluating the Central Valley Project's ("CVP") impacts on
endangered species by attributing to the CVP the effects of "mandatory" compliance with the COA. The district court

22  rejected this argument, reasoning:

23          Even assuming, *arguendo*, that any mandatory obligation exists under the COA, a proposition that is questionable
        given the open-ended wording of the COA and language in the CVPIA subjecting project operations to the ESA,

24          [the relevant caselaw] does not require the agency to segregate discretionary from non-discretionary activities during
        an ESA § 7 consultation.

25  *Id.* As the district court in the *Consolidated Salmonid Cases* did not examine the specific statutory provisions at issue in this
case, the above-quoted reasoning is neither controlling nor persuasive here.

3

### III. <u>FACTUAL BACKGROUND</u>

A helpful summary of relevant history of the Central Valley Project ("CVP") and COA is set forth in a 1985 House Report addressing H.R. 3113, which eventually would become Public Law 99-546. H.R. Rep. No. 99, 257 (1985), "PROVIDING FOR THE COORDINATED OPERATION OF THE CENTRAL VALLEY PROJECT IN CALIFORNIA" ("COA House Report"). As the COA House Report explains, the CVP was planned in the 1920s and 1930s to be a state-funded project. *Id.* at 2. However, when California failed to finance fully the construction of the project, the federal government stepped in. *Id.* Among other things, the Rivers and Harbors Act of 1937, 50 Stat. 844, 850, authorized the Secretary to construct the CVP as a federal project and stated that the purposes of the project were:

> ...improving navigation, regulating the flow of the San Joaquin and the Sacramento River, controlling floods, providing for storage and for the delivery of the stored water thereof, for the reclamation of arid and semi-arid lands and lands of the Indian Reservations, and other beneficial uses, and for the generation and sale of electric energy as a means of financially aiding and assisting such undertakings and in order to permit the full utilization of the works constructed to accomplish the aforesaid purposes.

Pub. L. No. 75-392, § 2, 50 Stat. 844, 850. The Rivers and Harbors Act also prioritized the use of CVP facilities, indicating the CVP's features "shall be used, first for river regulation, improvement of navigation, and flood control; second, for irrigation and domestic uses; and third, for power." *Id.* In the late 1950s, the State of California began planning for the construction of a parallel State Water Project ("SWP"), the construction of which was authorized and funded in 1960. COA House Report at 3.

The Delta sits at the heart of both the CVP and SWP.

> The plan of development for the CVP and the SWP was to store millions of acre-feet of surplus flows from the rivers in the north in order to make water available for use as far south as Southern California. The essential link in these plans is the Sacramento-San Joaquin Delta. It is through this area that water stored in the north flows for delivery to water users in the San Joaquin Valley and Southern California....

*Id.* at 4. At the same time, the Delta itself is of critical geographic importance.

> The Delta is an integral part of the vast San Francisco Bay estuary and waterway system which supports major fisheries and waterfowl

4

1   populations. In addition, the Delta is one of California's most fertile
    agricultural areas and supports a considerable industrial complex.

2   *Id.*

3   As time passed, competition for water from the Sacramento and San Joaquin watersheds

4   increased. *See id.* Complicating the landscape, the California State Water Resources Control Board

5   ("SWRCB"), the State agency charged with the task of issuing permits to appropriate water and

6   exercising functions related to water pollution and quality control, *see* Cal. Water Code § 179, began

7   issuing water quality standards for the Delta in 1967. COA House Report at 5. These water quality

8   standards have been extensively re-written several times, including in 1978, with the issuance of

9   SWRCB Decision 1485 ("D-1485[3]"). The SWRCB recognized in D-1485 that coordination between the

10  CVP and SWP was essential to the implementation of D-1485's water quality standards:

11      To ensure protection of Delta beneficial uses and to make optimum use of
        storage pumping and conveyance facilities, operation of the CVP and
12      SWP must be coordinated. Separation of the effects of the two projects on
        Delta water supplies, uses and environment is not possible. Therefore,
13      terms and conditions related to the Delta, including those for protection of
        fish and wildlife, must be the same in all of these permits. Inclusions of
14      such terms in some, but not all, of the permits for the CVP and SWP
        would create confusion and would be unworkable. Therefore, maintenance
15      of the water quality standards set forth in this decision, including flows to
        be maintained for protection of fish and wildlife will be imposed as a
16      condition of all of the CVP and SWP permits....

17  D-1485 at 6.

18  There was never any serious dispute that the SWP, managed by the State, was required to

19  comply with restrictions imposed to meet State water quality standards. However, the Bureau long

20  maintained that it was not required to meet the State standards. *See* COA House Report at 5. This

21  position ultimately led to litigation. *Id.* at 6. Uncertainty related to this dispute clouded water resource

22  decision-making for many years. *Id.* As the COA House Report explained:

23      Delta interests opposed water development projects until water quality

24  _____

25  [3] *Available at*: http://www.swrcb.ca.gov/waterrights/board_decisions/adopted_orders/decisions/d1450_d1499/wrd1485.pdf
    (last visited Jan. 9, 2015).

was protected. Those proposing new projects sought to authorize Federal or State facilities, notwithstanding the opposition of Delta interests. The result was stalemate. No new projects were authorized or built, and no assurances were given for Delta protection by the CVP.

*Id*. at 6-7.

Building upon a 1960 agreement concerning coordinated operation of the CVP and SWP, which dealt with issues unrelated to water quality requirements, including allocation of shortages, in 1985 the Department of Water Resources ("DWR"), the California agency that manages the SWP, and the Bureau completed negotiations on a new agreement that, among other things, resolved the parties' dispute over the Bureau's contribution toward meeting State water quality goals. *Id*. at 6-7. This agreement broke the "logjam," *id*. at 7, by calling for DWR and Reclamation to share responsibility for meeting Delta water quality standards during times of "balanced water conditions," which exist when "it is agreed that releases from upstream reservoirs plus unregulated flow approximately equal the water supply needed to meet Sacramento Valley inbasin uses, plus exports." COA § 3(b) (USBR 00009)[4], § 6(c)-(d) (USBR 00014-16). In contrast, in times of "excess water conditions," defined as "periods when it is agreed that releases from upstream reservoirs plus unregulated flow exceed Sacramento Valley inbasin uses, plus exports," "each party has the responsibility to export and store as much water as possible within its physical and contractual limits." COA § 3(d) (USBR00009); § 6(g) (USBR00017).

The House Subcommittee on Water and Power Resources held oversight hearings on the new agreement in May 1985. COA House Report at 7. As a result of those hearings, a bill was introduced to authorize and direct the Secretary to execute and implement the agreement. In addition, the legislation included provisions to formally impose upon the federal government responsibility to comply with state water quality standards for the Delta. The bill, which would eventually become Public Law 99-546 ("P.L. 99-546"), amended Section 2 of the Rivers and Harbors Act of 1937 by adding the following

---

[4] Federal Defendants produced the Administrative Record in this case in two parts. Documents from records of the Bureau bear bates numbers starting with "USBR." Documents from the records of the Fish and Wildlife Service bear bates numbers starting with "FWS."

relevant language:

> (b)(1) Unless the Secretary of the Interior determines that operation of the Central Valley project in conformity with State water quality standards for the San Francisco Bay/Sacramento–San Joaquin Delta and Estuary is not consistent with the congressional directives applicable to the project, the Secretary is authorized and directed to operate the project, in conjunction with the State of California water project, in conformity with such standards. Should the Secretary of the Interior so determine, then the Secretary shall promptly request the Attorney General to bring an action in the court of proper jurisdiction for the purposes of determining the applicability of such standards to the project.
>
> ***
>
> (d) The Secretary of the Interior is authorized and directed to execute and implement the 'Agreement Between the United States of America and the Department of Water Resources of the State of California for Coordinated Operation of the Central Valley Project and the State Water Project' dated May 20, 1985....

Pub. L. 99–546, 100 Stat. 3050. DWR and Reclamation executed the COA on November 24, 1986. USBR 00006; USBR 00035.

Execution of the COA benefitted the federal government in several ways. The Senate Report addressing H.R. 3113 indicated that "[i]mplementation of the COA would free a substantial block of CVP water (estimates range up to 1.1 million acre-feet annually) for future long term water service contracts." S. Rep. No. 99-265 (1986), IMPLEMENTING THE COORDINATED OPERATION AGREEMENT FOR THE CENTRAL VALLEY PROJECT AND STATE WATER PROJECT, CALIFORNIA, TO IMPLEMENT THE SUISUN MARSH PRESERVATION AGREEMENT, CALIFORNIA, TO AMEND THE SMALL RECLAMATION PROJECTS ACT OF 1956, AS AMENDED, AND TO VALIDATE CERTAIN CONTRACTS ("COA Senate Report") at 6; *see also id.* at 23 (letter of Robert Broadbent, Assistant Secretary for Water and Science, Department of Interior) ("Implementation of the COA would free a substantial block of CVP water for which the status is currently uncertain for future water service contracts. There have been numerous requests for additional water from current CVP contractors."). The COA also "provides an institutional framework whereby both projects can operate conjunctively in such a way that the State, if it purchases water on an interim

7

basis from the [CVP], can help repay the Federal investment in project works." *Id*. at 45 (statement of Robert N. Broadbent, Assistant Secretary for Water and Science, Department of the Interior).

In 1992, Congress enacted the CVPIA, which was designed:

> (a) To protect, restore, and enhance fish, wildlife, and associated habitats in the Central Valley and Trinity River basins of California;
>
> (b) To address impacts of the Central Valley Project on fish, wildlife and associated habitats;
>
> (c) To improve the operational flexibility of the Central Valley Project;
>
> (d) To increase water-related benefits provided by the Central Valley Project to the State of California through expanded use of voluntary water transfers and improved water conservation;
>
> (e) To contribute to the State of California's interim and long-term efforts to protect the San Francisco Bay/Sacramento-San Joaquin Delta Estuary;
>
> (f) To achieve a reasonable balance among competing demands for use of Central Valley Project water, including the requirements of fish and wildlife, agricultural, municipal and industrial and power contractors.

CVPIA § 3402(a). The CVPIA amended the Rivers and Harbors Act of 1937's original prioritization that the CVP's features "shall be used, first for river regulation, improvement of navigation, and flood control; second, for irrigation and domestic uses; and third, for power," Pub. L. No. 75-392, § 2, 50 Stat. 844, 850, to instead provide that the CVP's features "shall be used, first for river regulation, improvement of navigation, and flood control; second, for irrigation domestic <u>uses and fish and wildlife mitigation, protection and restoration purposes</u>; and third, for power <u>and fish and wildlife enhancement</u>." CVPIA § 3406(a)(2) (new language emphasized).

At issue in this case are two other specific provisions of the CVPIA. CVPIA § 3406(b)(2), which, as discussed below, has been litigated extensively in this Court and the Ninth Circuit, directed the Secretary to dedicate and manage annually 800,000 AF of water to fish and wildlife purposes:

> (b) FISH AND WILDLIFE RESTORATION ACTIVITIES.--The Secretary, immediately upon the enactment of this title, shall operate the Central Valley Project to meet all obligations under state and Federal law, including but not limited to the Federal Endangered Species Act, 16

8

U.S.C. 1531, *et seq.*, and all decisions of the California State Water Resources Control Board establishing conditions on applicable licenses and permits for the project. The Secretary, in consultation with other State and Federal agencies, Indian tribes, and affected interest, is further authorized and directed to:

*** 

(2) upon enactment of this title dedicate and manage annually eight hundred thousand acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title; to assist the State of California in its efforts to protect the waters of the San Francisco Bay/Sacramento-San Joaquin Estuary; and to help meet such obligations as may be legally imposed upon the Central Valley Project under state or federal law following the date of enactment of this title, including but not limited to additional obligations under the federal Endangered Species Act....

The instruction in this provision to "dedicate and manage annually [800,000 AF] of [CVP] yield" is often referred to simply as the "(b)(2) program," water subject to the program is often referred to as "(b)(2) water" or "(b)(2) assets," the 800,000 AF is referenced as the "(b)(2) account," and actions taken pursuant to fulfill CVPIA § 3406(b)(2)'s fishery purposes are referred to as "(b)(2) fish actions" or "(b)(2) fishery actions." *See* USBR 00296, 01791.

At the same time, CVPIA § 3411(b) directs the Secretary to comply with the COA:

SEC. 3411 - COMPLIANCE WITH STATE WATER LAW AND COORDINATED OPERATIONS AGREEMENT.

*** 

(b) The Secretary, in the implementation of the provisions of this title, shall fully comply with the United States' obligations as set forth in the "Agreement Between the United States of America and the Department of Water Resources of the State of California for Coordinated Operation of the Central Valley Project and the State Water Project" dated May 20, 1985, and the provisions of Public Law 99-546; and shall take no action which shifts an obligation that otherwise should be borne by the Central Valley Project to any other lawful water rights permittee or licensee.

At the end of May 2011, Defendants began to consider how they should utilize the remaining "B2 assets" left in the water year. FWS 00001. As a May 26, 2011 email from National Marine Fisheries

9

1  Service ("NMFS") fishery biologist Bruce Oppenheim indicated:

2  > This year is a wet year [and] we are flush with B2 assets. The latest
   > forecast ... shows only 614 [thousand acre-feet ("TAF")] of 800 TAF
3  > available being used this year. This leaves approximately 186 TAF of
   > water available for protective fish actions, banking for next year, or the
4  > Fall x2 study. We should be discussing what we are planning to do with
   > this windfall.

5  FWS 00001. Oppenheim's May 26, 2011 email floated the idea of "using additional B2 water to keep

6  the CVP exports lower through June." *Id*. As Oppenheim explained:

7  > This action would protect late emigrating steelhead and fall-run Chinook
8  > salmon leaving the San Joaquin River. We are seeing large numbers of
   > fall-run/spring-run juvenile[] [salmonids] at the pumps right now (8,000
9  > fish last week). With the high flows and low water temperatures on the
   > San Joaquin R[iver] this is likely to continue. This action would cost about
10 > 192 TAF if we keep the CVP down at 1 unit....

11 *Id*. Oppenheim's email also identified three possible rationales for <u>not</u> ordering an export reduction in

12 June 2011:

13 > If we do not take an action to protect fall-run and steelhead in June we
   > should at least have a reason if asked did we consider it [sic]. The
14 > rationale for not taking an action at this time could be; 1) The SWP would
   > increase to cover the difference lending the export reduction at the CVP
15 > worthless, 2) We want to maintain high exports for VAMP and the 6 year
   > acoustic study which are continuing to release salmon & steelhead the first
16 > 2 weeks of June. This gives us a high and low export rate to compare, and
   > lastly 3) the restrictions on OMR flows in the [biological opinions] are
17 > protective enough.

18 *Id*. Federal Defendants also "discussed the options of banking some b2 water for use [in 2012], or doing

19 some re-operation to increase reservoir releases in the fall," but "Reclamation deemed both options

20 infeasible since all reservoirs [were] expected to fill ... and there [would] be no room to hold water

21 over." FWS 00065.

22  It is undisputed that excess conditions existed for approximately two weeks beginning on June 8,

23 2011. Doc. 48 (Answer) at ¶ 2. It is also undisputed that during this time, the United States sent a change

24 order to the Authority directing the Authority to reduce export pumping at the CVP's Jones Pumping

25 Plant to only three pump units beginning at 6:59 a.m. on Wednesday June 8, 2011. USBR 01790. The

1  change order commented that the action was a "B2 fishery action." *Id.* The Authority complied with the

2  order, and reduced pumping to approximately 3,000 cubic feet per second ("cfs"). *See* FWS 00181.

3  Reclamation issued another change order on June 23, 2011, directing the Authority to increase pumping

4  to "five units" which equated to approximately 4,200 cfs. USBR 01805.

## IV. STANDARD OF DECISION

6  The claims in this case arise under the APA, 5 U.S.C. §§ 701-706, pursuant to which "[a] person

7  suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action

8  within the meaning of a relevant statute, is entitled to judicial review thereof." *Id.* § 702.[5] Under the

9  APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions

10  found to be":

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in
> accordance with law;
>
> ***
>
>  (C) in excess of statutory jurisdiction, authority, or limitations, or short of
> statutory right; [and/or]
>
> (D) without observance of procedure required by law[.]

15  *Id.* § 706(A).

16  Summary judgment is appropriate when the pleadings and the record demonstrate that "there is

17  no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

18  Fed. R. Civ. P. 56(a). A court conducting APA judicial review may not resolve factual questions, but

19  instead determines "whether or not as a matter of law the evidence in the administrative record permitted

20  the agency to make the decision it did." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)

21  (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)). "[I]n a case involving review

22  of a final agency action under the [APA] ... the standard set forth in Rule 56[(a)] does not apply because

---

[5] The CVPIA does not provide for a private right of action. Therefore, claims alleging that a federal agency acted contrary to the CVPIA must be brought under and are governed by the APA. *See San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676, 699 (9th Cir. 2012) (applying APA to claim based upon the CVPIA).

1    of the limited role of a court in reviewing the administrative record." *Id*. at 89. In this context, summary

2    judgment becomes the "mechanism for deciding, as a matter of law, whether the agency action is

3    supported by the administrative record and otherwise consistent with the APA standard of review." *Id*. at

4    90.

5           Eastern District of California Local Rule 260(a) directs that each motion for summary judgment

6    shall be accompanied by a "Statement of Undisputed Facts" that shall enumerate each of the specific

7    material facts on which the motion is based and cite the particular portions of any document relied upon

8    to establish that fact. In APA cases, such statements are generally redundant because all relevant facts

9    are contained in the agency's administrative record. *See San Joaquin River Grp. Auth. v. Nat'l Marine*

10   *Fisheries Serv.*, 819 F. Supp. 2d 1077, 1083-84 (E.D. Cal. 2011).

11                                      **V. <u>DISCUSSION</u>**

12   **A.    <u>Standing</u>**

13          This Court denied Federal Defendants' previous motion to dismiss this case for lack of standing.

14   *San Luis & Delta-Mendota Water Auth. v. U.S. Dep't of the Interior*, 905 F. Supp. 2d 1158, 1168-73

15   (E.D. Cal. 2012). That decision articulated the applicable legal standard:

16                  Standing is a judicially created doctrine that is an essential part of the
                    case-or-controversy requirement of Article III. *Pritikin v. Dept. of Energy*,
17                  254 F.3d 791, 796 (9th Cir. 2001). "To satisfy the Article III case or
                    controversy requirement, a litigant must have suffered some actual injury
18                  that can be redressed by a favorable judicial decision." *Iron Arrow Honor
                    Soc. v. Heckler*, 464 U.S. 67, 70 (1983). "In essence the question of
19                  standing is whether the litigant is entitled to have the court decide the
                    merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S.
20                  490, 498 (1975). To have standing, a plaintiff must show three elements.

21                  First, the plaintiff must have suffered an "injury in fact"—an
                    invasion of a legally protected interest which is (a) concrete and
22                  particularized and (b) actual or imminent, not conjectural or
                    hypothetical. Second, there must be a causal connection between
23                  the injury and the conduct complained of—the injury has to be
                    fairly traceable to the challenged action of the defendant, and not
24                  the result of the independent action of some third party not before
                    the court. Third, it must be likely, as opposed to merely
25                  speculative, that the injury will be redressed by a favorable

decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal citations and quotations omitted).

The Supreme Court has described a plaintiff's burden of proving standing at various stages of a case as follows:

> Since [the standing elements] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

*Id.* at 561.

In addition, where an organization or association is bringing suit on behalf of its members, that organization or association must demonstrate that: (1) its members would otherwise have standing to sue in their own right; (ii) the interests it seeks to protect are germane to the organization's purpose; and (iii) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

*Id.* at 1168-69.[6]

At the motion to dismiss stage, the Court determined each of the elements of standing was supported by evidence presented by Plaintiffs. This same evidence supports an identical finding at the summary judgment stage and the Court incorporates by this reference its previous analysis. *See id.* at 1169-73. Federal Defendants have not submitted any argument or evidence suggesting otherwise.

---

[6] The Court also previously articulated the well-established principle that standing is measured at the time the complaint is filed. *San Luis*, 905 F. Supp. 2d at 1169. While Federal Defendants do not question this in their present motion, they do mention that the pumping reduction at issue in this case did not actually end up impacting Plaintiffs' allocation. Doc. 105 at 6. As previously addressed, this fact does not undermine Plaintiffs' standing, nor can the Court discern how it is relevant to any aspect of this case.

1   Plaintiffs have standing to sue.

2   **B.    Merits of the Cross Motions.**

3       Generally, Plaintiffs argue in their motion for summary judgment that the June 2011 pumping

4   reduction was "contrary to law" for purposes of the APA because the reduction violated P.L. 99-546 and

5   CVPIA § 3411(b), both of which require the Secretary to comply with the COA. Doc. 100. More

6   specifically, Plaintiffs argue that the pumping reduction violated COA Article 6(g), which requires,

7   during excess conditions, "each party ... to export and store as much water as possible within its physical

8   and contractual limits." COA Art. 3(d) (USBR00009); Art. 6(g) (USBR00017).

9       Federal Defendants concede they have a duty to comply with CVPIA § 3411, *see* Doc. 96 (joint

10  status report) at 3, and, therefore, that they have a duty to comply with the COA, but they maintain that

11  they nonetheless possessed discretion to order the pumping reductions pursuant to CVPIA § 3406(b)(2)

12  during the period of excess conditions that existed in June 2011. Federal Defendants emphasize that the

13  CVPIA elsewhere requires the Secretary to operate the CVP to "meet all obligations under State and

14  Federal law." Doc. 109 at 9 (citing CVPIA § 3406(b)). Thus, according to Federal Defendants, the

15  obligation in COA Article 6(g) "to export and store as much water as possible within its physical and

16  contractual limits" is limited by other state and federal laws. *Id*. Federal Defendants maintain that

17  commands contained in CVPIA § 3406(b)(2) limit CVP operations, even during times of excess

18  conditions.

19      The remainder of this Memorandum Decision addresses the parties' competing positions

20  regarding the relative priority of CVPIA § 3406(b)(2) vis-a-vis CVPIA § 3411(b) and COA Article 6(g).

21  First, the Court addresses threshold arguments regarding the level of deference owed to the agency in

22  this case. Then, the Court proceeds to the remaining issues of statutory interpretation. In so doing, the

23  Court follows the established procedure of first examining the plain meaning of the relevant statutory

24  provisions for any instruction regarding the prioritization of CVPIA § 3406(b)(2) vis-a-vis CVPIA §

25  3411(b) and COA Article 6(g). The Court addresses numerous plain meaning arguments raised in the

14

1   briefs, but finds that none definitively settles how CVPIA § 3406(b)(2) and CVPIA § 3411(b)/COA

2   Article 6(g) relate to one another. The Court next finds that there is an ambiguity created by the

3   existence of these competing provisions. Having so found, the Court turns to the canons of statutory

4   construction. In particular, the one canon that is discussed at length by the parties – the specific v.

5   general canon – does provide a basis for prioritizing COA Article 6(g) over CVPIA § 3406(b)(2) during

6   times when Article 6(g) is triggered.[7]

7   **1.   Deference.**

8   Normally, the standard of review is highly deferential in an APA case; the agency's decision is

9   usually "entitled to a presumption of regularity," and a court may not substitute its judgment for that of

10  the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971), *abrogated in*

11  *part on other grounds as recognized in Califano v. Sanders*, 430 U.S. 99, 105 (1977). Plaintiffs argue,

12  however, that Federal Defendants' current litigation position -- that Federal Defendants possessed

13  discretion to reduce pumping pursuant to CVPIA § 3406(b)(2) notwithstanding CVPIA § 3411(b) -- is a

14  post hoc rationalization entitled to no deference because nothing in the record indicates Federal

15  Defendants considered CVPIA § 3411(b). Doc. 100 at 13. Federal Defendants rejoin that Plaintiffs

16  "misunderstand what constitutes a post hoc rationalization," and erroneously assert that Federal

17  Defendants "were required to expressly consider [COA] Article 6(g)'s instruction to 'export and store as

18  much water as possible within its physical and contractual limits' at the time of the decision." Doc. 106

19  at 25. While Federal Defendants correctly point out that the record does contain an explanation for the

20  action in the record, *id*., Plaintiffs do not challenge that explanation per se. Rather, Plaintiffs argue that

21  the action violated CVPIA § 3411(b) and that because Federal Defendants did not consider CVPIA §

22  3411(b) anywhere in the record, Federal Defendants' litigation position is not entitled to deference.

23  Federal Defendants argue that their position in this case is not a post hoc rationalization because

24

25  [7] The Court notes that the briefs are not organized in such a deliberate manner. The Court has endeavored to situate the parties' arguments into the statutory interpretation framework.

1   they "fully explained why they took the action they did." Doc. 105 at 26. Federal Defendants maintain

2   that the fact that the record does not "explicitly discuss Article 6(g) or the interplay between Article

3   6(g), CVPIA § 3411(b), and CVPIA § 3406(b)(2) is of no import ... [] because [the agency's] rationale is

4   that Reclamation has the discretion to apply § 3406(b)(2), Article 6(g) notwithstanding.'" *Id*. Federal

5   Defendants cite *In re Operation of Missouri River Sys. Litig.*, 421 F.3d 618, 634 (8th Cir. 2005), for the

6   proposition that there is "no requirement that every detail of the agency's decision be stated expressly in

7   the" decision itself. Doc. 105 at 26. But, Federal Defendants misapply *Missouri River*. As the Eighth

8   Circuit held in that case, while an agency's rationale need not be articulated in the formal decision

9   document, it does need to appear in the administrative record underlying that document. *See id*. Here,

10  nothing in the record indicates the agency considered COA Article 6(g) <u>at all</u> when implementing the

11  June 2011 pumping reduction.

12      Federal Defendants next cite *McFarland v. Kempthorne*, 545 F.3d 1106, 1112-13 (9th Cir.

13  2008), for the proposition that an agency's rationale must be upheld where its reasoning can be

14  "reasonably discerned" from the entire record. Doc. 105 at 26. Federal Defendants suggest that their

15  rationale, namely that Reclamation has the discretion to apply CVPIA § 3406(b)(2) notwithstanding

16  COA Article 6(g), reasonably can be discerned from the entire record. But, the bald fact that the agency

17  implemented the June 2011 Pumping Restrictions pursuant to CVPIA § 3406(b)(2) does not in any way

18  indicate that the agency gave any thought to how its authority under CVPIA § 3406(b)(2) related to its

19  obligations under COA Article 6(g). *Pac. Coast Fed'n Fishermen's Assns. v. U.S. Bureau of*

20  *Reclamation*, 426 F.3d 1082, 1091 (9th Cir. 2005) ("[W]e cannot infer an agency's reasoning from mere

21  silence," and "an agency's action must be upheld, if at all, on the basis articulated by the agency.")).

22      In contrast, Plaintiffs' position finds some support in the Ninth Circuit's decision in *Defenders of*

23  *Wildlife v. Norton*, 258 F.3d 1136, 1145 (9th Cir. 2001). In *Defenders*, plaintiffs challenged the

24  Secretary's decision not to designate a lizard species as threatened under the Endangered Species Act

25  ("ESA"). The term "threatened species" means "any species which is likely to become an endangered

16

1   species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. §

2   1532(2). At issue in *Defenders* was the meaning of the phrase "throughout ... a significant portion of its

3   range." *Defenders*, 258 F.3d at 1141. While the Secretary advanced an interpretation of the phrase for

4   purposes of the litigation, the agency did not expressly consider "throughout ... a significant portion of

5   [the species'] range" during the administrative process. *Id.* at 1141-43, 1145-46. Accordingly, the Ninth

6   Circuit concluded the Secretary's interpretation was due no deference under *Chevron v. Natural*

7   *Resources Defense Council*, 467 U.S. 837 (1984), nor was deference owed to the "interpretation of the

8   statute now advocated by the Secretary's counsel - newly minted, it seems, for this lawsuit, and

9   inconsistent with prior agency actions - as [a court should] not defer 'to agency positions that are wholly

10  unsupported by regulations, rulings, or administrative practice.'" *Id.* at 1145 n. 11 (quoting *Bowen v.*

11  *Georgetown Univ. Hospital*, 488 U.S. 204, 212 (1988)).

12         *Defenders* is not directly on point because, unlike in *Defenders*, where the agency's position was

13  not only newly minted but was <u>also</u> inconsistent with prior agency action, here, there is no evidence of a

14  prior agency position inconsistent with the one being advanced in this case regarding CVPIA § 3411.

15  However, more recent Ninth Circuit authority suggests that an agency position created solely for

16  litigation is entitled to no deference, even where the interpretation is not in conflict with prior agency

17  action. *See Alaska v. Fed. Subsistence Bd.,* 544 F.3d 1089, 1095 (9th Cir. 2008) ("We do not afford

18  *Chevron* or [even] *Skidmore* [*v. Swift & Co.,* 323 U.S. 134 (1944)] deference to litigation positions

19  unmoored from any official agency interpretation because Congress has delegated to the administrative

20  official and not to appellate counsel the responsibility for elaborating and enforcing statutory

21  commands."). Federal Defendants have pointed to nothing in the record that indicates the agency ever

22  considered whether during excess conditions CVPIA § 3411(b)'s command to comply with the COA

23  would take precedence over CVPIA § 3406(b)(2)'s command to dedicate 800,000 AF of water to fish

24  and wildlife purposes.

25         Even if some form of deference lesser than *Chevron* does apply here, the agency decision "is

entitled to a measure of deference proportional to its power to persuade, in accordance with the

principles set forth in *Skidmore*." *Tablada v. Thomas*, 533 F.3d 800, 806 (9th Cir. 2008) (citing *United States v. Mead*, 533 U.S. 218, 228, 234 (2001)). Under this framework, a court should "look to the

process the agency used to arrive at its decision." *Id.* "Among the factors [to be] considered are the

interpretation's thoroughness, rational validity, consistency with prior and subsequent pronouncements,

the logic and expertness of an agency decision, the care used in reaching the decision, as well as the

formality of the process used." *Id.* (internal citations and quotations omitted). For example, an internal

agency guideline that is "akin to an interpretive rule," but does not require notice and comment, is

entitled to a measure of deference under *Skidmore*. *Id.* As Federal Defendants offer no formal

interpretation that incorporates any reference to COA Article 6(g) or even CVPIA § 3411(b), most of

these factors are inapposite, leaving only the "rational validity" factor, which simply calls for an

evaluation of whether Federal Defendants' position is rational.

**2.    P.L. 99-546.**

As explained above, P.L. 99-546 "authorize[s] and direct[s]" the Secretary "to execute and

implement the [COA]." 100 Stat. 1050, § 103.[8] The language of P.L. 99-546 is not the direct focus of

any of the parties' briefs, perhaps because its command to "implement" the COA is arguably

overshadowed by the command in CVPIA § 3411(b) to "fully comply with" the COA. Plaintiffs argue

that P.L. 99-546 gave the COA the "force of law," Doc. 100 at 9, but do not explain how it does so in

any way that is unique or more powerful than CVPIA § 3411. Accordingly, the Court does not believe

that P.L. 99-546 materially impacts the analysis in this case.

**3.    CVPIA.**

The thrust of the dispute in this case revolves around the interplay of CVPIA § 3406(b) and

CVPIA § 3411(b). "The starting point for our interpretation of a statute is always its language." *United*

---

[8] The relevant portion of P.L. 99-546 contains two provisos, neither of which is implicated in this case.

1  *States v. Fei Ye,* 436 F.3d 1117, 1120 (9th Cir. 2006) (quoting *Cmty. for Creative Non–Violence v. Reid,*

2  490 U.S. 730, 739 (1989)). A court must first determine whether the language to be interpreted is "plain

3  and unambiguous." *United States v. Youssef,* 547 F.3d 1090, 1093 (9th Cir. 2008) (quoting *Robinson v.*

4  *Shell Oil Co.,* 519 U.S. 337, 340 (1997)). "The statutory language is interpreted by reference 'to the

5  language itself, the specific context in which that language is used, and the broader context of the statute

6  as a whole.'" *Id.* (quoting *Robinson,* 519 U.S. at 341). "If the plain language of a statute renders its

7  meaning reasonably clear, [a court] will not investigate further unless its application leads to

8  unreasonable or impracticable results." *Fei Ye,* 436 F.3d at 1120 (internal citation and quotation

9  omitted). If, on the other hand, the language to be interpreted is ambiguous, "we may use canons of

10  construction, legislative history, and the statute's overall purpose to illuminate Congress's intent." *Ileto*

11  *v. Glock, Inc.,* 565 F.3d 1126, 1133 (9th Cir. 2009) (internal citation and quotation omitted).

12        **a.**     **Plain Meaning: Statutory Language.**

13      The analysis, therefore, begins with an examination of the plain language of the statutory

14  provisions at issue. As previously set forth, CVPIA § 3406(b) commands that the Secretary

15  
16          immediately upon the enactment of this title, shall operate the Central
Valley Project to meet all obligations under state and Federal law,
including but not limited to the Federal Endangered Species Act, 16

17  U.S.C. 1531, *et seq.*, and all decisions of the California State Water
Resources Control Board establishing conditions on applicable licenses
and permits for the project.

18  
19  (Emphasis added.) CVPIA § 3406(b)(2) commands the Secretary to

20          dedicate and manage annually eight hundred thousand acre-feet of Central
Valley Project yield for the primary purpose of implementing the fish,
wildlife, and habitat restoration purposes and measures authorized by this

21  title; to assist the State of California in its efforts to protect the waters of
the San Francisco Bay/Sacramento-San Joaquin Estuary; and to help meet

22  such obligations as may be legally imposed upon the Central Valley
Project under state or federal law following the date of enactment of this

23  title, including but not limited to additional obligations under the federal
Endangered Species Act....

24  

25  There is no dispute that Federal Defendants ordered the pumping restrictions at issue in this case to

1   serve the "primary" (b)(2) purpose of "implementing the fish, wildlife, and habitat restoration purposes

2   and measures authorized by [the CVPIA]." *See* USBR 01788. Plaintiffs do not challenge the scientific

3   basis for Federal Defendants' conclusion that the pumping restrictions would serve that primary

4   purpose, nor do Plaintiffs otherwise argue that this conclusion was irrational or otherwise unsupported

5   by the record.[9] Rather, Plaintiffs maintain that Federal Defendants lacked discretion to order the

6   reductions during excess conditions because of CVPIA § 3411(b).

7       As explained above, CVPIA § 3411(b) directs the Secretary to comply with the COA:

8           SEC. 3411 - COMPLIANCE WITH STATE WATER LAW AND
            COORDINATED OPERATIONS AGREEMENT.

9                                    ***

10

11          (b) The Secretary, in the implementation of the provisions of this title,
            shall fully comply with the United States' obligations as set forth in the

12          "Agreement Between the United States of America and the Department of
            Water Resources of the State of California for Coordinated Operation of
            the Central Valley Project and the State Water Project" dated May 20,

13          1985, and the provisions of Public Law 99-546; and shall take no action
            which shifts an obligation that otherwise should be borne by the Central

14          Valley Project to any other lawful water rights permittee or licensee.

15   Plaintiffs focus on the first clause of CVPIA § 3411(b), which instructs the Secretary to "fully comply

16   with the United States' obligations as set forth in the [COA]."[10] The most straightforward interpretation

17   of this language is that Congress intended to incorporate by reference the terms of the COA itself as

18   _____

19   [9] This renders almost irrelevant Federal Defendants' frequent assertion in their papers that Reclamation's decision was supported by the record. *See, e.g.*, Doc. 105 at 12.

20   [10] Plaintiffs do not contend that Federal Defendants' actions ran afoul of the second clause of CVPIA § 3411(b), which prohibits the Secretary from "tak[ing] action which shifts an obligation that otherwise should be borne by the [CVP] to any other lawful water rights permittee or licensee." *See* Doc. 107 at 6. Federal Defendants nevertheless argue that the second

21   clause informs the first and is evidence that the purpose of the COA is to ensure that both the CVP and the SWP retain their shares of water and bear their shares of the burdens imposed by the COA's terms. Doc. 109 at 14-15. While the second clause

22   of CVPIA § 3411 certainly does direct the parties to the COA to maintain their respective burdens, rather than pass them along to the other party or any other water rights permittee, Federal Defendants do not explain how this should alter the

23   Court's interpretation of COA Article 6(g), which calls upon each party to the COA to "during excess conditions ... export and store as much water as possible within its physical and contractual limits," in light of the first clause of the CVPIA § 3411(b), which directs the Secretary to "fully comply" with the COA. Nothing in the record suggests that exporting and

24   storing as much water as possible within the physical and contractual limits of the CVA, in lieu of implementing the June 2011 pumping reduction, would have shifted any burden from the CVP onto either the SWP or any other water rights

25   permittee. To the extent the second clause informs the first, any such influence is not directly relevant to the interpretive questions central to this case.

20

1    obligations under CVPIA § 3411.

2         Plaintiffs maintain that in implementing the pumping reductions, Federal Defendants failed to

3    "fully comply with the United States' obligations as set forth in the [COA]," because COA Article 6(g)

4    provides that "during excess conditions each party has a responsibility to export and store as much water

5    as possible within its physical and contractual limits." USBR 00017. As previously mentioned, it is

6    undisputed that excess conditions existed during the relevant period in June 2011. Nor do Federal

7    Defendants argue that any physical or contractual limitation required Federal Defendants to reduce

8    pumping in June 2011. *See* Docs. 105 and 109.

9              **(1)    "Export and Store" Arguments.**

10        COA Article 6(g) provides that "during excess conditions each party has a responsibility to

11   export and store as much water as possible within its physical and contractual limits." Plaintiffs argue

12   that the order of the words "export and store" in Article 6(g) demonstrates that Article 6(g) requires "the

13   export and storage, in that order, of water out of the Delta." Doc. 100 at 19. In contrast, Federal

14   Defendants argue that Plaintiffs' interpretation attempts to add requirements to Article 6(g) and that the

15   plain language of Article 6(g) allows Reclamation to store water in upstream reservoirs during periods

16   of excess conditions. Doc. 105 at 21-23.[11]

17        Article 6(g) can be read in a manner that accommodates both parties' interpretive positions

18   regarding the phrase "export and store." According to the COA, "[e]xcess water conditions" means the

19   conditions that exist when "releases from upstream reservoirs plus unregulated flow exceed Sacramento

20   Valley inbasin uses, plus exports." COA Art. 3(c) (USBR 00009). "Sacramento Valley inbasin uses" are

21   "legal uses of water in the Sacramento basin including the water required under" the Delta water quality

22   standards included in Exhibit A to the COA. *Id*.; COA Ex. A (USBR 00036-42). "Export" means

23

24   ───────────────────

25   [11] Although the parties make little effort to frame these argument (or many of their other arguments) in terms of any of the principles of statutory construction, the Court believes this argument is best evaluated as an interpretation of the plain language of Article 6(g).

1    "diversions by the United States and the State through export facilities specified in subarticle (g)" COA

2    Art. 3(f) (USBR 00011). These export facilities are: the Contra Costa Pumping Plant #1 and the Jones

3    Pumping Plant for the CVP; and the Harvey O. Banks Delta Pumping Plant, including the Clifton Court

4    Forebay ("Banks Pumping Plant") for the SWP. COA Art. 5(b) (USBR 00013).

5          The definition of excess conditions renders upstream storage decisions an input to the operation

6    of Article 6(g). Excess conditions only exist when "releases from upstream reservoirs plus unregulated

7    flow exceed Sacramento Valley inbasin uses, plus exports." Nothing in the COA or any other authority

8    presented to the Court precludes Reclamation from storing water upstream during periods of excess

9    conditions. Doing so simply impacts whether excess conditions persist.[12] Under certain circumstances, it

10   might be possible for Reclamation to increase storage at upstream reservoirs enough that excess

11   conditions would no longer persist. Obviously, if excess conditions no longer exist, the obligation to

12   export and store as much water as possible would no longer apply. If, however, excess conditions persist

13   despite upstream storage, either because Reclamation could not or chose not to store additional water

14   upstream, Reclamation's obligation to export and store as much water as possible would also persist.

15   In such a circumstance, upstream storage would not be a viable alternative to the export water of water

16   through one of the "export facilities," namely the Contra Costa Pumping Plant, the Jones Pumping Plant,

17   and/or the Banks Pumping Plant.

18         Here, however, nothing in the record suggests that Reclamation endeavored to comply with COA

19   Article 6(g) by making efforts to increase upstream storage in June 2011. The very fact that excess

20   conditions persisted for the entire period in question in this case demonstrates either that Reclamation

21   could not or would not increase upstream storage in such a manner as to cause excess conditions to

22   dissipate. Therefore, it is Reclamation's failure to export, rather than its failure to store, water that is the

23   _____

24   [12] Reclamation and the State's obligations under the COA are computed on a daily basis. *See generally* Article 6. The Parties
     do not present argument on and the Court does not address the question of what Reclamation might be required to do if
25   excess conditions existed for a single day, but Reclamation was in the process of implementing plans to increase storage such
     that excess conditions were likely to dissipate. This is not such a case.

focus of this case.

In a related argument, Federal Defendants argue that "[a]ccording to Plaintiffs' interpretation, Reclamation must export and store every drop of water" and therefore "would be unable to release any water from the reservoirs during excess water conditions, which might have unintended consequences for San Luis farmers who would benefit from releases of the stored water." Doc. 105 at 21 n.6. This is a straw man of Federal Defendants' own construction that may be knocked down by reference to the plain language of Article 6(g), which limits Reclamation's obligation to "export and store as much water as possible within its physical and contractual limits." As Plaintiffs explain in reply, "if Defendants' hypothetical ever occurred – i.e., San Luis Reservoir were approaching storage limits during excess water conditions – then those physical limits may justify reducing exports that could not be stored." Doc. 107 at 13. Likewise, the Court agrees with Plaintiffs that "[t]o the extent Reclamation delivered water pursuant to its obligations under its water service contracts during excess water conditions, Reclamation would not be in violation of Article 6(g) because its failure to maximize storage of exported water during excess conditions would be due to a contractual limitation...." *Id*. at 14.

> **(2)** **CVPIA § 3406(b)'s Command that the Secretary Operate the CVP "to Meet All Obligations Under State and Federal Law."**

Another of Federal Defendants' arguments that arguably falls under the rubric of plain language analysis is their contention that CVPIA § 3406(b)'s requirement that the Secretary operate the CVP "to meet all obligations under state and Federal law" permits the Secretary to implement actions pursuant to CVPIA § 3406(b)(2) notwithstanding the requirements of CVPIA § 3411 (and, by extension, notwithstanding COA Article 6(g)). Doc. 105 at 20. Relatedly, Federal Defendants assert that Reclamation did in fact export and store "as much water as possible" because CVPIA § 3406(b)(2)'s direction to dedicate and manage 800,000 AF of water for fish and wildlife purposes is a "legal mandate with which Defendants must comply." Doc. 109 at 6.

Federal Defendants support these arguments by pointing to the undisputed fact that mandatory

1    legal obligations imposed upon the CVP by state and Federal law, such as those imposed by the ESA, do

2    trump all other discretionary operational plans for the CVP. Plaintiffs do not and cannot dispute, for

3    example, that the Secretary could have implemented the pumping reductions at issue in this case had

4    they been imposed pursuant to a valid biological opinion promulgated pursuant to the ESA. *See* Doc.

5    107 at 18 n. 8.

6          But, an examination of the reasons <u>why</u> obligations imposed pursuant to the ESA trump the

7    Bureau's operational discretion over the CVP reveals why the same conclusion does <u>not</u> apply to actions

8    undertaken pursuant to CVPIA § 3406(b)(2). Because numerous endangered and threatened species are

9    impacted by CVP operations, the ESA requires Reclamation to consult with other agencies that

10   implement the ESA, namely FWS and/or NMFS, to determine whether CVP operations will threaten the

11   continued existence of the impacted species and/or adversely modify their critical habitats. 16 U.S.C. §

12   1536(a)(2).

> The purpose of consultation is to obtain the expert opinion of wildlife agencies to determine whether the action is likely to jeopardize a listed species or adversely modify its critical habitat and, if so, to identify reasonable and prudent alternatives that will avoid the action's unfavorable impacts. The consultation requirement reflects "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies."

17   *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012) (quoting *Tenn. Valley*

18   *Auth. v. Hill*, 437 U.S. 153, 185 (1978)). Once ESA consultation is complete, the FWS or the NMFS

19   must provide the agency with a written biological opinion "setting forth [an] opinion, and a summary of

20   the information on which the opinion is based, detailing how the agency action affects the species or its

21   critical habitat." 16 U.S.C. § 1536(b)(3)(A); *see also* 50 C.F.R. § 402.14(h). If the Secretary concludes

22   that the proposed agency action would place the listed species in jeopardy or adversely modify its

23   critical habitat, "the Secretary shall suggest those reasonable and prudent alternatives which he believes

24   would not violate [the ESA] and can be taken by the Federal agency ... in implementing the agency

25   action." 16 U.S.C. § 1536(b)(3)(A).

At least two major biological opinions apply to operation of the CVP, each of which found CVP operations are likely to jeopardize listed species or adversely modify their critical habitat, and identify reasonable and prudent alternatives ("RPAs") that impose various restrictions on CVP operations. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581 (9th Cir. 2014) ("*San Luis v. Jewell*"); *San Luis & Delta-Mendota Water Auth. v. Locke*, __ F.3d __, No. 12-15144, 2014 WL 7240003 (9th Cir. Dec. 22, 2014) ("*San Luis v. Locke*"). The RPAs imposed in these two biological opinions have very specific trigger points and require specific actions during key periods for the various species. *See San Luis v. Jewell*, 747 F.3d at 598-99; *San Luis v. Locke*, 2014 WL 7240003, at *6. If the implementing agency (in this case, Reclamation) chooses to implement the proposed agency action (in this case, operation of the CVP), it may only lawfully do so if it also implements the RPAs suggested by the relevant wildlife agency. In other words, implementing the RPAs is <u>mandatory</u> and many of those RPAs require specific actions at specific times. Plaintiffs concede that Defendants must follow any "specific legal mandates under the ESA or otherwise." Doc. 107 at 18 n.8.

However, it is undisputed that compliance with the ESA was not offered as a basis for implementing the June 2011 pumping reductions, which were, instead, exclusively categorized as an action taken pursuant to CVPIA § 3406(b)(2). USBR 01788. Unlike the ESA, CVPIA § 3406(b)(2)'s command to "dedicate and manage annually eight hundred thousand acre feet of [CVP] project yield" to serve the purposes listed in that subsection, including the "primary" purpose of fish and wildlife and habitat restoration, has been interpreted to afford Reclamation a large degree of flexibility. While the requirement that the Secretary "dedicate and manage annually eight hundred thousand acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purpose and measures authorized by [the CVPIA]" has been described as a "mandate," *see, e.g.*, *San Luis & Delta- Mendota Water Authority v. United States*, 672 F.3d 676, 693, 719 (9th Cir. 2012) ("*San Luis v. United States*"), Federal Defendants exercise considerable discretion in dedicating and managing their 800,000 AF (b)(2) annual "budget" to meet this mandate. For example, Federal

1  Defendants have discretion to determine the _type_ of (b)(2) actions to take. The Bureau's 2003 "Guidance

2  for Implementation of Section 3406(b)(2) of the CVPIA" Memorandum ("2003 (b)(2) Guidance

3  Memo"), explains that (b)(2) actions can include measures on "Clear Creek [(the first major tributary to

4  the Sacramento River downstream of Shasta Dam)]; the Sacramento, American, and Stanislaus Rivers;

5  and in the Delta." USBR 00309. Other record documents make it clear that many of these actions target

6  areas upstream of the Delta and would not impact Reclamation's ability to export during excess

7  conditions. _See_ USBR 365-66.

8  　　　　Federal Defendants also have discretion to determine _when_ to take (b)(2) actions within the

9  (b)(2) accounting period, which runs from October 1 to September 30. _See_ USBR 00308. As the 2003

10  (b)(2) Guidance Memo explains:

11  　　　　　　The seasonality of actions fits into the accounting period and the time
　　　　　　dependent order for determining the priority of actions and need for
12  　　　　　　adjustments to allocations, in general. Fall flow improvements, impacts to
　　　　　　export due to DCC gate closures, some wintertime export reductions
13  　　　　　　during fishery migration windows, some wintertime and spring flow and
　　　　　　export costs to fishery beneficial uses of the WQCP, Vernalis Adaptive
14  　　　　　　Management Plan (VAMP), and some other spring export reductions
　　　　　　during the sensitive estuarine species periods are examples of actions that
15  　　　　　　reflect the seasonality of decisions and operations.

16  USBR 00309. Other guidance documents provide some targets for using quantities of water in different

17  portions of the year. For example, the May 2003 "Decision on Implementation of Section 3406(b)(2) of

18  the Central Valley Project Improvement Act" ("May 2003 Decision") states that "the Service will target

19  using approximately 200,000 acre feet of (b)(2) water in October through January for fishery purposes."

20  USBR 00299. However, these targets "are not [] cap[s] and may vary from year to year depending on

21  fishery needs." _Id_.

22  　　　　To a certain extent, Federal Defendants also have discretion to determine whether to take (b)(2)

23  actions at all in a given year. Federal Defendants may decide to "bank" some quantity of their (b)(2)

24  budget for a future year. The May 2003 Decision explains that "Interior has discretion to determine

25  whether to bank (b)(2) water," after FWS has "request[ed] that (b)(2) water be banked in CVP or non-

1   CVP facilities for fish and wildlife purposes." USBR 00304. In addition, Federal Defendants may

2   manage their 800,000 AF (b)(2) budget by making some portion of the water available for other CVP

3   purposes. CVPIA § 3406(b)(2)(D) states: "If the quantity of water dedicated under this paragraph, or

4   any portion thereof, is not needed for the purposes of this section, based on a finding by the Secretary,

5   the Secretary is authorized to make such water available for other project purposes." In *San Luis v.*

6   *United States*, 672 F.3d at 705 n.29, the Ninth Circuit explained: "if the Secretary finds that there is a

7   portion of that yield which is not needed for purposes of section 3406, the Secretary is 'authorized' (not

8   ordered) to make such water available for other project purposes." However, there is no clear indication

9   in the record that the Secretary made a finding that the full 800,000 AF was "not needed" for (b)(2)

10  purposes in 2011.[13] Accordingly, the fact that the Secretary has some discretion to reallocate (b)(2)

11  water to other project purposes appears not to be relevant in this case.[14]

12      Nevertheless, overall, the Secretary has considerable discretion in the timing and manner by

13  which it may implement CVPIA § 3406(b)(2). In sum, while CVPIA § 3406(b)'s command that the

14  Secretary operate the CVP "to meet all obligations under state and Federal law," elevates specific legal

15  mandates, such as those imposed by ESA biological opinions, over other provisions of the CVPIA, the

16  800,000 AF dedication set forth in CVPIA § 3406(b)(2) is not such a specific legal mandate. The

17  Secretary is entitled to considerable discretion in the timing of and manner by which it may make

18

19  [13] Plaintiffs also argue that the record indicates Defendants anticipated that they would not use the entire 800,000 AF budget in the 2011 water year for fish actions. Doc. 100 at 27. In June 2011, Reclamation deemed options that would bank (b)(2)

20  water for the next year "infeasible" because "all reservoirs are expected to fill this summer and there will be no room to hold water over." FWS 00065. In a June 3, 2011 email, NMFS staff acknowledged that even if the agencies made a June export reduction with a 90,000 AF water cost, the (b)(2) accounting projected using only 690,000 AF of the 800,000 AF (b)(2)

21  budget. FWS 00088. But, this does not establish that the agency had unbridled discretion to not utilize the entire 800,000 AF in any given year, as any decision to do so would have to be accompanied by a finding under CVPIA § 3406(b)(2)(D) that the water was "not needed."

22  [14] Plaintiffs suggest that Federal Defendants "understood they were not required to reduce exports during June 2011," pointing to the May 26, 2011 email from Oppenheim, in which he explained that the agencies had, at that time,

23  "approximately 186 TAF of [(b)(2)] water for protective fish actions, banking for next year, or the Fall X2 study" and indicated to the group that, as decision-makers, "[w]e should be discussing what we are planning on doing with this windfall." FWS 00001. The email discussed potential export reductions through June, and noted that if the agencies decided

24  not take the action, they "should at least have a reason" for rejecting it. *Id.* The email then identified three possible rationales for not ordering export reductions in June. *Id.* But, absent any evidence that Oppenheim's email presents the legal position of the agency, the fact that Oppenheim searched for a rationale for not taking the action establishes nothing more than what an

25  individual within the agency believed.

1  dedications under the (b)(2) program. This fact distinguishes actions take under CVPIA § 3406(b)(2)

2  from those taken pursuant to ESA biological opinions.

3        Federal Defendants argue that the existence of alternative types of actions and alternative times

4  during which actions could be taken is not dispositive, because being forced to redirect (b)(2) water

5  away from (b)(2) purposes identified by agency staff to instead comply with Article 6(g)'s command

6  impermissibly hamstrings Reclamation's discretion under CVPIA § 3406(b)(2). *See* Doc. 109 at 13. A

7  footnote in *San Luis v. United States*, 672 F.3d 676, helps to explain why this argument is not

8  persuasive. There, the Ninth Circuit explained that Reclamation's implementation of CVPIA §

9  3406(b)(2) is itself constrained by the limiting language in CVPIA § 3406(b), which requires the CVP to

10 "meet all obligations under State and Federal law":

11           It is not true, of course, that Interior's discretion is unlimited. First, the
             referenced discretion pertains to the allocation among competing uses for
12           the 800,000 AF in the (b)(2) account. Second, at the very least, it is
             constrained by the limiting language in the CVPIA itself that requires the
13           CVP "to meet all obligations under State and Federal law," as this court
             has acknowledged. *See Central Delta [Water Agency v. Bureau of*
14           *Reclamation]*, 452 F.3d [1021,] 1024 [(9th Cir. 2006)].

15 *Id*. at 697 n. 22. According to this reasoning, CVPIA § 3406(b)(2) is <u>itself</u> limited by the "obligations

16 under State and Federal law." It would be entirely circular to conclude, as Federal Defendants suggest,

17 that CVPIA § 3406(b)(2) is, instead, an "obligation under ... Federal law" that limits the operation of

18 other provisions of the CVPIA, such as CVPIA § 3411(b).

19        Relatedly, Federal Defendants suggest that Article 6(g)'s phrase "as much water as possible"

20 operates as a back door mechanism for elevating CVPIA § 3406(b)(2)'s direction to dedicate 800,000

21 AF to fish and wildlife purposes over COA Article 6(g)'s own mandate. *See* Doc. 109 at 6 (Federal

22 Defendants arguing that Reclamation "exported and stored 'as much water as possible' given [Federal]

23 Defendants' obligations under § 3406(b)(2)"). However, Federal Defendants fail to consider the phrase

24 "as much water as possible" in context. *Robinson v. Shell Oil Co*., 519 U.S. 337, 341(1997) ("The

25 plainness or ambiguity of statutory language is determined by reference to the language itself, the

28

1    specific context in which that language is used, and the broader context of the statute as a whole.").

2    COA Article 6(g) requires each party to "export and store as much water as possible <u>within its physical</u>

3    <u>and contractual limits</u>." Because there is no mention in COA Article 6(g) that the COA parties'

4    obligations may be offset by "legal" requirements, there is no basis for reading such an exception into

5    the plain language.[15] *See Botosan v. Paul McNally Realty*, 216 F.3d 827, 832 (9th Cir. 2000) ("The

6    incorporation of one statutory provision to the exclusion of another must be presumed intentional under

7    the statutory canon of *expressio unius*."); *United States v. Crane*, 979 F.2d 687, 691 n.2 (9th Cir.1992)

8    ("The maxim of statutory construction, '*expressio unius est esclusio alterius*' provides that '[w]hen a

9    statute limits a thing to be done in a particular mode, it includes the negative of any other mode.'").

10            Neither CVPIA § 3406(b) nor the text of Article 6(g) itself elevate CVPIA § 3406(b)(2)'s

11    "mandate" over that Article 6(g)'s command to "export and store as much water as possible within its

12    physical and contractual limits."

13                            **(3)        "Possible" Argument.**

14            COA Article 6(g) states: "during excess conditions each party has a responsibility to export and

15    store as much water as possible within its physical and contractual limits." USBR 00017. Federal

16    Defendants assert that the use of the term "possible" leaves the determination of whether something is

17    "possible" to agency discretion. Doc. 109 at 10-11. Federal Defendants point out that in litigation

18    surrounding CVPIA § 3406(b)(2), the Ninth Circuit found that a provision of the CVPIA using the

19    phrase "to the greatest degree practicable" was "left to Interior's expertise and discretion." *San Luis v.*

20    *United States*, 672 F.3d at 707. Federal Defendants also point to numerous other cases in which the

21    terms "possible" and "practicable" were interpreted permissively. Doc. 109 at 10-11 (citing *Freeze v.*

22    *City of Decherd, Tenn.*, 753 F.3d 661, 670-71 (6th Cir. 2014) (Griffin, J., dissenting); *Tuft v. McDonnell*

23    *Douglass*, 517 F.2d 1301, 1307 (8th Cir. 1975); *Joihner v. McEvers*, 898 F.2d 569, 571 (7th Cir. 1990);

24    _____

25    [15] Whether CVPIA § 3406(b) imposes such a requirement is a separate question addressed below.

1  *Miami Bldg. & Constr. Trades Council v. Sec'y of Def.*, 143 F. Supp. 2d 19, 25 (D.D.C. 2001); *Figueroa*

2  *v. United States*, 64 F. Supp. 2d 1125, 1131 (D. Utah 1999); *Rivera Acevedo v. United States*, No. Civ.

3  04-1232 (JAF), Civ. 04-1372 (JAF), 2005 WL 5610230, at *5 (D.P.R. Apr. 25, 2005); *Loughlin v.*

4  *United States*, 286 F. Supp. 2d 1, 16 (D.D.C. 2003); *Whalen v. United States*, 29 F. Supp. 2d 1093, 1098

5  (D.S.D. 1998)).

6       The Court has examined all of these cases and the statutory provisions at issue in them and finds

7  COA Article 6(g)'s use of the term "possible" distinguishable. In each case cited, the statutory language

8  at issue, when read in context, rendered permissive otherwise mandatory language. For example, at issue

9  in *San Luis*, 672 F.3d at 707, was CVPIA § 3406(b)(1)(C), which provides that:

10            The Secretary shall cooperate with the State of California to ensure that, <u>to</u>
            <u>the greatest degree practicable</u>, the specific quantities of yield dedicated to
11            and managed for fish and wildlife purposes under this title are credited
            against any additional obligations of the Central Valley Project which may
12            be imposed by the State of California following enactment of this title,
            including but not limited to increased flow and reduced export obligations
13            which may be imposed by the California State Water Resources Control
            Board in implementing San Francisco Bay/Sacramento–San Joaquin Delta
14            Estuary standards pursuant to the review ordered by the California Court
            of Appeals in *United States v. State Water Resources Control Board*, 182
15            Cal.App.3d 82 [] (1986), and that, <u>to the greatest degree practicable</u>, the
            programs and plans required by this title are developed and implemented
16            in a way that avoids inconsistent or duplicative obligations from being
            imposed upon Central Valley Project water and power contractors.
17
   *Id*. (citing 106 Stat. at 4715) (emphasis added). The Ninth Circuit reasoned that the "to the greatest
18
   degree practicable" language indicated that
19
20            any crediting against the dedicated 800,000 AF of CVP yield stemming
            from the overlap between actions taken for the primary (b)(2) purpose and
            actions required by post-1992 water quality and ESA measures would be
21            left to Interior's expertise and discretion.

22  *Id*.

23       At issue in *Tuft*, 517 F.2d at 1307, was a provision of Title VII of the Civil Rights Act of 1964

24  that provides, in pertinent part:

25            The [Equal Employment Opportunity] Commission shall make its

determination on reasonable cause <u>as promptly as possible and, so far as</u> <u>practicable</u>, not later than one hundred and twenty days from the filing of the charge or ... from the date upon which the Commission is authorized to take action with respect to the charge.

42 U.S.C. § 2000e-5(b) (emphasis added). The Eighth Circuit concluded that the language "as promptly as possible and, so far as practicable" demonstrates that Congress did not set specific administrative deadlines. *Tuft*, 517 F.2d at 1307.

*Joihner*, 898 F.2d at 571, concerned a provision of Illinois law addressing prisoner transfers to work camps that provided:

> The [Illinois] Department [of Corrections] shall, <u>insofar as possible</u>, employ at useful work committed persons confined in institutions and facilities of the Department, who are over the age of compulsory school attendance, physically capable of such employment, and not otherwise occupied in the programs of the Department.

Ill. Rev. Stat. ch. 38, para. 1003–12–1 (emphasis added). At issue was whether the prison regulations contained the kind of mandatory language necessary to create a protectable liberty interest for purposes of establishing a procedural due process claim. *Joihner*, 898 F.2d at 570-71. Because the statute required employment only "insofar as possible," the Eighth Circuit found the existence of such discretion negated the creation of a protected liberty interest. *Id*. at 571.

*Miami Building*, 143 F. Supp. 2d at 25, addressed a provision of the Defense Base Closure and Realignment Act of 1990, which provided:

> Not later than 12 months after the date of the submittal to the Secretary of Defense of a redevelopment plan for an installation approved for closure under a base closure law, the Secretary of Defense shall, <u>to the extent</u> <u>practicable</u>, complete any environmental impact analyses required with respect to the installation, and with respect to the redevelopment plan, if any, for the installation, pursuant to the base closure law under which the installation is closed, and pursuant to the [National Environmental Policy Act ("NEPA")].

(Emphasis added.) The plaintiffs in *Miami Building* argued this provision operated "as an absolute requirement that all procedures that defendants have to follow under NEPA must be completed within 12 months." *Id*. The district court concluded that the statute's use of phrase "to the extent practicable"

31

1  suggested "that there is some discretion and flexibility given to the Air Force to complete the

2  [environmental impact statement ("EIS")] as required by NEPA." *Id.*

3            The Court concludes that the best reading of Section 2911 is that the
             phrase "to the extent practicable" modifies the time in which the EIS must
4            be prepared and does not modify or eliminate the Air Force's
             responsibilities under NEPA. Here, it was not practicable—that is, feasible
5            or possible—to comply with all the requirements of NEPA within 12
             months from the date the redevelopment plan had been submitted to the
6            Air Force.

7  *Id.*

8            In *Figueroa*, the district court in Utah examined the following language in a Forest Service

9  Manual

10           *2332.12* - Other Natural Hazards. <u>If possible</u>, correct known natural
             hazards when a site is developed and opened for public use. If it is not
11           possible to remove the hazard, take immediate steps to protect the public
             from the hazard. Tailor the action taken to each hazardous situation. Post
12           signs or other notices at a minimum. Consider installing barriers or closing
             the site altogether to ensure public safety.

13  64 F. Supp. 2d at 1131 (emphasis added). Citing *Aragon v. United States*, 146 F.3d 819, 824 (10th Cir.

14  1998), the district court noted that the Tenth Circuit had "already held that such language 'is a prime

15  example of discretionary language, which g[ives] federal agencies a choice or judgment on what action

16  to take, if any.'" *Id.*

17           In *Loughlin*, claimants contended that the Army did not comply with a set of internal guidelines

18  applicable to the cleanup of former military establishments. 286 F. Supp. 2d at 16. Specifically,

19  claimants alleged the Army "failed to establish a Restoration Advisory Board (RAB) to facilitate public

20  education about the cleanup effort," arguably required by 10 U.S.C. § 2705(c), which provides:

21           <u>Whenever possible and practical</u>, the Secretary shall establish a technical
             review committee [TRC] to review and comment on Department of
22           Defense actions and proposed actions with respect to releases or
             threatened releases of hazardous substances at installations.
23

24  *See also* 10 U.S.C. § 2705(d) (allowing a RAB to take the place of a TRC "where the Secretary is

25  planning or implementing environmental restoration activities"). Citing *Aragon*, the district court

32

1   concluded that "[t]he statute leaves the establishment of a RAB firmly within the discretion of the

2   Secretary of Defense." 286 F. Supp. 2d at 16.

3               A RAB is not required under any and all circumstances; instead, one is
            properly formed where doing so is "possible and practical." Such language
4           is fundamentally at odds with the [existence] of [a] mandatory directive ....

5   *Id.*

6           *Rivera Acevedo* concerned a 1983 memorandum of understanding ("MOU") between the Navy

7   and the Commonwealth of Puerto Rico that required

8               that the Navy undertake certain efforts including, in relevant part, that the
            Navy, "to the extent possible," keep the use of live ordnance to the
9           absolute minimum, that noise from the bombing be reduced, remain
            sensitive to fragile ecological and environmental matters, and assist the
10          community through increased investment.

11  2005 WL 5610230, at *5. Citing both *Aragon* and *Loughlin* for the proposition that the phrase "to the

12  extent possible" is a prime example of discretionary language, the district court concluded that the MOU

13  "does not contain any specific and mandatory directives; rather, it contains broad goals for the Navy to

14  attempt to meet." *Id.*

15              The MOU clearly leaves to the Navy's best judgment and choice precisely
            how to achieve these worthy goals while at the same time fulfilling its
16          mission ....

17  *Id.*

18          In *Whalen*, the district court in South Dakota examined Badlands National Park management

19  guidelines that indicated "hazards are 'to the greatest degree possible' to be made aware to visitors." 29

20  F. Supp. 2d. at 1098. The estate of an injured visitor argued that the language required the National Park

21  service to put up signs in a particular hazard area. The district court interpreted this provision "less

22  stringently than d[id] plaintiffs," finding "the language 'to the greatest degree possible' is inherently

23  discretionary and requires a balancing of factors by park officials." *Id.*

24          Here, COA Article 6(g) states: "during excess conditions each party has a responsibility to

25  export and store as much water as possible within its physical and contractual limits." USBR 00017.

1   This is an affirmative command to export and store "as much water as possible." If that were all COA

2   Article 6(g) required, Federal Defendants might have a stronger argument with regard to the

3   implications of the word "possible." But, instead, COA Article 6(g) modifies the term possible with the

4   phrase "within its physical and contractual limits." In so doing, COA Article 6(g) indicates intent to

5   transform the normally permissive term into a <u>command</u>, subject only to "physical and contractual

6   limits." As previously discussed, neither physical nor contractual limits constrained Reclamation's

7   actions in June 2011.

8              **(4)      "Notwithstanding" Argument.**

9          Federal Defendants also argue that CVPIA § 3411 itself indicates that this provision is not meant

10  to control over other provisions in the CVPIA. Federal Defendants point to Section 3411(a), which

11  provides:

12              Notwithstanding any other provision of this title, the Secretary shall, prior
               to the reallocation of water from any purpose of use or place of use
13             specified within applicable Central Valley Project water rights permits and
               licenses to a purpose of use or place of use not specified within said
14             permits or licenses, obtain a modification in those permits and licenses, in
               a manner consistent with the provisions of applicable State law, to allow
15             such change in purpose of use or place of use.

16  While it is true that courts typically have construed a "notwithstanding" clause as "clearly signal[ing]

17  the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions

18  of any other section," *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993); *see also United States v.*

19  *Novak*, 476 F.3d 1041, 1046-47 (9th Cir. 2007), CVPIA § 3411(a) is not at issue in this case. In contrast,

20  CVPIA § 3411(b) provides:

21              The Secretary, <u>in the implementation of the provisions of this title</u>, shall
               fully comply with the United States' obligations as set forth in the
22             "Agreement Between the United States of America and the Department of
               Water Resources of the State of California for Coordinated Operation of
23             the Central Valley Project and the State Water Project: dated May 20,
               1985, and the provisions of Pub. L. 99-546; and shall take no action which
24             shifts an obligation that otherwise should be borne by the Central Valley
               Project to any other lawful water rights permittee or licensee.

25

                                        34

1  (Emphasis added.) The "notwithstanding" language in CVPIA § 3411(a) is simply inapposite here. If

2  anything, it serves to set off in contrast the language of CVPIA § 3411(b) indicating its terms should be

3  applied to the entirety of the CVP.

4         **b.**    **Canons of Statutory Construction.**

5         **(1)**    **Are the Relevant Statutory Provisions Ambiguous?**

6        Having found that none of the parties' competing arguments regarding the plain language of the

7  relevant statutory provisions definitively settles how CVPIA § 3406(b)(2) and CVPIA § 3411(b)/COA

8  Article 6(g) relate to one another, the Court next turns to the question of whether the provisions are

9  ambiguous. Plaintiffs point out, correctly, that Federal Defendants fail to identify specifically any

10 ambiguity in any of the relevant statutory provisions. Doc. 107 at 7. However, statutory language can be

11 rendered ambiguous by other, inconsistent statutory language. *See Carlson v. C.I.R.*, 712 F.2d 1314,

12 1315 (9th Cir. 1983); *see also C.I.R. v. Tufts*, 461 U.S. 300, 315 (1983) ("apparent conflict of [statute's]

13 subsections renders the facial meaning of the statute ambiguous, and therefore [a court] must look to the

14 statute's structure and legislative history"). As discussed above, neither CVPIA § 3406(b) nor the text of

15 Article 6(g) itself explicitly elevate CVPIA § 3406(b)(2)'s "mandate" over COA Article 6(g)'s

16 command to "export and store as much water as possible within its physical and contractual limits."

17 However, the absence of an explicit command elevating CVPIA § 3406(b)(2) over § 3411 does not

18 settle the dispute in this case. When the key provisions at issue are considered together, an apparent

19 conflict exists between CVPIA § 3406(b)(2)'s mandate to dedicate 800,000 AF of water to fish and

20 wildlife purposes coupled with CVPIA § 3411's command to comply with the COA. This creates

21 enough of an ambiguity on the question of how the Secretary may implement CVPIA § 3406(b)(2)

22 during times of excess conditions to warrant resort to the canons of statutory interpretation. In so doing,

23 "[a] court must interpret the statute "as a symmetrical and coherent regulatory scheme, and fit, if

24 possible, all parts into an harmonious whole." *Food & Drug Admin. v. Brown & Williamson Tobacco*

25 *Corp.*, 529 U.S. 120, 133 (2000) (internal citation and quotation omitted).

a.   **Purpose/Context.**

When the language to be interpreted is ambiguous, a court may use the statute's overall purpose to "illuminate Congress's intent." *Ileto.*, 565 F.3d at 1133. Here, Plaintiffs argue and Federal Defendants do not materially dispute that the COA was a historic peace treaty wherein the federal government received a reprieve from ongoing litigation and a more secure water supply in exchange for agreeing to contribute to meeting water quality standards. *See generally* COA House Report at 6-7. But, while establishing that the COA was intended to be a peace treaty provides some context for interpretation of its provisions, it does not aid substantially resolution of the specific dispute in this case.

Federal Defendants point out that the COA was also designed to preserve operational flexibility and argue that Plaintiffs' interpretation of COA Article 6(g) is inconsistent with that purpose. But, the devil is in the details. Federal Defendants do point to many provisions of the COA that promote operational flexibility. *See*, *e.g.*, COA, Art. 2 ("Both the State and the United States are dedicated to utilizing their existing and future water conservation facilities so as to provide the maximum benefits to the people of California and the Nation and believe that through the coordinated and cooperative operation of State and Federal facilities, these benefits can be maximized."), USBR 00008-9; Art. 6(a)(3) ("As either party proceeds toward the full utilization of its project, any changes in the underlying assumptions with respect to the development of the two projects and the demands for water from each project will be reflected by recomputing the annual water supplies specified [elsewhere in the COA."), USBR 00013-14; Art. 6(f) ("If the Sacramento Valley inbasin use changes, upstream reservoir releases and/ or exports will be modified based on the current accumulation identified in subarticle 6(e) and/ or the daily share of responsibility computed in subarticles 6(c) and 6(d)."), USBR 00016; Art. 6(h) ("Unless otherwise agreed, whenever a party's storage withdrawal available for export is greater than its export capability, the difference shall be available for export by the other party without affecting either party's future respo-nsibility for providing storage withdrawals to meet Sacramento Valley inbasin use."), USBR 00017; Art. 6(i) (Unless otherwise agreed, whenever a party's share of· unstored water for

export exceeds its exports, the unusable portion is available for export by the other party without affecting either party's daily sum of stored water."), USBR 00017; Art. 9 ("If any forecast indicates that either the United States or the State, or both, will be unable to meet the anticipated demands of its water users during the balance of the calendar year, representatives of the United States and the State shall confer on possible procedures for making joint operational changes to minimize the shortage."), USBR 00018-19;  Art. 10a ("Either party may make use of its facilities available to the other party for pumping and conveyance of water by written agreement."), USBR 00019; Art. 11(a) ("Should the State Water Resources Control Board establish new Delta standards, and the United States determines that operation of the [CVP] in conformity with the new Delta standards is not inconsistent with Congressional directives the parties shall amend Exhibit A to conform with the new Delta standards and amend this agreement to the extent necessary to provide for continued operation of both projects to accomplish the purposes of this agreement."), USBR 00024, 00026; Art. 14(a) (explaining process by which the parties to the COA periodically meet and confer to review project operations and agree upon revisions to the COA), USBR 00028.

In contrast, COA Article 6(g) contains no such language, instead declaring very specifically that: "During excess water conditions each party has the responsibility to export and store as much water as possible within its physical and contractual limits." USBR 00017. Operational flexibility is certainly a goal of the COA as a whole, but as a historic "peace treaty," the COA also included provisions that operate as firm requirements, the omission of flexibility in light of the maxim of statutory construction *expressio unius est esclusio alterius*. *See Botosan*, 216 F.3d at 832.

Federal Defendants also point to the purposes of the CVPIA, which are:

> (a)  To protect, restore, and enhance fish, wildlife, and associated habitats in the Central Valley and Trinity River basins of California;
>
> (b)  To address impacts of the Central Valley Project on fish, wildlife and associated habitats;
>
> (c)  To improve the operational flexibility of the Central Valley Project;

(d)  To increase water-related benefits provided by the Central Valley Project to the State of California through expanded use of voluntary water transfers and improved water conservation;

(e)  To contribute to the State of California's interim and long-term efforts to protect the San Francisco Bay/Sacramento-San Joaquin Delta Estuary;

(f)  To achieve a reasonable balance among competing demands for use of Central Valley Project water, including the requirements of fish and wildlife, agricultural, municipal and industrial and power contractors.

CVPIA § 3402. While the stated purposes of the CVPIA include protection and restoration of fish and wildlife, as well as operational flexibility, they also include achievement of balance between competing demands for use. The CVPIA, like the COA, was a compromise. *San Luis & Delta-Mendota Water Auth. v. U.S. Dep't of Interior*, 637 F. Supp. 2d 777, 793 (E.D. Cal. 2008) ("The CVPIA represented a compromise between competing needs for limited CVPIA yield."). As with the COA's purposes, the CVPIA's stated purposes do not substantially resolve the present dispute.[16]

### b.  Specific v. General.

Both parties invoke the "well established canon of statutory interpretation ... that the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2070-71 (2012) (internal citation and quotation omitted). This canon is "most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission," in which case the specific provision is construed as an exception to the general one." *Id.* "But the canon has full application as well to statutes ... in which a general authorization and a more limited, specific authorization exist side-by-side. There the canon avoids not contradiction but the superfluity of a

---

[16] Relatedly, Federal Defendants point out that while CVPIA § 3406(b)(2) cites numerous purposes to which the 800,000 AF designation could be put, primacy is given to the purpose of "implementing the fish, wildlife, and habitat restoration purposes and measures authorized by [the CVPIA]," including restoring anadromous fish populations. *See* Doc. 105 at 4. But, there is no dispute that the June 2011 pumping reduction was implemented to serve the primary purpose. Nor do Plaintiffs dispute that the record supports the agency's conclusion, from a scientific perspective, that the pumping reduction would aid anadromous fish. To the extent Federal Defendants suggest that the primacy of anadromous fish protection vis-a-vis the other purposes articulated as permissible uses of the 800,000 AF of water translates into primacy of fishery purposes over other provisions of the CVPIA, Federal Defendants offer no support for such a proposition.

1  specific provision that is swallowed by the general one, [and supports the] cardinal rule that, if possible,

2  effect shall be given to every clause and part of a statute." *Id.* (internal citation and quotation omitted). [17]

3       Federal Defendants argue that the COA is a "general agreement meant to allow for coordinated

4  operation of the CVP and the [SWP] to serve the purposes of conserving water and maximizing benefits

5  to California and the nation." Doc. 105 at 2. Federal Defendants maintain that CVPIA § 3406 is the

6  more specific congressional command because it is aimed at a particular problem and offers specific

7  solutions, and therefore that it takes precedence over the general responsibilities set forth in CVPIA §

8  3411. But Federal Defendants' argument only rings true if one avoids examination of the COA itself,

9  with which CVPIA § 3411 commands that the Secretary comply. The Court has been unable to locate

10  (and the parties have not cited) any case that addresses statutory language that commands a federal

11  agency to comply with the terms of a contractual agreement. As explained above, the most

12  straightforward interpretation of the language at issue in this case – which directs the Secretary to "fully

13  comply with the United States' obligations as set forth in the COA" – is that Congress intended to

14  incorporate by reference the terms of the COA itself as obligations under CVPIA § 3411. In light of this,

15  the question is whether the relevant provisions of the COA, not the language of CVPIA § 3411, are more

16  or less specific than CVPIA § 3406(b)(2). As previously discussed, the key COA provision, Article 6(g),

17  provides that during periods of excess conditions "each party has the responsibility to export and store as

18  much water as possible within its physical and contractual limits." Art. 6(g) (USBR00017).

19       On the one hand, CVPIA § 3406(b)(2) specifies a particular volume of water, 800,000 AF, to be

20  utilized, while COA Article 6(g) does not. [18] CVPIA § 3406(b)(2) also specifies purposes to which that

21

22  [17] Plaintiffs also rely on an infrequently cited canon of statutory construction that stands for the proposition that, even if there
   is an irreconcilable conflict between two statutory provisions, the provision that is latest in sequence within the statute (i.e.,
23  the highest numbered) controls. *See United States v. Jackson*, 143 F. 783, 787 (9th Cir. 1906); *see also United States v.
   Moore*, 567 F.3d 187, 191 (6th Cir. 2009). The Court finds it unnecessary to rely on this canon, as there is no irreconcilable
   conflict in this case.
24  [18] Relatedly, Plaintiffs argue that Article 6(g) is less specific than other language in COA Article 6, such as Article 6(d),
   which provides for the sharing of responsibility between Reclamation and DWR during balanced water conditions and
25  specifies particular percentages each entity is responsible for contributing. Doc. 105 at 18. But this case is not about resolving
   any conflict between the various sub-articles within Article 6. The question here is whether Article 6(g) is more specific than

1  water is to be dedicated. However -- and this is critical to this case -- CVPIA § 3406(b)(2) does not say

2  exactly _how_ the 800,000 AF should be managed or scheduled (i.e., where it should be utilized and for

3  what specific purposes, let alone _when_ the water should be dedicated). As the key dispute in this case is

4  whether or not the Secretary acted unlawfully in choosing to time CVPIA § 3406(b)(2) releases during a

5  period of excess conditions in such a way as to interfere with the "export and storage" of water pursuant

6  to COA Article 6(g), the relative specificity of the two provisions prescriptions regarding timing is key.

7  Article 6(g), in contrast, requires the Secretary to "export and store as much water as possible within its

8  physical and contractual limits" during periods of "excess conditions," the occurrence of which is

9  defined specifically in the COA.[19]

10      All in all, the Court finds COA Article 6(g) to be more specific than CVPIA § 3406(b)(2).

11  Because the more specific governs the general, during excess conditions, the Secretary cannot invoke

12  CVPIA § 3406(b)(2) in a manner that renders ineffectual the commands of COA Article 6(g).[20]

13              **c.    Avoiding Absurd Results.**

14      Federal Defendants also argue that Plaintiffs' interpretation of the relevant statutory and COA

15

16  CVPIA § 3406(b)(2).
   [19] In its Findings of Fact and Conclusions of Law re Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, this Court stated that "[t]he COA's statutory duty 'to export and store as much water as possible' during excess

17  water conditions is not temporally limited, as the current 2011 water year does not end until September 30, 2011." Doc. 100 at 18 n.3. On further reflection, particularly in light of the fact that the existence of excess conditions is evaluated on a daily

18  basis under the COA, the Court does not adopt this preliminary finding here.
   [20] The Parties make reference to _Arizona Power Pooling Ass'n v. Morton_, 527 F.2d 721 (9th Cir. 1975), which concerned a provision of the Colorado River Basin Project Act ("CRBPA"), 43 U.S.C. § 1523(a), which authorized the Secretary to

19  devise "the most feasible plan" for obtaining pumping power for the Central Arizona Project. _Id._ at 723. While this language "would seem to endow [the Secretary] with almost unlimited authority in orchestrating all phases of the project, _id._ at 727,

20  another provision of the CRBPA incorporated by reference all other "Federal reclamation laws." _Id._ at 724 (citing 43 U.S.C. § 1554). Specifically, the Federal Reclamation Project Act of 1939 contains a preference clause applying to any sale of electric power or lease of power privileges by the United States, giving preference to municipalities, other public

21  corporations or agencies, and cooperatives and nonprofit organizations. 43 U.S.C. § 485h(c). Customers preferred under this provision sued. _Id._ at 724. Federal Defendants asserted that the Secretary had so much discretion under the "most feasible

22  plan" language that the APA's judicial review provisions did not even apply, citing 5 U.S.C. § 701 (indicating the APA does not apply to "agency action ... committed to agency discretion by law"). _Id._ at 725. The Ninth Circuit found that Congress

23  "circumscribed [the Secretary's] discretion in at least one way by making [the Secretary's] actions subject to the federal reclamation laws." _Id._ at 727. Plaintiffs argue that the present case is analogous to _Arizona Power_ insofar as this case

24  involves a general grant of discretion (CVPIA § 3406(b)(2)'s instruction to dedicate and manage 800,000 AF of CVP yield for fish and wildlife purposes) that is circumscribed by the specific commands of CVPIA § 3411. Doc. 107 at 19-20. While this case is distantly analogous to _Arizona Power_, because the key holding in _Arizona Power_ framed in terms of the APA's

25  "committed to agency discretion by law" standard, which is inapplicable here, the Court finds that _Arizona Power_ provides little guidance.

1  language "could mean that in some years, [Federal] Defendants would be entirely unable to meet their

2  obligations under CVPIA § 3406(b)(2)...." Doc. 105 at 20. Federal Defendants explain this concern as

3  follows:

4          For example ... the system might be in excess water conditions for an
          entire water year or most of any given water year. In that case, under
5          Plaintiffs' interpretation, Defendants would be required to export and then
          store in downstream reservoirs as much water as possible for most or all of
6          the water year. In that situation, Defendants might be unable to meet their
          statutory responsibilities under the ESA[21] or § 3406(b)(2), despite the very
7          clear congressional mandate to do so.

8  *Id*.

9          Federal Defendants urge an interpretation that would avoid this "absurd result." Doc. 109 at 14.

10  In construing statutes, "absurd results are to be avoided." *United States v. Turkette*, 452 U.S. 576, 580

11  (1981); *see also Ma v. Ashcroft*, 361 F.3d 553, 558 (9th Cir. 2004) ("[S]tatutory interpretations which

12  would produce absurd results are to be avoided."). In contrast, a court should interpret the statute "as a

13  symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole."

14  *Williamson Tobacco Corp*., 529 U.S. at 133 (internal citation and quotation omitted). Federal

15  Defendants maintain that their interpretation evidences a "reasonable harmonization" of the competing

16  statutory provisions.

17          The record simply does not reflect that the result hypothesized by Federal Defendants is likely to

18  occur. The record is devoid of information suggesting Federal Defendants would have been unable to

19  meet their obligations under CVPIA § 3406(b)(2) had they been unable to implement the 2011 pumping

20  reductions.[22] In contrast, as discussed above, the record does reflect that Reclamation had discretion to

21

22  ─────────────────────

    [21] As explained elsewhere in this Memorandum Decision, the Court is not persuaded by Federal Defendants' repeated
23  suggestion that Reclamation's obligations under CVPIA § 3406(b)(2) are equivalent to those under the ESA. Here, the Court
    focuses on only the statutory commands of CVPIA § 3406(b)(2).
    [22] For example, Federal Defendants posit a hypothetical situation in which excess water conditions existed for the entire
24  water year. Doc. 105 at 20-21. According to Plaintiffs such circumstances are "rare," Doc. 107 at 22 n.11, but no party
    presents record evidence (or, for that matter, any evidence) that would permit the Court to actually determine the frequency
    of such events. Regardless, even in such years, as discussed above, Defendants would have numerous options other than
25  export reductions to "dedicate and manage" water under the (b)(2) program.

                                                    41

1   implement other types of (b)(2) actions during the relevant time period that would not have necessitated

2   export cuts during excess water conditions. The Court will not base its statutory interpretation upon a

3   hypothesis that is unsupported by record evidence.

4               **d.      Legislative History.**

5           If statutory language is ambiguous, a court may refer to legislative history to discern

6   Congressional intent. *Tides v. The Boing Co.*, 644 F.3d 809, 814 (9th Cir. 2011). The Court has

7   thoroughly examined the legislative history of both P.L. 99-546 and the CVPIA for any information that

8   might illuminate the present dispute. The legislative history of P.L. 99-546 underscores the importance

9   of the COA as a means for resolving a dangerous "logjam" in the operation of the CVP, COA House

10  Report at 6-7, but does not otherwise shed light on the questions critical to this case. The legislative

11  history of the CVPIA, which has been examined in detail in other decisions and has been re-examined

12  by the Court in this case, is likewise essentially silent with respect to the purpose and relative weight of

13  CVPIA § 3411 vis-a-vis any other CVPIA provision.

14              **e.      Third Party Beneficiaries/Waiver.**

15          Federal Defendants advance two additional arguments that merit some discussion. First, Federal

16  Defendants argue that because Plaintiffs are third parties "seeking to interpret and enforce [a] contract to

17  which they are not [] partie[s]... their interpretation should not control over the interpretation of the

18  parties to the COA." Doc. 109 at 16. Federal Defendants cite *Klamath Water Users Protective Ass'n v.*

19  *Patterson*, 204 F.3d 1206, 1211-12 (9th Cir. 1999), for the well-established rule that third-party

20  beneficiaries may not enforce a contract absent clear intent to the contrary expressed in that contract.

21  While Federal Defendants are correct that Plaintiffs, as third-party beneficiaries of the COA, likely have

22  no right to enforce the COA's terms under contract law, Plaintiffs' claims arise under the APA. As

23  discussed above, CVPIA § 3411 incorporated the terms of the COA into the CVPIA. Therefore, as

24  Federal Defendants acknowledge, Doc. 109 at 16, Plaintiffs may allege under the APA that Defendants

25  acted contrary to law.

1       Federal Defendants appear to emphasize Plaintiffs' status as third-party beneficiaries to

2    encourage the Court to find reasonable Federal Defendants' interpretation of the relevant statutory

3    provisions. Doc. 109 at 16. Federal Defendants point out that the two parties to the COA, Reclamation

4    and DWR, acted in coordination to implement the June 2011 pumping reductions. In a footnote, Federal

5    Defendants suggest that, under COA Article 19, the parties to the COA can waive violations of the COA

6    and that this "cast[s] further doubt on the idea that a third party, through the APA or otherwise, can

7    bring suit to enforce the COA when neither of the parties to the COA objected to operations." *Id.* at 16

8    n.5.

9       This argument is not persuasive for several reasons. First, the suggestion that Plaintiffs, as third-

10   party beneficiaries, may not "bring suit to enforce the COA" conflicts with Federal Defendants' own

11   admission <u>on the same page</u> that Plaintiffs may bring an APA claim that Federal Defendants acted

12   contrary to law. Second, it is not entirely clear that Article 19 provides the type of waiver mechanism

13   claimed by Federal Defendants. Article 19 states:

14                 The waiver of a breach of any of the provisions of this agreement shall not
                   be deemed to be a waiver of any other provisions hereof or of a

15                 subsequent breach of such provisions.

16   USBR 00030. While this language does imply that the parties may waive breaches of the COA's terms,

17   there is no evidence suggesting the parties to the COA viewed implementation of the June 2011

18   pumping reductions as a waiver of any obligations under Article 6(g). Even if the parties' conduct could

19   be interpreted under contract principles as an implied waiver, *Westfed Holdings, Inc. v. United States*,

20   407 F.3d 1352, 1361 (Fed. Cir. 2005) ("Implied waiver may be inferred by conduct or actions that

21   mislead the breaching party into reasonably believing that the rights to a claim arising from the breach

22   was waived.") (cited with approval in *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1125 (9th Cir.

23   2008)), the Court has been unable to identify and Federal Defendants have not cited any authority that

24   suggests it would be appropriate for a Court to apply the doctrine of implied waiver to bar a third party

25   from raising an APA claim based on a contract term incorporated by reference into a federal statute.

1  **C.**      **Summary of Statutory Construction/Analysis.**

2          To summarize, Federal Defendants' interpretation of the relevant statutory provisions is a post

3  hoc rationalization entitled to no significant deference. Even if Federal Defendants are entitled to some

4  limited deference under *Skidmore*, the applicable standard is whether Federal Defendants' interpretation

5  is "reasonable." The Court finds it is not.

6          Federal Defendants' arguments regarding the plain language of the relevant statutory and COA

7  provisions are not reasonable.

8    • While the term "export and store" does not absolutely preclude Federal Defendants from
         satisfying their obligations under Article 6(g) through upstream storage, nothing in the record
9        indicates Federal Defendants attempted to or could have done so in June 2011. Nor does
         Plaintiffs' position regarding the term "export and store" mean that Reclamation would be
10       unable to release any water from reservoirs downstream of the Delta during excess conditions.
         This potentially absurd scenario is avoided by the language in Article 6(g) requiring Reclamation
11       to "export and store as much water as possible <u>within its physical and contractual limits</u>."
         (Emphasis added.)

12   • CVPIA § 3406(b)(2)'s direction to the Secretary to "dedicate and manage" 800,000 AF of water
13       for fish and wildlife purposes is not an "obligation under ... Federal law" for purposes of CVPIA
         § 3406(b)'s requirement that the Secretary operate the CVP "to meet all obligations under state
14       and Federal law." Unlike mandatory obligations imposed under ESA biological opinions, the
         (b)(2) program is discretionary in both the timing and manner of its implementation.

15   • Inclusion of the word "possible" in COA Article 6(g) does not render its otherwise mandatory
16       language permissive.

17   • Inclusion of the phrase "[n]otwithstanding any other provision of this title..." in CVPIA §
         3411(a) is inapposite to the interpretation of CVPIA § 3411(b), which contains contrasting
18       language.

19         In the absence of an explicit command elevating CVPIA § 3406(b)(2) over CVPIA § 3411, an

20  apparent conflict exists between CVPIA § 3406(b)(2)'s mandate to dedicate 800,000 AF of water to fish

21  and wildlife purposes and CVPIA § 3411's command to comply with the COA. This creates enough of

22  an ambiguity on the question of how the Secretary may implement CVPIA § 3406(b)(2) during times of

23  excess conditions to warrant resort to the canons of statutory interpretation.

24         The stated purposes of the CVPIA are by no means dispositive of the relative priority of the

25  (b)(2) program vis-à-vis the COA.

1    The specific/general canon is more instructive. While CVPIA § 3406(b)(2) specifies a particular

2    volume of water, 800,000 AF, to be utilized and specifies purposes to which that water is to be

3    dedicated, it does not say exactly how the 800,000 AF should be managed or scheduled (i.e., where it

4    should be utilized and for what specific purposes, let alone when the water should be dedicated). COA

5    Article 6(g), in contrast, requires the Secretary to "export and store as much water as possible within its

6    physical and contractual limits" during periods of "excess conditions," the occurrence of which is

7    defined specifically in the COA. The Court finds COA Article 6(g) to be more specific than CVPIA §

8    3406(b)(2). Because the more specific governs the general, during excess conditions, the Secretary

9    cannot invoke CVPIA § 3406(b)(2) in a manner that renders ineffectual the commands of COA Article

10   6(g).

11   While Federal Defendants raise the "avoidance of absurd consequences" canon, the record is

12   devoid of information suggesting that Federal Defendants would have been unable to meet their

13   obligations under CVPIA § 3406(b)(2) had they been unable to implement the 2011 pumping reductions

14   **VI. <u>CONCLUSION AND ORDER</u>**

15   For the reasons set forth above, Plaintiffs are entitled to summary judgment on their APA claim

16   under 5 U.S.C. § 706(2) that, by imposing pumping restrictions during June 2011, Federal Defendants

17   undertook a final agency action not in accordance with law. Plaintiffs' motion for summary judgment as

18   to that claim is GRANTED. Plaintiffs' alternative motion for summary judgment on their 5 U.S.C. §

19   706(1) claim therefore is MOOT. Federal Defendants' cross motion is DENIED.

20   **SO ORDERED**
     **Dated: March 2, 2015**

21                                                          **/s/ Lawrence J. O'Neill**
                                                       **United States District Judge**

22

23

24

25

45